Kenneth K. Henderson
1266 Ryan Ln # F
Corona CA 92881
951-393-0318

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

)

Kenneth K. Henderson et al.,

)

Plaintiff

RECEIVED

AUG 21 2020

FILED

AUG 21 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

v.                                    Eastern District Court #

ExxonMobil et al.,

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

Defendants

1:20-CV-01180-DAD-SAB

**Plaintiff's** Kenneth Henderson, Monica Henderson,, Amillia Henderson, Maya Henderson, Kayla Henderson, and Jordyn Henderson are filing a complaint against **Defendants**, Exxon-Mobil, Tulare County Probate Court, Eaton Corp, Darrell's Drilling (Konowa, Oklahoma),Attorney Milton C. Grimes, Attorney Tommy Andrews Jr.', Attorney Thomas Chapin, Orange County Superior Courts, Easter Seals, Ultimate Software, Orange County Internal Revenue Services, Orange County Social Services, Anaheim Social Security Administration Office, CalOptima Health Insurance, CHOC Health Alliance, Afgagh Kathryn Khorashadi, CHOC Hospital , Saint Joseph's Heritage Medical (Group), Orange County Medi-Cal, David Joseph Ponce, Joseph Ponce Jr., L'amour Ellis Ponce Sr., Stephen Dolphin, Michele Dolphin, Christine Holmes, Lamour Kim Ponce Jr., Adams Silva & McNALLY LLP, **OAH** (Office of Administrative Hearings-Special Education, Sacramento, CA), Wells Fargo Bank, Union Bank, Attorney- Karen A. Anderson, Anadarko Petroleum, Atoka Oklahoma's Judge Orel Busby Estate Heirs, Eastside Christian Schools, Orange School District, Corona-Norco School District.

**Plaintiff, Kenneth Henderson States Oil and Gas Energy Companies, Banks, Courts, Orange County Government Agencies, School Districts, and various County Hospital & Medical Centers, colluded with his Spouse, his in laws and County Workers as Criminal Agents in an Inheritance Heist of his Washita, Seminole Indian Family heirs, Similar to the Billions in Inheritance taken from the Osage Indian Heirs.**

**Introduction**

Plaintiff's Kenneth Henderson and his 3 daughters, Maya, Kayla and Jordyn Henderson's grandmother and great grandmother, Laura McCullough, along with many of their aunts and uncles were enrolled and attended the historic Riverside Indian Boarding School of Anadarko, Oklahoma beginning as early as 1914.  The plaintiffs living Uncle Quincy, states he remembers attending the Riverside Indian Boarding School as a boy during the summers and being told while looking at many oil wells outside of Anadarko, alongside his sister, Monica Henderson as children by their father, David McCullough, that "This land is ours as far as the eyes can see, always remember that!" Plaintiff, Kenneth Henderson was informed by both his uncle Eddie and Uncle Quincy, along with his mother, Monica Henderson that several acts of violence and murder against their Native American Family members that took place, such as the killing of  Laura McCullough's parents on the same day from a mysterious illness, to include her 2 siblings, the Richardson brothers with various acts of intimidation by Atoka Oklahoma Judge Orel Busby and court associates with ties to the Klu Klux Klan (KKK).

After the Richardson brothers were murdered judge Orel Busby appointed legal guardians to their children. However, the children, Viola and Susan lived a life of poverty as the guardians only claimed their inheritance. These guardians soon sold the Richardson brothers assets and oil royalties to Judge Orel Busby. This form of intimidation, violence, murder, and theft of land and inheritance by the hands of corrupt court officials and appointed legal guardians of child heirs forced my grandparents David and Laura McCullough to move their children to Tulare California, where many black native American Indian Washita, Chickasaw, Seminole,

Cherokee, Creek, and Choctaw tribal members called the End of the Trail of Tears. It was in Tulare, California that David and Laura McCullough were left to pick cotton like slaves in efforts to make a living.

It was in Tulare, California where David and Laura McCullough along with their 13 children from Oklahoma had 2 more children, a girl and a boy named Monica and Augustus McCullough. The plaintiff's mother, Monica Henderson states when she was a child, she had the opportunity to visit her Indian Reservation in Anadarko where Lula Dunford raised and enrolled her mother Laura McCullough as Laura Dunford at the Anadarko, Indian Boarding School.

The plaintiff's mother, Monica Henderson vividly states the day her mother, Laura McCullough-Dunford stopped receiving her royalty payments from Oklahoma when she was around 8 years of age. The Tulare CA. family had to pick twice as much cotton.  The Oklahoma Bureau of Indian Affairs states Lula Dunford's will of land and mineral rights was in fact willed to Laura McCullough, however, the Tulare Probate Court in a hearing in 2019 denied it.  The Tulare judge told Monica Henderson as an heir that they don't have any association with Laura McCullough's willed mineral rights and land from Oklahoma from Lula Dunford, stating to Mrs. Henderson that she would need to have all matters in relation to Laura McCullough probated in Oklahoma, when in fact, such matters of land and mineral rights were already probated. Such actions by the state of California to conceal potentially millions in Black American Indian inheritance from Oklahoma, would support various California Superior court, judges, attorneys, School District - Special Education Programs, Hospitals, Medical Centers, Social Services, Internal Revenue Services, Social Security Administration, Health Insurance Providers,  Banks, all colluded with the Ponce and Dolphin family as appointed guardians of Mr. Henderson's daughters as heirs to inheritance of oil and gas leases from Oklahoma.

I, **KENNETH HENDERSON** define myself and my relationship with my children as the following:

1) A **FATHER**: To **Maya, Kayla, Jordyn** as my 3 biological daughter's and **Aaminah** as my estranged stepdaughter or biological daughter to Lamour Ponce Jr , who I have filed a previous motion to be divorced from.

2) I further define myself, with Maya, Kayla and Jordyn as **NATIVE AMERICANS**: Also known as American Indians, or indigenous Americans and other terms, are the indigenous peoples of the United States, except Hawaii and territories of the United States. More than 570 federally recognized tribes live within the U.S, about half of which are associated with Indian Reservations. The current American Indian tribe myself and my 3 children are direct descendants **from the Seminole Nation of Oklahoma.**

3) I also should continue to be defined as A **WHISTLEBLOWER**: Known as a person who informs a person or organization, engaged in illicit activity.

**A) Due to continued Cyber Criminal Attacks on me and my daughter's medical records**

**B) Due to continued discriminatory efforts by government agencies and their agents to deny my Parental Rights by separating my existence as a Native American father from my 4 daughters.**

**C) And due to continued financial gain of California's Eaton Corp and Exxon Mobil in their ability to continue to fund state government agencies,  Orange County Superior Courts , School Districts, Hospitals, Medical Centers to use County Agents as Guardians over the land and minerals to separate my existence as a father with my children by targeting my family inheritance of oil and gas leases from Lula Dunford as my great-grandmother as a member of the Seminole Nation for years:**

2









1  **I have a narrative of events supporting the above actions by county agencies and their agents in**
2  **discriminating against me and my children in filed State Complaints as a Whistle-blower From 2015**
3  **through 2019.** I have filed various State Complaints to the Virginia and California Attorney General Offices,
4  filed various charges with the EEOC at the Washington DC Field House, filed a state complaint to the
5  Washington DC Inspector General's Office, Department of Labor Complaint (Baltimore), with all filings as a
6  Whistle blower, stating criminal, libel, and discriminatory actions brought against me and my daughter's from
7  my employer and various other government agencies, to include the Eastern District of Virginia Courthouse,
8  with the Orange County Superior Courts, in collusion with L'amour Ponce Sr., and Lamour Ponce Jr., as county
9  agencies and their agents deny my existence as a father to my children due to my Native American inheritance
0  and likely millions in royalties from oil and gas leases that continue to be unclaimed and used and profited by
1  agencies, to include $500 billion dollar companies such as Exxon Oil and Eaton Corp, oil and gas royalty
2  profits taken from my family members as Seminole Indians by blood. Oklahoma Oil and Gas leases willed to
3  my grandmother, Laura McCullough, with my mother, Monica Henderson as the administrator of her land by
4  probate, from great grandmother, Lula Dunford should be placed back with its rightful heirs.
5
6  **Related Court filings from 2018 through 2019** in support of the above State complaint filings as
7  **1)A Father  2) A Native American 3) and A Whistleblower,** I also filed with the Eastern District  Court of
8  Virginia, the 4th District Court of Virginia, and the 4th District Court of California as a narrative of events of
9  discriminatory actions taken against me and assisting agent attempts of Lamour Ponce (both mother and
0  grandmother), and in laws such as Stephen Dolphin, Michele Ponce, and David Ponce to deny my Native
1  American tribal ties with the Seminole Nation of Oklahoma, and willed Native American inheritance of oil and
2  gas leases in using directives to further deny and separate my existence as a Native American father to my
3  biological daughters, Maya, Kayla and Jordyn.
4
5  <u>**ACTIONS TAKEN BY CHILD SUPPORT CYBER CRIMINALS (CSCC's):**</u>
6  **Child Support Cyber Criminals (CSCC):** Claim Native American Child from parent for inheritance
7  **Eastside Christian Schools:** Separate native American parent from student, school claims inheritance
8  **Michele Ponce:** O.C agent assisted both Lamour's in targeting Eastside students for inheritance
9  **Stephen Dolphin** Agent worked at **Union Bank & EATON CORP** to target inheritance from children
0  **Kim Van Geloof,** used school position to deny my existence with children & take away inheritance
1  **Lamour E. Ponce Sr,** teacher at Eastside Christian, removed parent from child to claim inheritance
2  **Lamour K. Ponce Jr,** prior Eastside Christian volunteer, removed parent to claim oil & gas inheritance
3  **Lamour Ponce:**Moms use same name /Black Widows,O.C, claim children, oil & gas leases from heirs
4  **Aaminah Watkins:** Stepdaughter abducted to Virginia from father for financial gain of oil & gas leases
5  **Child Support:**Used UltiPro, wife & her mother hide claiming child heirs to take away inheritance
6  **His Employers:**Used Citrix/UltiPro so O.C can Cyber Claim child, inheritance, deny fathers existence
7  **CSCC's:** Cyber Claim <u>Lamour Ponce</u> only with <u>O.C agencies</u> claiming children, oil & gas from parent.
8  **Children's Hospital Association: CITRIX & EPIC** used by CSCC''s to alter EMR's to claim children.
9  **Judges/Attorney/Agents:** Assist both wife & her mom as L'amour Ponce to claim girls & inheritance
0
1  In my assessment, since the exploration and discovery of oil on Native American Indian territories, no race of
2  people were more targeted by U.S Government Agencies and their Agents to deny their existence and land
3  royalty rights than the millions of Indigenous Native American Indians who were never a part of the Pan
4  American Slave Trade.
5
6  Each decade since the exploration and discovery of oil on Native American Indian territories, U.S government
7  agencies used discriminatory laws within the court systems, advancements in computer technology,
8  advancements in identity fraud, and recruitment of African American Women as agents in support of various
9  County Agencies can profit and take advantage of billions in unclaimed royalties from oil and gas leases
0  remaining on Indian territories still tied to the Native American parent.

The goal of U.S agencies was to separate the Native American Indian parent from his or her unclaimed royalties of oil and gas leases remaining on Indian Territories **1)** by legally separating the Native American parent from their children through Family Law courts **2)** By using the non-Native American parent as an agent to Claim the Native American Indian Parent or Spouse as dead with the Social Security Administration to receive Survivor's Benefits **3)** and then use Cyber Parental Identity Impersonation with County Agencies and Healthcare facilities of the parent being used as an agent to claim billions in unclaimed oil and gas leases from the Native American Indian children as heirs.

In short, U.S agencies SEPARATE and CLAIM the AMERICAN INDIAN CHILD from their NATIVE AMERICAN PARENT to CONTINUE to CLAIM the ROYALTIES to OIL & GAS LEASES. Non-Native American Parents as Agents then use other CSCC's as a SHADOW COURT to influence their custody decisions in support of financial agencies tied to oil and gas leases.

INFLUENCE NATIVE AMERICAN CHILD CUSTODY CASES IN FAVOR OF AGENT/PARENT

**IN EXCHANGE:**

OIL & GAS COMPANIES, O.C AGENCIES, USE AGENTS TO CLAIM SOCIAL SECURITY & SURVIVOR BENEFITS FROM THE AMERICAN INDIAN PARENT & THEN CYBER CLAIM THE NAME OF THE AGENT PARENT (LAMOUR PONCE) USING NO MIDDLE NAME OR SUFFIX TO CLAIM THE AMERICAN INDIAN CHILD (Maya) or CHILDREN (Kayla & Jordyn) FOR COUNTY AGENCIES TO MAINTAIN FOR INHERITANCE FROM THE NATIVE AMERICAN HEIRS.

The above Plaintiffs are filing charges against the above defendants for conspiring for more than 2 decades (1993 – 2020) to conceal and alter all online government agency and physical evidence of daughter, Aaminah Watkins custody hearings, and abduction by her grandparents and mother, L'amour Ponce from a Orange County court order in 2004 with biological father, Alvin Watkins, and Mr. Henderson as her stepfather.

The claims made against the above defendant parties are for also conspiring to conceal the location of Alvin Watkins as the living father to Aaminah Watkins to claim him as deceased along with Mr. Henderson to obtain inheritance and Survivors benefits through both mothers with the Social Security Administration. The above defendants have also conspired to conceal potential abduction of Aaminah from Alvin Watkins in leaving the state of California to Virginia in August of 2004.  Both Lamour Ponce Sr and Lamour Ponce Jr, the wife, further concealed prior court actions supporting parental identity impersonation, were then involved in the abduction of Mr. Henderson's 3 biological daughters, Maya, Kayla and Jordyn once arriving to California from his parents' home in Georgia in November of 2016, as the 2 women took his daughter's into their Anaheim home without any court order or Just Cause filing with the Orange County D.A' Office, colluding with school district principals and their staff, court clerks, attorney's, and judges to cover up all legal action from taking inheritance from all Native American McCullough heirs, with such facts sealed in the Orange County Superior Courts.

Such actions by both women allowed the grandmother named Ellis to change her name to her daughter's name of Lamour Ponce and issued an additional social security number with the Orange County Social Security Domestic Violence and Disability Benefits Program to not only repeatedly deny both fathers' rights but to also claim and separate the children from their fathers to maintain years of royalties for Orange County oil and gas companies in Exxon-Mobil, Eaton Corp, for County agencies such as the Orange County Superior courts, School Districts, various Government agency and Healthcare facilities with community workers throughout the region placed in positions as County agents so State Government Agencies in California can continue to profit from oil and gas leases owed and willed to Mr. Henderson's Native American family members as heirs.

4

In February of 2017, Mr. Henderson recognized an August 8th, 2004 court judgment inside the Orange County Superior Courts left unknown to him from his wife that took place some weeks after his wedding date of June 12th, 2004. The Judgment was in relation to Mr. Henderson's stepdaughter, and her custody with her biological father, Alvin Watkins, who continued to seek a relationship with his daughter. Mr. Henderson began questioning many actions taken by Lamour Ponce in court, such as her actions to take all government agency and legal documents used throughout their marriage, take the storage key and then mail several boxes from their belongings together to her mother's home in California. Mr. Henderson also recognized an additional issued California Social Security number was given to Lamour Ponce separate from her New York issued social security number at birth.

Kenneth Henderson as a Native American Seminole Nation Tribe heir to oil and gas willed to his grandmother, Laura McCullough from his great grandmother Lula Dunford, believes the sinister plot by his wife Lamour Ponce Jr. and his mother in law, Lamour Ponce Sr with support by various family members and County court, school, and healthcare workers. are very similar to sinister acts previously taken by Osage Indian Tribe heir Mollie Burkart's husband, Ernest Burkhart and his surrogate father, William K. Hale.... Both Mollie's husband and William Hale as his surrogate father devised a plan involving many people who worked within the County or Community Hospitals, nurses, doctors, judges, sheriff's, school teachers, principals who were likely financially assisted upon helping take away Mollie's Osage Tribal Indian Inheritance to oil. Kenneth views the actions by his wife and mother in law to be given a 2nd identity under the name LAMOUR PONCE only to have Mr. Henderson's daughter, Maya or her sisters claimed as Native American heirs to oil wealth while fraudulently claiming their father as deceased on record to receive Survivor's Benefits with various Orange County government agencies, supports the use of many agents to conspire to continue to take Lula Dunford's willed inheritance away from Mr. Henderson and his Native American family members as heirs.

Back when Mollie was alive in the early 1900's the only way to take away the oil wealth from Osage and other Native Americans was to either kill them or kill them after marrying them as a headlight. Today, due to advanced online technology, government agents throughout the county are still needed to assist agents who marry into American Indian wealth in order to claim the wealth through the children, however, laws that have passed have made it more difficult for the non-Native American spouses to claim Native American oil wealth so court systems assist the spouses with legal custody situations in efforts to tie in the inheritance through the spouse assisting the government as a county agent as Lamour Jr and Lamour Sr with various other in laws and agents. The very act of fraud and concealment by both mothers to create another identity for the grandmother to claim her grandchildren with her daughter's name for financial gains in oil profits before the couples wedding date of June 12th, 2004 says Mr. Henderson was deliberately left without many legal facts from court in which had he known, would never have married Lamour Ponce Jr.

**EATON CORP & EXXON-MOBIL COLLUDE with UNION BANK, ORANGE COUNTY SUPERIOR COURTS to TARGET CHILD HEIR, AMILLIA HENDERSON FOR NEW OIL & GAS LEASES:**

In the school year of 1986-1987 as a 17yr old senior at El Modena High School in the City Orange, sister of Kenneth Henderson, and heir, Amillia Henderson became an intern at Union Bank in Orange and Santa Ana, California. Sometime before completing her internship and beginning several years of employment at both banks in Orange and Santa Ana, Amillia, at the start of her internship, was given a paid taxi cab ride to Santa Ana Unemployment Services and asked by a Union Bank supervisor to complete an Unemployment Claim before beginning her employment. What Amillia, as a teenage Union Bank intern was unaware of was Eaton Corporation and Exxon-Mobil's innate desire to create new oil and gas lease contracts through Amillia as a grandchild and heir to Laura McCullough, who was probated and willed Lula Dunford's mineral rights from her restricted Oklahoma land in 1950.

5

Oil & Gas companies such as Eaton Corp and Exxon -Mobil have an opportunity to negotiate new oil and gas leases with the next heir of any inheritance or family will, however, these companies have shown a continued unwillingness to negotiate with the adult living heirs to instead TARGET THE MINOR CHILDREN AS HEIRS. Oil and Gas companies such as Eaton Corp and Exxon Mobil collude with California Superior Courts, with California Family Law attorneys, and with California banks to secretly create and select Guardians over the child heirs of Native American families for inheritance theft, as Judge Orel Busby did in the early 1900's by appointing guardians to assist him with claiming the Richardson brothers 2 daughters, Viola and Susan for inheritance theft.

The difference between the Black Gold Royal Heist of the Richardson daughters inheritance involving Viola and Susan as heirs in the 1900's and the Henderson daughters in the 2000's as heirs, involve the use of disability diagnoses of Maya, Jordyn, and Kayla to divert oil and gas inheritance into a Special Needs Trust (SNT) Fund created through a concealed Judgement in the Orange County Superior Court. The Richardson Black Gold Royal Heist of their inheritance through child heirs Viola and Susan was taken through the Atoka OK. Judge appointed Guardians.

In the end, Black Gold and the Royal Heist of Inheritance of American Indian families such as the Richardson's and the McCullough's was always supported by the local court systems such as in Atoka, Oklahoma and Counties of Tulare and Orange in California in collusion with banks, oil and gas companies, able to appoint Guardians and now Trustee's over SNT's.

**City of Orange 1986 -1992**

Plaintiff, Kenneth Henderson's sister, Amillia Henderson and parents while residing in the City of Orange from 1986 through 1992 were targeted for their family inheritance by Eaton Corp, Exxon-Mobil, Union Bank and the Orange County Superior Courts. It was during this time after the Plaintiff, Kenneth Henderson's sister, Amillia was given an internship at the Union Bank in the City of Orange, during her senior year in high school. It was also during this time after Amillia had completed her internship and was informed to sign up for unemployment in Santa Ana, that Amillia and Kenneth Henderson's parents, Elmer and Monica Henderson were frustratedly involved into a 5 year court dispute over a lease to own mortgage contract in which concluded in 1992 after several continuances. During this time the Henderson's resided in Orange from 1986 to 1992 the oil drillers on Lula Dunford's land began to fraudulently transfer ownership of our family wells to create several new oil and gas leases for Exxon-Mobil and Eaton Corp, money that should be owed to the McCullough family.

Eaton Corp, Exxon-Mobil, Union Bank, and the Orange County Superior Courts, due to the defendants being able to gather information during the ongoing City of Orange trial from the Henderson home lease to purchase dispute involving Monica Henderson-McCullough and her husband, Elmer Henderson, were aware that adult heirs such as Monica Henderson-McCullough, Eddie McCullough, Quincy McCullough, Augustus McCullough, Roberta McCullough, Katherine McCullough, and Katy McCullough, as children to Laura McCullough, still existed while living in Orange.

Instead of negotiating a new oil lease with Monica Henderson as a direct heir who remains alive as the daughter to, Laura McCullough, who Lula Dunford willed her land and minerals to once  probated in 1950, specifically after the Amended Stigler Act of 2018, the actions by Eaton Corp, Exxon-Mobil, Union Bank, the Orange County Superior Courts support the defendants targeted the McCullough inheritance to take the profits from many oil wells beginning in 1986 by transferring the Dunford last name out with RAPER and WALKER throughout the years the Henderson's remained in their City of Orange residence before the defendants actions to completely remove Lula Dunford's name as the landowner by 1993, when the Henderson family moved from their Orange residence to Irvine where Eaton Corp and the Ponce family resided.

## McCullough Child Heirs are Placed into IEP's with the Orange Unified School District

Both Amillia, Kenneth and Kevin Henderson as sibling heirs to Monica Henderson-McCullough and Kayla and Jordyn Henderson as siblings heirs of Kenneth Henderson, all were approved for IEP's (Induvial Education Plan) due to diagnosed learning disabilities from a district school psychologist from the Orange Unified School District. Orange Unified School District is a defendant due to being involved with various other Orange County defendants to target medical claims and use of a district school psychologist, Eric Supedo, for completion of Jordyn and Kayla's IEP assessments without Mr. Henderson's knowledge or involvement in efforts to keep him as an heir as non-existent with the Ponce's as assigned Guardians already in place in California. Ellis Ponce, after Kenneth Henderson and Lamour Ponce's 2004 marriage, was assigned guardians by the Orange County Superior Courts over child, Aaminah Watkins who lived in Virginia with her mom and stepfather, Kenneth Henderson,

Ellis Ponce (Grandmother) would maintain Guardianship over not only Aaminah Watkins as Mr. Henderson's stepdaughter in Virginia, she would further maintain Guardianship over any McCullough child heir born between her daughter and Kenneth Henderson in Virginia while Ellis resided in Irvine, California, by using Identity Impersonation to claim her daughter's birth name of Lamour.

Ellis and her husband Joseph Ponce, with David, Michele, and Lamour Ponce, beginning in 1993, when Monica Henderson-McCullough and the Henderson family moved from their Orange residence to their Irvine residence called Northwood across Walnut St. Like the Henderson's, the Ponce family while in Irvine, would move and remain in Irvine in yet another residence of 128 Monroe, Irvine, California, near the Henderson address of 270 Hayes St, Irvine,

Ellis and her husband, Joseph Ponce then moved from Irvine, California to Anaheim Hills, California many years later, sometime before their daughter's marriage became legally separated in the Orange County Superior Courts in November of 2016, when Lamour and Kenneth returned back from Virginia. With Ellis as an assigned Guardian over Maya, Kayla and Jordyn Henderson as McCullough heirs from Kenneth Henderson and her daughter, Lamour Ponce's marriage, the Ponce's were aware they needed to move in a regional school zone of the Orange Unified School District where the 3 child heirs father was enrolled with an IEP alongside his brother and sister, Amillia Henderson.

Ellis and Joseph Ponce in November of 2016 abducted Maya, Kayla and Jordyn in knowing new IEP's from the Orange unified School District could be created while enrolling them into Eastside Christian Schools to deny Jordyn's previous out of state IEP from Georgia and Virginia in efforts to deny her Native American father, Kenneth Henderson's existence. The Ponce family in collusion with Eastside Christian Schools, the Orange County Superior Courts and various agencies tied to Eaton Corp and Exxon-Mobil as oil and gas companies were intent on allowing Mr. Henderson's twin girls, Jordyn and Kayla to fail the 4th grade in order to create the medical claims toward social security disability to divert the family finances into Special Needs Trust Funds for Lamour Ponce Sr (Orange County) to remain the Trustee over all her grandchildren's Trust Accounts. Lamour Ponce Jr, after clearly stating her dissatisfaction in the Corona Norco School District and their schools as compared to what she repeatedly described in her continued attempts to manipulate the children to support her thoughts to transfer them back into the higher rated schools in Orange County, were acts taken by the mother after the court ordered Maya, Kayla and Jordyn Henderson to go to the Corona Norco School district. Lamour Ponce Jr., then almost immediately and strangely began working as a substitute teacher within the Special Education department of Jordyn's School n a school district she openly stated her dislike with in a custody dispute, however, her actions were never seen as a conflict of interest when knowing a court dispute and court order was in place after she denied Jordyn's out of state IEP while denying the fathers rights to be involved in creating a new IEP to tie into a Special Needs Account under her mother in using her same name as

a Guardian and Trustee, once arriving to California. Both Kayla and Jordyn stated in the 2nd semester of the 2020 school year after stating the differences in reactions the teachers had in smiling and being uncomfortable around their father as compared to their mother for a catapult project event completed by the students in which their mother assisted as volunteer, as a substitute teacher, and a parent  "Daddy, I noticed the other teachers were always scared to be around or talk to Mommy." The Letha Raney Principal who appeared to have a very similar close relation with Lamour Ponce as did the Eastside Christian School Principle who denied Jordyn's Georgia's IEP, should have been aware of the conflict of interest in coworking with a parent as an IEP Team Member with teachers or the Special Education coordinator could create conflict with various other teachers and special education instructors who were uncomfortable while recognizing the substitute teacher and mother using her connections as an employee to dismantle her daughters IEP without involving Mr. Henderson as the father. School principals and various school staff were made aware of the court order, specifically that the mother continuously kept trying to conceal any relationship with the father and an already implemented IEP from Georgia. It was as if Letha Raney and their Principal was intent to not only hire Lamour Ponce Jr, but further deny all facts regarding the existence of the out of state IEP in Georgia, the court order and Mr. Henderson rights as a father with equal rights as the mother with his children as students.

**Ellis Ponce, Union Bank, & Orange County Superior Courts attack Child Heirs to Obtain Inheritance**
Amillia Henderson settled her discrimination lawsuit with her employer, Union Bank with the Orange County Superior Court with medical claims tied into the Social Security Administration to support her disability near the same time months between 1996 and 1997 in which Lamour Ponce filed her claims to be recognized like Amillia Henderson as permanently disabled were done to create and redirect inheritance of Lula Dunford's will from heir, Amillia Henderson's Special Needs Trust Account with Union Bank to Lamour Ponce Jr's Special Needs Trust Account after Kenneth and Lamour married on August 8th, 2004 in the Orange County Superior Courts. With the grandmother (Nana) able to change her name from Ellis to Lamour before twice claiming and abducting her grandchildren. Ellis first abducted Aaminah Watkins into her home in the 1990's before flying her away from her biological father to reside with Kenneth Henderson as her stepfather and her biological mother, Lamour Ponce in Woodbridge, Virginia in August of 2004, right after the August 8th 2004 Judgement remaining unknown and sealed from Kenneth Henderson.

In November of 2016, during the holidays, Ellis and the Ponce family then abducted Plaintiff, Kenneth Henderson's 3 daughters as heirs to claim as Ellis likely became an assigned Guardian by the Orange County Superior Courts of any children from her daughter while using her same first and last name of Lamour Ponce but held in sealed testimony in a judgement made weeks after Mr. Henderson married Lamour Ponce Jr married, coincidentally, in Orange, California. The couple then moved to Virginia with Aaminah for 12 years before returning back to California in November of 2016 to legally separate and once again observe Ellis abduct Maya, Kayla and Jordyn into the Ponce Family Anaheim home as zoned to make medical claims for new IEP's with the Orange unified School District.

**Raper Converted A Dunford Well into A Trust Account for a Children's Hospital**

Raper, a non-Native American Indian land and mineral owner or heir Willie Hays or Lula Dunford's will while on the edge of section 10 and 11, was able to convert her oil well in 1989 into a Trust account, able to support billing claims for various Children's Hospitals and their pediatrician offices in Massachusetts.   It must be noted that any wells that are converted into Trust Accounts for a Children's Hospital, the Children's Hospital Association (CHA) connects all the Children's Hospitals medical records and billing financial systems together, allowing these appointed guardians like Ellis and the Ponce family members to go in and out of these converted Trust Accounts created from stealing wealth from oil wells and many child heirs tied to inheritance such as those child heirs named Monica Henderson, Cheryl Henderson, Amillia, Henderson, Derrick Henderson, Kevin Henderson, Kenneth Henderson, Maya Henderson, Jordyn Henderson, and Kayla Henderson

**Adams Silva & McNALLY LLP, Family Law Attorney Karen A. Anderson, and Union Bank**

The Law Firm of Adams Silva & McNALLY LLP while nearly 1 hour and ½ away from the Corona Norco School District, may have colluded with the Orange and Corona Norco School District Superintendents to conceal not using the school district's appointed Legal Counsel while instead choosing to financially use Riverside County tax payers money to have a high profile Family Law Attorney named Karen A Anderson from Orange County and Long Beach, California while secretly representing Maya and Jordyn Henderson's mother, Lamour Ponce Jr, appear on her emails and U.S mailed deliveries to be working in representation for the Corona Norco School District but as the school districts appointed Legal Counsel with Adams Silva & McNALLY LLP. Karen's Orange County and Long Beach name may have been fraudulently changed to Karin Anderson with the Carlsbad law firm. Attorney Anderson, while claiming to be representing the Corona Norco School District and employed through, Adams Silva & McNALLY LLP, assisted the School District in wrongfully dismissing Mr. Henderson's daughter, Maya Henderson's OAH case during a California Stay at Home Order beginning March 19th, 2020 due to the COVID-19 Pandemic. Mr. Henderson states the Corona Norco School District's Superintendent assigns the School District's legal counsel to represent the district in cases brought against them by the students and their families, however, by the Superintendent and the board choosing attorney Karen Anderson and stating she was working as an attorney with the Carlsbad law firm, Adams Silva & McNALLY LLP may have been falsifying Mrs. Anderson's true self-employment as a high profile Law Lawyer in Orange County and Long Beach in efforts to conceal such legal facts to Mr. Henderson. Maya and Jordyn Henderson's father, who continues to support his daughters diagnosed disabilities, continue to be denied by the Corona Norco School District in what he believes is due to discrimination and racism for being Black American Indian heirs to oil and gas leases in which the County of Orange County has denied to Mr. Henderson's family for decades.

Currently, Mrs. Anderson continues to not be a part of the Adams Silva & McNALLY LLP attorney list, supporting Mr. Henderson's belief that some form of financial agreement between Orange County and the Corona Norco Superintendent may have been reached to use Karen Anderson to dismiss Maya Henderson's case, however, the attorney is not legally working with the law firm which would be a conflict of interest between wrongful actions taken between the Corona Norco School District and the law firm in support of Orange County, California in their financial use of Karen Anderson as an attorney. Furthermore, Mr. Henderson believes all illegal financial transactions of Riverside County taxpayers money used between a non-appointed District Legal Counsel named Karen A. Anderson by the Corona Norco Superintendent would support a conflict of interest in either the Orange County Superior Court in collusion with Lamour Ponce Jr and Sr, with Eastside Christian Schools, and with Orange or the Corona Norco School Districts ability to continue using Karen A. Anderson or any attorneys associated with Adams Silva & McNALLY LLP  as Mr. Henderson will be requesting further relief and damages due to what he considered libel in actions in repeatedly denying his ability to continue to support the disability needs of his daughters diagnosed conditions in Virginia and Georgia. Mr. Henderson also believes Karen A. Anderson's Family Law Office in the Union Bank Long Beach building is a front company for Union Banks ability to target child heirs for millions in inheritance in Family Law cases such as Mr. Henderson's.

A subpoena requiring the Corona Norco School District Superintendent to testify as to whom was his selected appointed legal counsel for the School District and if Karin Anderson as a Senior Attorney not with the last name Adams, Silva or McNALLY was never appointed for prior School District cases involving students of the Corona Norco School District, then the Superintendent would need to testify as to why Maya and Jordyn Henderson's cases as Black American Indian children were legally and financially selected differently then all prior cases filed against the School District. Mr. Henderson believes all actions to financially and legally single out his 2 daughter's cases over other student cases to deny their disability needs were and continue to be directly related to racism and discrimination in yet another case supporting Black Lives Matter in children with diagnosed disabilities as well.

9

A subpoena requiring the Riverside County District Attorney, Michael A. Hestrin, will also be added for the District Attorney to further look into the fraudulent activities between the financial and legal relationship with the Corona Norco School District's Superintendent's legal counsel selection of Karin Anderson and Adams, Silva & McNALLY being used in all legal actions taken to single out and dismiss student, Maya Henderson's OAH case but fraudulently through Attorney Karen A. Anderson in Family Law inside Union Banks building in Long Beach, California.

## WELLS FARGO BANK

Plaintiff, Kenneth Henderson and Lamour Ponce Jr opened up a Wells Fargo joint checking account, with 3 savings accounts for daughters, Maya, Kayla and Jordyn Henderson in early 2016. After more than a year after Kenneth and Lamour legally separated in California, Mr. Henderson reopened a checking account with just him and separate savings accounts for his daughters. Sometime in late October of 2019, the plaintiff, Mr. Henderson was shocked to see an unauthorized quarterly payment of her New York Life Policy from his Wells Fargo Account. Neither Mr. Henderson's mother, Monica Henderson, or father, Elmer Henderson could explain how no one in the family provided the New York Life Insurance Policy number to complete or authorize any payment from Kenneth Henderson's Wells Fargo account. The Wells Fargo Manager was unable to explain how the New York Life Policy for Mr. Henderson's mother was unauthorized and paid through his checking account, and repeated his explanation to Monica Henderson.

Mr. Henderson was aware that Lamour Ponce continued to maintain a checking account through Wells Fargo, and a few months after his mother's unauthorized New York Life Insurance Policy payment shockingly showed up in his checking account, Mr. Henderson thought about the Osage Indian Murders and the continued theft of his family inheritance when he nearly lost his mother after somehow surviving an hour and a ½ ambulance commute, this after suffering a MAJOR STROKE from Corona to Temecula Valley Hospital near San Diego County. The Henderson family was irate in being informed that Corona Regional Hospital allowed a major stroke patient to endure more than an hour ambulance ride after even the EMT driver said "Temecula Valley? That's crazy, why are you all having me driving this patient way out there?" Mr. Henderson and his siblings began to think about the New York Life Insurance Policy incident relating to their mother with Wells Fargo and began looking into possible high level criminal fraud scenarios involving the Ponce family ties to Orange County Intelligence Agencies such as the CSCC's (Child Support Cyber Criminals) to claim the children as heirs and redirect Monica Henderson's New York Life Insurance Policy with her inheritance into a Special Needs Trust Wells Fargo account for all 3 daughters into the Trustee and grandmother's name as Lamour Ponce in Anaheim, California.

## EATON CORP

EATON CORP is the employer of Lamour Ponce's brother in law, Stephen Dolphin for over 13 years, since 2007. Mr. Dolphin, while also previously employed with Union Bank, Mr. Henderson believes colluded with the aunt and uncle of his children's mother, Raquel and Anthony Dillett, and various other in laws as Ellis Ponce, David Ponce as Guardians with Family Law and Union Bank attorney, Karen Anderson. Eaton is the energy supplier drilling on land sites with our family oil and gas leases such as the leases in Oklahoma, willed to Mr. Henderson's grandmother, mother and family members.

## Building Your Assets and Wealth: Special Needs Trust (SNT)

**1)**	**Lamour Ponce Sr** (aka Ellis Ponce): Trustee on SSDI

**2)**	**Lamour Ponce Jr** (Spouse): Beneficiary on SSI

Below online statements taken from: Copyright © 2020 World Institute on Disability. Technology © 2002-2020 Eightfold Way Consultants. Disclaimers. Privacy.

A Special Needs Trust (SNT), sometimes called a Supplemental Needs Trust, is a legal arrangement in which a person or organization (like Union bank or Wells Fargo Bank) manages assets for a person with a disability. The person with the disability is called the "beneficiary" and the person who is managing the assets is the "trustee." Many kinds of assets can be put into a trust, such as cash, stocks, bonds, and real estate. An SNT provides for the needs of a person with a disability without losing or reducing their benefits such as Supplemental Security Income (SSI), Medi-Cal, In-Home Support Services (IHSS), and HUD housing assistance.

Assets in an SNT won't be counted toward the SSI, Medi-Cal and IHSS asset limit of $2000 for an individual. Note: The rules for setting up trusts can be complicated and it is important to make sure that you seek out good advice about how to set one up in order to avoid serious problems. If you get public benefits such as SSI, Medi-Cal, IHSS, and HUD housing assistance, the SNT must say that: It is up to the trustee when and how to use the funds to benefit the beneficiary.

The main purpose of the trust is to supplement the support and services the beneficiary gets from public benefits, and the beneficiary cannot sell or give away her rights under the trust to anyone else and has no control of the assets. These three statements will usually keep the assets in the SNT from being counted against your eligibility for public benefits. It is also important to know that the assets in the SNT must not have belonged to you before the trust was set up (except for a First Party SNT -- see Three Types of Special Needs Trusts). This means that you cannot use the SNT as a savings account. You cannot put your own money into most SNTs. If someone you know wants to leave assets for you in their will, they must state the name of the SNT in their will, not your name.

While public benefits such as SSI, Medi-Cal, IHSS, and HUD housing assistance provide basic support for food, shelter and medical care, a Special Needs Trust can be used to add support and services in the ways Your Situation Asset Building Your Assets and Wealth Trust Funds most helpful to you. For example, money from the trust could be used to pay for your recreation, telephone bill, education, and vacations. The money in an SNT cannot be used for food or shelter; that is what your SSI money is for. How does money from the SNT affect your SSI payments? Money paid directly to providers for items other than your food and shelter will not reduce your SSI payments. If money is paid directly to a provider for food or shelter, your SSI payment will be reduced, but only up to a certain limit. Money paid directly to you will reduce your SSI payment. A good way for people to give you assets, such as money, but not affect your public benefits (SSI, Medi-Cal, IHSS, and HUD housing assistance), is to give the assets to the SNT.

If someone simply gives you money directly, that gift might result in a loss or reduction in the amount of your SSI checks, Medi-Cal benefits, IHSS funding, and HUD housing assistance. This will happen if that money will cause you to have more than the asset limit you can have for these programs. Also, if you have a disability and you inherit money or get a settlement in a court case, those funds can also cause your SSI, Medi-Cal, IHSS and HUD housing assistance to be affected unless that money is placed directly into a First Party SNT (see Three Types of Special Needs Trusts). Although SNTs can have huge advantages, they also have strict rules. The funds must be used to benefit only you; no one else can benefit from that SNT. Also, the trust is set up to help you, but no payments can be made directly to you. When you need to pay a provider for something that is not food or

11

shelter, the trustee will pay the money from the SNT directly to the provider. Only the trustee can handle the money from the SNT.

**An SNT attorney may be faced with a situation where a decedent leaves a bequest to an individual with a disability not understanding the adverse impact the gift will have on the gift will have on that individual. In these cases, depending on the state, may be possible to redirect or divert the inheritance into a SNT.**

If the intended SNT beneficiary is under an existing conservatorship or guardianship (as in Ellis and Lamour Ponce's concealed August 8th, 2004 Judgement decision involving the custody of Aaminah Watkins) with a petition for substituted judgement can be brought establishing the SNT and directing the guardian or conservator to deposit the inheritance into the SNT. Since the SNT in this instance would be created by a judicial proceeding resulting in a court order creating the SNT, the resulting SNT satisfies the requirements of **42U.S.C.&1396p(d)(4)(A).**

The Above Online Information was taken from: Copyright © 2020 World Institute on Disability. Technology © 2002-2020 Eightfold Way Consultants. Disclaimers. Privacy.

**Ellis Ponce (aka Lamour Ponce aka L'amour Ellis Ponce Sr)**

One of many black American women agents, used to target Native American Indian Men and their inheritance as heirs in marriage was and continues to be Lamour Ponce Sr and Lamour Ponce Jr in both mother and grandmothers' efforts to financially tie and redirect inheritance from a judgement into an SNT account just weeks after Kenneth and Lamour's marriage. Native American Indian children as heirs born into the marriage between Kenneth Henderson and Lamour Ponce in deliberately keeping her last name, was in libel action to target unclaimed oil and gas leases from all adult and child McCullough heirs from the Henderson family through a concealed (42U.S.C.&1396p(d)(4)(A)) judgement unknown to Mr. Henderson, while further allowing the theft of both fathers in Alvin Jerome Watkins and Kenneth Henderson's family inheritance.

Mr. Henderson states Ellis Ponce and the Orange County Superior Court concealed a Judgement he believes involved not only the custody of his stepdaughter, Aaminah Watkins, on August 8th, 2004, just weeks after the June 12th, 2004 wedding date between the parents, Kenneth Henderson and Lamour Ponce Jr. for continued theft of his families inheritance from Lula Dunford to Laura McCullough.

It is Mr. Henderson's belief that Milton Grimes as the family attorney in support of Lamour Ponce, may have been placed in charge of both Lamour Ponce the mother and grandmother in Orange County for custody of Native American Children through using black American spouses as Guardians of child heirs to deny the existence of the ones they marry in efforts to claim millions in oil and gas leases from their children as heirs to financially support various agencies throughout the nation.

**Exxon Mobil**

A complaint is filed against Exxon Mobil, previously known as Humble Oil. ExxonMobil in contractual agreement with Eaton Corp continues to drill on property inherited to my grandmother, Laura McCullough and put into my mother's name, Monica Henderson, as the Administrator of Property in Tulare in efforts to reclaim all royalties taken by ExxonMobil and Eaton Corp from our family's oil and gas leases. Both Eaton Corp and ExxonMobil have unclaimed and claimed oil and gas leases to financially support county courts, agencies and healthcare facilitie. Exxon Mobil works behind the scenes, where Native Americans cannot see the dirty work of money that is essentially not theirs being used for criminal activity in targeting the heirs of living wills from tribal ancestors that are secretly hidden by agencies for financial gain,

12

The above defendants criminally placed people on Lula Dunford's land as a fictitious front heir company named Guinn Co., after her late husband, able to manage the mineral rights as a front drilling and oil company in financial support Orange County and San Diego Government and Healthcare Agencies from the mineral right profits.

**Tulare County Probate Court**

In a recent Probate hearing in 2019, my mother and heir to Lula Dunford's will, Monica Henderson, informed the Tulare County Probate Court "In selling my parents David and Laura McCullough's land here in Tulare, as the Administrator of Probate over my mother's land, I am not selling the mineral rights of the land willed to me from my mother." The judge then stated we in Tulare do not have anything to do with the mineral rights willed to you or your family members from Oklahoma, you will have to go to Oklahoma to probate those mineral rights." The Judge and Tulare were not telling the truth to my mother as the Oklahoma BIA (Bureau of Indian Affairs) did in fact inform us (The Henderson family) that Lula Dunford's will to Laura McCullough was in fact already probated after Lula passed away. This Judge and the Tulare County Court, just as the Orange County Superior Court, just as the Eastern District Court of Virginia, all knew ONCE YOU COMPLETE PROBATE THE ROYALTIES COME WITH IT. However, The Tulare County Court and judge remained mum to my mother, Monica Henderson standing beside my father, Elmer Henderson on all accounts of mineral rights from Lula Dunford's land and mineral rights per her will as already being probated to Laura McCullough.

 The California courts of Tulare and Orange where my family resided have been aware for decades that they have systematically stolen the wealth and inheritance willed to my mother as a living heir from both her parents in David McCullough and Laura McCullough as Native Americans directly related as heirs to Indian Territory lands from the Richardson's , the Nolitubby's, the Dansby's, the Dunford's, the O' Guinn's, and McCullough's. The Tulare County Court, the Orange Superior Courts, the Los Angeles Superior Courts, and the San Diego Superior Courts in the State of California have all colluded with Union Bank where my sister Amillia Henderson as heir began working in Orange, Santa ana, and San Diego, was targeted as an heir for inheritance and terminated.

The Oklahoma BIA made it clear to us as Henderson's in May of 2020 that Kenneth Henderson's grandmother, Laura McCullough while residing in Tulare County, California was already willed Lula Dunford's Oklahoma land and mineral rights but all legal facts of such a probate continued to be concealed by Tulare County even while Mr. Henderson's mother pleaded her case about her mom's inheritance and mineral rights needing to be probated and willed to her and other heirs. Damages in relief from the actions taken by all California courts in collusion with the oil and gas companies such as Eaton Corp and Exxon Mobil to steal millions in willed inheritance through California' Union Bank while using the Ponce family to further target the plaintiff's as heirs are acts of systemic racism and discrimination by the state of California. California illegally set up willed land mineral rights as a Trust Account with Union Bank when it was actually probated to Laura McCullough from Lula Dunford's with possibly many other royalty rights left unknown and should be willed to Monica Henderson as an heir to our Oklahoma Indian land previously owned by her parents David and Laura McCullough as heirs.

**Milton Charles Grimes**

Mr. Grimes will always be known as one of the criminal defense attorneys who represented Rodney King but in the eyes of a father in protecting his family from cyber identity fraud while trying to maintain his relationship as an American Indian father in all custody matters with L'amour Ponce Jr., in the Orange County Superior courts with his 4 daughters, Mr. Henderson is requesting the attorney's presence in court with his stepdaughters'

1   biological father for answers to a mother and grandmother possibly concealing years of court testimony of his
2   children's mothers brain injury, possible concealment of Social Security Disability Fraud between both mothers
3   using the same name, years of possible concealment of Identity Impersonation fraud claims with both mother
4   and grandmother using the same name, years of concealment of possible child abduction claims due to both
5   mothers claiming the same name, and years of concealment of IRS Fraud Claims of all 4 children (Aaminah
6   Watkins, Maya Henderson, Kayla Henderson, and Jordyn Henderson) claimed in his marriage with to L'amour
7   Ponce Jr., while both women concealed court testimony for years supporting  the grandmother, Ellis Ponce Sr.,
8   being made her disabled daughter's Power of Attorney of her daughter and the Legal Guardian of her daughter's
9   children even throughout all the years her daughter was married to Kenneth Henderson. The grandmother, Ellis
10  Ponce, may have also been court ordered through the Orange County Superior Courts to change her name to
11  Lamour Ponce with the Orange County Social Security Domestic Violence Program and finally ordered a
12  Judgment unknown to Mr. Henderson only weeks after his marriage and relocation to Virginia with L'amour and
13  his stepdaughter as possibly abducted from California and her father, Alvin Jerome Watkins.  All actions taken
14  by Orange County Superior Courts in using both mother and grandmother as agents were to claim the same
15  name and Native American Indian children from Mr. Henderson to continue to claim millions in oil and gas
16  leases inherited to Mr. Henderson's mother, Monica Henderson as the administrator of property of his
17  grandmother, Laura McCullough who was willed land rights from Oklahoma from her mother, Lula Dunford.
18  Eaton Corp and Exxon Mobil were the 2 main oil and gas companies involved in such actions taken by the
19  Orange County Superior Courts who continue to profit and financially support Orange County Government
20  agencies, Nationwide Government agencies, school districts, and healthcare facilities.
21
22  **Office of Administration-Special Education (Sacramento, CA)**
23
24  California was under an Emergency Stay at Home Order due to the Corona Virus Pandemic issued by its State
25  Governor at the time Mr. Henderson's complaint against the Corona Norco School District in support of his
26  daughter, Maya Henderson's diagnosed disabilities of Anxiety Disorder, Skin Picking Disorder, Wetting the Bed,
27  and positive Depression Test were denied by the School District in support of a 504 Plan. Mr. Henderson
28  believes attorney Karen Anderson's involvement in any successful attempt have his daughter's case dismissed
29  by an OAH judge during the Governors Stay at Home Order should be properly investigated.  With Maya's
30  truancy record for being late to school in relation to her need for showering in the mornings due to her bed
31  wetting, Mr. Henderson claims the 1st period P.E teacher being aware of the difficulties of Maya's mental health
32  needs along with the 504-Plan coordinator should have supported his daughters plan along with any OAH judge.
33  The father continues to believe California will continue to discriminate against black American Indian heirs
34  from Oklahoma in efforts to maintain all royalties the state continues to deny to their many black Native
35  American family heirs.
36
37  **Attorney Thomas Chapin**
38
39  Refused to submit the Petitioner's request for an Emergency Ex Parte Order in December of 2016 after his wife
40  abducted his 3 daughters into her parents Anaheim apartment then immediately enrolled them into Eastside
41  Christian Schools in Fullerton, CA, some 25 miles from his corona residence. The mother had agreed with the
42  Petitioner before their return into the state that they and their 3 children would stay with his cousin in Victorville.
43  Mr. Chapin. after taking money upfront, informed Mr. Henderson that he should file in Orange County over
44  Riverside County Superior Courts due to <u>feeling he had a closer relationship with the judges there.</u>
45
46  Mr. Chapin's actions as Mr. Henderson's assigned attorney in December of 2016 was to use premeditated and
47  tactical legal methods to try and get himself off the case while dangerously hurting Mr. Henderson 's legal
48  chances to maintain a relationship with his daughters in all matters relating to his request for Physical and Legal
49  Custody.  The mother had taken his children without any evidence to support the Petitioner was a threat. Such
50  actions taken by Attorney Chapin in choosing to file several weeks later in Orange County, refusing to legally

represent Mr. Henderson in his Child Support hearings, and further not filing Mr. Henderson's Emergency Ex Party Order in Riverside Superior Courts where he lived in December of 2016, allowed the Respondent and her mother to keep his children from him in a home and private school he never consented on in court. Because of attorney Chapin's unwillingness to file an emergency order in Riverside County Superior Courts, though the Respondent had no supportive facts to support her claims of the Petitioner's threatening behaviors as being the reason for taking his children from him and placing them into a private school that denied his daughter Jordyn her SELPA RIGHTS as a student diagnosed with a learning disability. The Judge was apprehensive in wanting to remove the children out of yet a 3rd school district and school after 3 months had already passed as students at Eastside Christian so he ruled to keep them enrolled there with a temporary order in which he would make a final order on choosing the girls school district on July 25th, 2017. Had the Emergency Order been entered in Riverside County Superior Courts, and had Mr. Chapin represented Mr. Henderson in his Child Support hearing, the actions taken by the mother to deny him his rights as the children's biological father, would have been reviewed by the courts sooner.

**Attorney Tommy Andrews Jr:**

Bankruptcy attorney from Old Town Alexandria in 2012 was chosen by Lamour Ponce Jr. and likely L'amour Ponce Sr., to remove all evidence of Kenneth Henderson and Lamour Ponce's marriage in Virginia, to remove medical claims of the children in Virginia, and ownership of property such as the mortgage loan for the condominium and the loan for their family van in Virginia.

**Easter Seals**

Petitioner, Kenneth Henderson is requesting damages in relief against employer, Easter Seals for denying his rights to financially support his 3 daughters in a 50/50 joint legal and physical custody decision ordered on July 25th, 2017 for both parenting parties. Easter Seals billing department secretly kept Mr. Henderson and his attorney from being aware of a court ordered contractual agreement with Orange County Superior Courts Child Support Services to use Ultimate Software in Santa Ana, California to garnish his paychecks over what is normal state policy to use California's State Distribution Unit (SDU).

Mr. Henderson, upon finding out from Easter Seals billing department that his checks were unknowingly being garnished by Ultimate Software, was also not aware that he had been double paying the Respondent with credit card payments through the State Distribution Unit for several months, requested Orange County's Child Support services complete an audit. Orange County's Child Support Services, while in contract with both Easter Seals and Ultimate Software, not only never informed or notified Mr. Henderson of an existing court ordered garnishment with Ultimate Software, but were also taking money in benefits from his leave deductions, vacation deductions, and transportation deductions for several months,

Mr. Henderson realized Ultimate Software was simply a 3rd Party Biller used by Eaton Corp and Exxon Mobil as Oil and Gas companies with various Orange County Government Agencies, its court system and the Ponce family as Agents used to keep Mr. Henderson as the Native American Indian father and heir separated from his children as heirs to millions in royalties from oil and gas leases taken from his grandmother, Lula Dunford.

**Orange County Social Services**

Petitioner, Kenneth Henderson is requesting damages in relief from Orange County Social Services for first covering up all written complaint filings made by Mr. Henderson in March of 2019 with no written response, and by allowing both mothers in L'amour Kim Ponce and L'amour Ellis Ponce to claim all 3 children he signed

them up with through Medi-Cal health insurance by way of using CalOptima and CHOC Health Alliance when Mr. Henderson informed Orange County in December of 2016 that he had separated from L'amour Kim Ponce and would be remaining in his own apartment at 1266 Ryan Lane #F, Corona CA 92882 and requesting his daughters Medi-Cal Health Insurance be transferred over to him under Riverside Social Services. However, Riverside County Social Services stated that Orange County Social Services is saying the mother, L'AMOUR PONCE had claimed his daughters for Medi-Cal Health insurance first and all benefits would be denied to him other than his own, including Cal Fresh Food Stamps while he remained in the red as case workers stated he did not make enough to cover for all his rent, utilities, and car payments each month to support his children under the current court order.

Orange County Social Services was made aware of all actions taken by both mothers in continuing to allow them to claim all 3 children in knowing Lamour Ponce, the mother never planned to claim her 3 children because she was receiving SSI when the Petitioner applied to add his 3 daughters under his name for Medi-Cal Health Insurance due to being unemployed and not being aware of the financial restrictions of his wife's disability benefits as she set their and watched him complete all the paperwork while likely knowing she would soon be asking for legal separation with the insurance cards arriving to her and her mother as L'amour Ponce's Anaheim apartment residence. Whenever Mr. Henderson would see his daughter's struggling to cope with the operation between he and their mother he attempted to request to the mother that the girls needed therapy while recognizing their eldest daughter as skin picking her arms and legs, but the mother kept denying her daughters condition while denying consent of treatment as she was initially given 80/20 custody, then 50/50 custody after July 25th, 2017. Mr. Henderson is requesting relief from Orange County Social Services for allowing both L'amour Ponce the daughter and L'amour Ponce the grandmother to hide the SSI benefits and marriage without claiming the children on the daughter's disability insurance in efforts to legally claim them in court on the grandmother's health insurance through CHOC Health Alliance in which she should not be able to claim due to her income she was receiving through Eastside Christian Schools. It was during this February of 2018 time period in which the Petitioner informed Riverside Social Services of issues of his daughters being denied counseling at their Riverside County schools from the mother while wetting the bed and skin picking, however he was informed by CalOptima health Insurance in Orange County that the children did not have a legal guardian named under their health insurance plan. Once Mr. Henderson informed Riverside Social Services that the mother, likely due to her continuing to receive Supplemental Security Insurance from the Social Security Administration while attempting to still hide all 3 children from her marriage in Virginia to deny Mr. Henderson's work income and marriage, the Riverside agent requesting Orange County provide the mothers disability status in knowing she was not recognizing herself as claiming the children and the County instead decided to transfer over all benefits to the Petitioner after nearly 14 months after he initially asked for his daughters transfer of benefits in December of 2016.

Orange County Social Services a few months after the February 2018 change of County Child Benefits to Riverside, decided to take back to Orange County only the Cal Fresh benefits in what the Petitioner felt was the Counties means to target his financial ability to support the children while knowing they could potentially seek fraudulent medical claims of his daughters from Orange Counties Saint Joseph's Medical Center in Corona California by means of the mother being able to claim them as the guarantor for financial gain of Orange County due to the judge's decision to add CHOC as a specialist, an act in which the mother was doing even when it wasn't even her week as the custodial parent to take the children, as all claims should have been done through Inland Empire Health Insurance.

Orange County Social Services deprived Mr. Henderson of benefits in which impacted his financial ability to support his children in again, Orange Counties legal means to support the mother over the father in knowing the current custody order of 50/50 could impact his financial means to support his 3 daughters in the courts using the Child Support order and 3rd party billing Company, Ultimate Software (UltiPro) to deprive the father of

maintaining a relationship with his daughter's by being unable to maintain his apartment he was leasing so they could remain together. It was the Petitioner's parents that ended up being his only recourse in maintaining a relationship with his 3 daughters in changing the custody order to a 50/50 high visitation. The Orange County Social Services never gave the Petitioner a written response to his filed Complaint given in April of 2019, which supports continued collusion between the County agency and all actions taken by both mothers in using the same name to allow the grandmother to claim Mr. Henderson's 3 daughter's, even after the father informed the agency that he was residing in Riverside County at 1266 Ryan Ln. #F, Corona, CA 92882 in December of 2016. Orange County Social Services continued to allow the grandmother to receive all benefits of the children in knowing her daughter continued to receive SSI disability benefits due to her permanent disability as described in the Orange County Superior Court in written testimony by the Petitioner's stepdaughter's biological father, Alvin Jerome Watkins in 1997.

**Orange County Internal Revenue Services**

Both Lamour Ponce Sr., and Lamour Ponce Jr., conspired for years as agents against the husbands and fathers of their children and grandchildren for financial gain of Orange County agencies by both mother and grandmother concealing federal violations of Identity Impersonation in the use of the name Lamour Ponce only without the use of a suffix, and Identity Theft of 5 minor children named Aaminah Watkins, Kendell Andre Young, Maya Henderson, Kayla Henderson, and Jordyn Henderson. Both mothers conspired to use Mr. Henderson's mother in law's adopted son who is his wife's nephew, Kendell Andre Young, fraudulently on the married couples tax return documents and deny both the existence of Alvin Watkins as Aaminah's biological father and the marriage to further deny Mr. Henderson's existence as a deceased husband within the Government system only, for the mothers to both claim Social Security Survivor's Benefits while the County or State Government of California obtain millions in oil and gas leases related to Inheritance from his daughter, Maya Henderson as an heir to her great grandmother, Lula Dunford's will. California IRS continues to deny copies of IRS documents more than 3 years old supporting copies removed from his home in 2018 would further suppport the mother and his mother in law were using an additional social security card number in Virginia with Lamour Kim Ponce Jr using Parental Identification Fraud with her mother from California with Kendell Andre Young and Aaminah Watkins on the returns but as her mother's dependents without her husband, Kenneth Henderson.

**Anaheim Social Security Administration Office**

Mr. Henderson is requesting relief in this matter for damages in actions taken against him, his children and parents while various County government agencies colluded with the Ponce family to cover up all fraudulent activities in hiding the improved disability status of Lamour Ponce Jr., and change in legal guardianship of his stepdaughter, Aaminah Watkins to her grandmother, Lamour Ponce Sr for financial gain of millions in oil and gas leases willed to Mr. Henderson's family heirs from Lula Dunford. Both Lamour Ponce Sr and Lamour Ponce Jr were allowed to switch identities to claim one another's children in different states for Survivors Benefits, and Inheritance claims from their husbands and biological fathers of their children and grandchildren. The Orange County Superior court order was likely deliberately concealed in support of Lamour Ponce as an agent financially supporting Orange County Government Agencies and healthcare facilities without both fathers in Alvin Watkins and Kenneth Henderson ever knowing the details of Judgment order and change in legal guardianship to the grandmother of all 4 children financially supported by both fathers while living in Virginia with Mr. Henderson and Lamour Ponce Jr. Mr. Henderson believes Anaheim Social Security Administration agent named MR. EVANS is directly involved in serious felony charges in targeting his children as heirs to be claimed by his mother in law "Ellis" (not Lamour) for inheritance for oil and gas leases willed to his grandmother, Laura McCullough.

17

## CalOptima

Plaintiff, Kenneth Henderson is filing this initial claim in seeking damages against CalOptima due to never responding back to Mr. Henderson after he filed a written complaint in relation to the actions of both Lamour Ponce Jr and her mother Lamour Ponce Sr committing Parental Identity Impersonation and fraud of their children and grandchildren's Medical Records and Medical Claims. An Insurance Company that allows a policy that supports Fraud Predators who tend to target children for financial gain, to further target their personal formation.  CalOptima, in supporting Medi-Cal Services, allows children who are not wards of the state to be their own Health Insurance Subscribers. Such a policy allows Child Fraud Predators to further target children's credit, medical records and social security records for fraudulent claims with Identity Fraud.

Children's credit, medical records, social security records or health insurance claims should not be further targeted by Child Fraud Predators due to a policy that can be changed and require parents of none wards of the state able to maintain legal guardianship be responsible as their Health Insurance Subscribers. An adult name in representing as the parent or legal guardian should always be shown on a child's health insurance plan with CalOptima through Medi-Cal as their minor childs Health Insurance Prescriber, not the child who is not an adult.

In knowing Mr. Henderson in November of 2017, was the parent alone who completed the initial application to add his 3 daughters to his request for CalOptima Health Insurance, the moment he informed the Health Insurance provider that he had moved out of Orange County into Riverside County that December, he states all claims activities involving his children should have ceased or transferred over to Riverside due to the mother already having SSI and needing to complete a separate application for the children in which the father claims she never did due to potential risk of being reported for Social Security Fraud in not claiming the marriage and husbands income to the Social Security Administration while maintaining Supplemental Security Income (SSI).

Instead of terminating Mr. Henderson's Cal Optima Insurance for him and his children, he states the Health Insurance Provider continued to allow the children to fraudulently be under the grandmother, Ellis Ponce in using her daughter's name, Lamour Ponce. CalOptima, in efforts to conceal such actions of identity fraud between both mothers, further denied Mr. Henderson access to all medical claims and records whenever attempting to call the Health Insurance provider, stating he "needed access."

It was in another phone call in which the CalOptima agent, after Mr. Henderson threatened to sue, did they decide to give 1 pediatrician's name in Irvine, California, instead of giving the father medical records of his children, and it was in that pediatrician's medical records did Mr. Henderson find an EEG test in relation to unknown seizure activity while Jordyn was a student at Eastside Christian Schools and other records such as a positive Depression Test for daughter, Maya, while also a student at Eastside Christian Schools but records and diagnoses left unknown to him.

Such actions allow County Agents in custody and child support courts to Cyber Name Claim a child with their parents first and last name only (No middle name or distinguishing titled suffix) to tie unclaimed oil and gas leases for royalties and financial gain with various County Government Agencies and Healthcare hospital/Centers.

## CHOC Health Alliance

Plaintiff, Kenneth Henderson is filing this initial claim in seeking damages against CHOC Health Alliance due to allowing a policy that supports Fraud Predators who tend to target children for financial gain, to further target their personal formation.  CHOC Health Alliance, in supporting Medi-Cal Services, allows children who are not

wards of the state to be their own Health Insurance Subscribers. Such a policy allows Child Fraud Predators to further target children's credit, medical records and social security records for fraudulent claims with Identity Fraud.

Children's credit, medical records, social security records or health insurance claims should not be further targeted by Child Fraud Predators due to a policy that can be changed and require parents of none wards of the state to be their children's Health Insurance Subscribers.

Such actions allow County Agents in custody and child support courts to Cyber Name Claim a child with their parents first and last name only (No middle name or distinguishing titled suffix) to tie unclaimed oil and gas leases for royalties and financial gain with various County Government Agencies and Healthcare hospital/Centers.

CHOC Hospital concealed medical records of daughter, Jordyn Henderson's EEG test in their Neurology Department from being faxed over to other pediatricians or medical centers for preventative treatment. Mr. Henderson documented more than once where he attempted to have his daughter's medical records sent via fax from CHOC to 2 Corona Pediatricians and the hospital simply never would send over the records to allow current doctors the ability to follow up on their medical treatment. Mr. Henderson would be required to physically drive to the Santa Ana and Orange hospital sites to receive in hand his daughter's medical records after they repeatedly failed to fax over Dr. Bahlla's then Dr. Yoo

Mother and Grandmother, Lamour Ponce may have created double billing and fraudulent claims with an retired referred CHOC Ophthalmologist in 2016 through their Irvine Pediatrician Afagh Kathryn Khorashadi, possible fraudulent double billing claims through Optometrist Seth Bernstein in Corona, California and Dr. Rahul Bhola, an Ophthalmologist with CHOC Hospital.

**Orange County Medi-Cal**

Plaintiff, Kenneth Henderson is filing this initial claim in seeking damages against Orange County Medi-Cal services due to allowing a policy that supports Cyber Fraud Predators who target children for financial gain by targeting their personal formation as minors.  Orange County Medi-Cal allows children who are not wards of the state to be their own Health Insurance Subscribers. Such a policy allows Child Fraud Predators to further target children's credit, medical records and social security records for fraudulent claims with Identity Fraud.

Children's credit, medical records, social security records or health insurance claims should not be further targeted by Cyber Child Fraud Predators due to a policy that can be changed and require parents of none wards of the state the ability to be their children's Health Insurance Subscribers.

Such actions allow County Agents of children in custody and child support courts to Cyber Name Claim a child with their parents first and last name only (No middle name or distinguishing titled suffix) to tie unclaimed oil and gas leases for royalties and financial gain with various County Government Agencies and Healthcare hospital/Centers.

**Orange County Superior Courts**

The Plaintiffs are filing this initial complaint against Orange County Superior Courts due to years of colluding with the above defendants to deprive Mr. Henderson, his 3 daughter's and various other Native American Family heirs from the Seminole Nation of Oklahoma their inheritance from Lula Dunford. The Orange County Superior Courts Child Support Services concealed a contractual agreement with a 3rd Party Billing Company, Ultimate Software for Mail Fraud with the U.S postal service in printing fraudulent Child Support statements

19

for financial gain of the County and the other parenting party to hide Mr. Henderson's additional payments to the biological Native American heir and father from being identified with the California State Child Support Payment Distribution Unit. The Child Support order and garnishment should be served to the parenting party when their payments are considered late in which Mr. Henderson in still considered being a non-state resident until May 22nd was ordered to pay Child Support on May 2nd 2017 without trailing the Custody courts decision in which changed the order from 80/20 visitation in favor of the mother to 50/50 equal visitation times for both parties. Orange County Superior Courts used intent and libel actions in using Ultimate Software to target Mr. Henderson's paycheck deductions for several months while hiding the wrongs being committed against him from being recognized with the California's Child Support State Distribution Unit, as the State SDU never knew his employer checks were being garnished due to Ultimate Software not showing Mr. Henderson's Child Support deductions due to not calculating his Vacation, Sick Leave and Travel Expenses until the court and his employer became aware that he had put in his resignation to take a job in Long Beach CA. However, it was the Petitioners decision to not take the job after his reliable family car was repossessed near December of 2018 in which he recognized the garnishment deductions finally appearing on his paycheck stubs mailed to his home address from 3rd party billing Company, Ultimate Software in contract with both the Superior courts and his employer, Easter Seals who Easter Seals headquarters in Sacramento states they only use the California State SDU for employee garnishment orders from the court, which would support collusion between a secretive contract order between Orange County Superior courts Child Support and Mr. Henderson's employer to target his financial ability to support his daughter's on a Child Support Order that was already considered to be in violation due to the change in high visitation schedule of his daughters with a 50/50 joint legal and physical temporary order given on May 19th, 2017 and a final order given on July 25th, 2017. The court used High Visitation as a reasoning to cover up Mr. Henderson's noted diagnosed disability as being the primary reason the court needed to conceal prior actions to hide years of receiving Survivor Benefits of a deceased husband and biological father who remains alive while further receiving SSI Payments with the Social Security Administration by the court and County Agencies colluding to use both mother and grandmother's scheme as to claim Mr. Henderson's Native American families inheritance for financial support of Orange County Government Agencies in filing and claiming the children heirs or simply Maya Henderson, deliberately born separately in Washington D.C from her biological parents and siblings place of birth in Virginia to be claimed by LAMOUR PONCE Sr and filed in all Orange County Superior Court custody matters with both fathers as LAMOUR PONCE only.

Orange County Superior Courts further assisted both Lamour Ponce Sr. and Lamour Ponce Jr. in never identifying which mother was made Power of Attorney with Legal Guardianship over her granddaughters while filing false claims of Domestic Violence charges against Mr. Henderson. The court also assisted both mothers with keeping all filings as Lamour Ponce only to conceal   who was diagnosed as permanently disabled due to a severe brain injury, giving up legal guardianship of Aaminah and her children in marriage to Mr. Henderson without his knowledge. The Superior Courts filings between both mothers still only state Lamour Ponce or Lamour Ponce to deny all parental rights of both fathers in favor of the grandmother known to family as Ellis not L'amour.

**[Afagh Kathryn Khorashadi, M.D (Irvine Pediatrics and Saint Joseph's Heritage Center)**

Attached documents from the Anxiety and Depression Association of America (ADAA) showing the common relationship between headaches and anxiety disorders support the Respondent, Lamour Ponce, once again colluded with another assigned pediatrician (Dr.Afagh Kathryn Khorashadi) to recreate medical records given to the Irvine doctor by redacting the Sunrise Multi-specialist Medical Centers physician ASSESSMENT of headaches and TREATMENT ORDERS of Ibuprofen on his medical records.  The Physician Assessment and Treatment Orders of the medical records, rather sent electronically, faxed or mailed, should be identical to whatever was sent from one physician's office to the next, however, the Sunrise Multi-specialist Medical Center's medical records for Maya, once given to Dr. Afagh Kathryn Khorashadi, Mr. Henderson recognized

20

changes under the titled area of **Assessment**, directly below where it states Overweight. it should state:

"Headache, acute, no additional work up required."  However, this assessment by the Sunrise Multispecialist Center's physician once in the office of Dr. Afagh Khorashadi, is clearly missing.

Likewise, where the Multi-specialist Medical Center's physician's medical records state **"Treatment/Orders,"** his last prescription ordered should state:

Prescribed Ibuprofen, 400 mg, 1 tablet orally every 6 to 8 hours as needed. For pain and Inflammation. Take with food #30 tablets, No refills, (McKelvey, James PA-C, 5/23/17 at 11:19AM),

However, the above treatment order of Ibuprofen once in the office of Dr. Afagh Kathryn Khorashadi, is also missing.

The courts may question rather such malpractice in medical records should be focused only with Dr. Kathryn Afagh Khorashadi's office and not in collusion with the Respondent, however, the Petitioner is asking the court to review the mothers actions in criminally altering and creating medical records in colluding as well with Dr. Jennifer Tucker's Saint Joseph's Heritage Center, some six months later. Such actions by the mother in collusion to create medical records with Dr. Tucker's office were in effort to hide such records, labs, referrals and medical test from Dr. Khorashadi's office from being included as added testimony in support of the Petitioner, in her continued actions in denying him decision making abilities in the children's educational and health needs while attending Eastside Christian Schools before the courts made their July 25th, 2017 After Hearing Court Order.

**Saint Joseph's Heritage Medical Center:**

An attached copy of CalOptima's Health Insurance billing statement requested this year by father, Kenneth Henderson, supports no medical billing existed from his daughter's November 28th, 2017 physical and medical records in which mother, L'amour Ponce claimed she took their child to be treated by Dr. Jennifer Tucker from Saint Joseph's Heritage Center. The non-existence of medical billing from the November 28th, 2017 visit supports the Petitioner's belief that the Respondent and Saint Joseph's Medical Center in Anaheim colluded in falsifying all his daughter's medical records from that Tuesday, to include a lab work request to test for pre-diabetes. Such criminal acts to fraudulently create medical records between the Respondent, L'amour Ponce and Saint Joseph's Heritage Medical Center were in efforts to cover up the existence of medical records that support possible negligence in daughter, Maya's mental health treatment while a student at Eastside Chistian Schools, Raney Intermediate Schools, and Centennial H.S from both mother and grandmother in collusion with Irvine pediatrician, Afagh Khorashadi, M.D.

**David Joseph Ponce**

Assisted with covering up all Identity Impersonation and Fraud claims between his sister Lamour Ponce Jr., and his mother, Lamour Ponce Sr., in claiming the same name of Lamour Ponce only in the Orange County Superior Courts and Aaminah, Maya, Kayla and Jordyn as children who resided in Virginia. The actions taken by David Ponce was for financial and custodial gain of Orange County and both mothers with various ties as County agents in financial support of California Government and Healthcare facilities.

**Joseph Ponce Jr**

Assisted with covering up all Identity Impersonation and Fraud claims between his wife, Lamour Ponce Sr., and his daughter, Lamour Ponce Jr., in claiming the same name and children who resided in Virginia and Georgia for financial and custodial gain of Orange County Government agencies and healthcare facilities with the name L'amour Ponce only, as filed into the Orange County Superior Courts.

**Michele Helena Ponce:**

Assisted with covering up all Parental Identity Impersonation Fraud claims between her sister and her mother, in being aware that both mothers as Lamour Ponce claimed the same name and children who resided in Virginia and Georgia for financial and custodial gain of L'amour Ponce with various ties as County agents with Orange County, California Government and Healthcare facilities.

**Stephen Dolphin:**

L'amour Ponce's Brother In Law has worked for Eaton Corp for 13 years as an agent while being aware that both mothers as L'amour Ponce claimed the same name and children who resided in Virginia and Georgia for financial and custodial gain of Orange County Oil and gas companies Eaton Corp and Exxon Mobil in financial support of various ties as  agents with Orange County, California Government and Healthcare facilities with oil and gas leases willed from Mr. Henderson's Great grandmother, Lula Dunford to his grandmother, Laura McCullough. Both Stephen Dolphin and his wife, Michele had Mr. Henderson's stepdaughter, Aaminah remain with them after things fell through where Aaminah was residing with her boyfriend Tyree Henderson. Mr. Henderson believes the Ponce family as Government Agents intended to use Aaminah as a child heir by blood once she marriage Tyree Henderson and changed her name to Aaminah Henderson and claim inheritance from her Indian Blooded sisters as heirs, Maya Henderson, Kayla Henderson, and Jordyn Henderson. However, the relation between Mr. Henderson and Aaminah had become strained due to the same manipulation tactics appeared to be skilled behaviors from the Ponces that they also use as Agents on Maya, Kayla and Jordyn. Both the Dolphin Home and the Ponce Home could both be claiming Aaminah and Maya as child heirs to inheritance to tie such royalty profits from each home into Eaton Corp and Exxon Mobil.

**Christine Holmes:**

Court assigned Therapist, denied to refer daughter, Maya Henderson and her behaviors for diagnosed Anxiety and Skin Picking Disorder to a higher form of care during and after ending services. Christine Holmes, also may have used aka name Christina Holmes, colluded with CSCC's (Child Support Cyber Criminals) by using an Online Scheduling System over paying for a Receptionist to deny Mr. Henderson the ability·to properly schedule his 3 daughter's in efforts to influence the courts custody decisions of the children in all monthly therapist reports in favor of LAMOUR PONCE and Orange County. The therapist further colluded with the Orange County by COACHING all 3 children into what to say for a court interview in which minor children should never be prepped into what answers to give to a Court Investigator before making a ruling on custody matters between 2 parenting parties. Not only was both mothers as Black Widow Agents allowed to change the Investigator's Report just days before filing a response to the court, but he was left to have to respond on the witness stand without knowledge of having to testify to such false statements made to his children of throwing their sisters items out of the house when he only attempted to move all her belongings down to the basement room after months of Aaminah denying to assist with support of the monthly rent while making over $46,000 annually with her employer at Enterprise Rental. The grandmother as Lamour Ponce Sr appeared to change the Court Investigator's Report of statements of Narcissism likely made in reference to the mother's inability to be truthful and provide facts of her actions in her interview for why she took the children into her home without reporting a Just Cause to the Orange County District Attorney's Office or the Custody Court, with Lamour Ponce likely justifying her actions in her beliefs as always legally right while never admitting she denied the fathers' rights of her children in what she and her mother did as Black Widow Agents for financial gain in

22

1  millions in inheritance taken from Mr. Henderson's Native American family heirs for Orange County.
2
3  **Darrell's Drilling (Konowa, Oklahoma):**
4
5  Darrell's Drilling states they have been in the business of oil drilling since the 1990's, however, when the
5  Plaintiff, Kenneth Henderson recently on Monday, June 8th, 2020, called the oil drilling company, he was
7  informed that her husband was no longer doing oil well drilling and that they "Only managed the land." The
3  employee and wife from Darrell's drilling did not state how they were paid for maintaining the land or if such
)  payment came from a percentage of the mineral rights, however, if someone is simply maintaining the land
)  owned by Lula Dunford and probated to Laura McCullough, then it would appear by taking out the landowner
1  or the middle man, the actual oil driller, and the mineral right buyer such as Exxon-Mobil would clearly benefit
2  in lease negotiations.
3
4  It should be noted that Eaton Corp, while only 37 miles away as an Up Stream oil drilling exploration and
5  recovery as a major oil and gas company resides in Shawnee, Oklahoma and in Irvine, California as a
5  Aerospace company, where coincidentally in Irvine, the Henderson family as McCullough heirs in 1993, after
7  going through years of a home, lease to purchase court battle in the City of Orange, with a complaint filed in
3  1987 by the Henderson's in the Orange County Superior Courts but did not settle out of court until 1992 as
)  drillers during that time named the Walker and Raper family transferred the ownership of Lula Dunford's oil
)  wells into their name, with Raper creating a Trust account. With the Henderson's settlement with the Superior
1  Court of Orange County, they moved to Irvine where Eaton Corp resides and living in a neighborhood across
2  the street from the Ponce family home, then had Lula Dunford's inheritance completely taken out of her name
3  as the owner into the Raper name.
4
5  **Violation of State Statutes by Lamour Ponce:**
5  The core issues between me and the Respondent, L'amour Kim Ponce stems from her knowingly and willfully
7  continuing to hide medical  records of our daughters as legal documents (as stated under California Penal Code
3  Section 135 PC for hiding evidence from being used as supportive testimony before and after the Orange
)  County Superior Courts July 25th, 2017 court order in support of my initial January 2017 filings for Legal
)  Separation and later for Divorce in 2018. The July 25th, 2017 final order gave both parenting parties joint legal
1  and physical custody over our 3 children with a continued week on/week off 50/50 visitation schedule from a
2  temporary order given on May 19th, 2017.
3
4  **California Penal Code Section 135 pc states:**
5
5  A person who, knowing that any book, paper, record, instrument in writing, digital image, video recording
5  owned by another, or other matter or thing, is about to be produced in evidence upon a trial, inquiry, or
7  investigation, authorized by law, willfully destroys, erases, or conceals the same, with the intent to prevent it or
3  its content from being produced, is guilty of a misdemeanor. Mr. Henderson reported in court that Lamour
)  Ponce knowingly concealed legal documents and video footage on laptops and camcorders belonging to him, to
)  include fraudulent activities involving the couples ax return documents, fraudulent activities involving her
1  disability benefits while receiving Survivors Benefits and Supplemental Security Insurance payments while
2  denying his work income and marriage for years. *(some source taken from . 2015, Ch. 463, Sec. 1. (AB 256)*
3  *Effective January 1, 2016.)*
4
5  **California statute 3003 for Joint Legal Custody states:**
5  Both parents shall share the right and the responsibility to make the decisions in the health, education, and
7  welfare, of a child.
3
)  The above source is from: https://www.womenslaw.org/laws/ca/statutes/3003-joint-legal-custody

Since my January 2017 filing for legal separation and divorce in 2018, I believe I have provided the courts proper testimony to support the Respondent's repeated actions in violating California's joint legal custody laws as the current ruling between us in further violating statute 3027.1.

Leading into this requested Custody Investigation, the Respondent has continued to falsely claim me as threat to our children going back to her 2017 testimony stating her reasoning in placing our children into her parents' home and into a private school her mother worked for once we arrived to California from Georgia. The Respondent in recent testimony on November 9th, 2019 essentially doubled down from her previous false accusations relating to her fears of me around the children in her written testimony response to my declaration in January of 2017. She recently stated in her filed request for modification of our July 25th,2017 custody order, that my demise due to mental health deterioration and threatening behaviors has our children "walking on eggshells" while they remain on visit in my home.

**3027.1. False accusations of child abuse or neglect during child custody proceedings; knowledge; penalties**

(a) If a court determines, based on the investigation described in Section 3027 or other evidence presented to it, that an accusation of child abuse or neglect made during a child custody proceeding is false and the person making the accusation knew it to be false at the time the accusation was made, the court may impose reasonable money sanctions, not to exceed all costs incurred by the party accused as a direct result of defending the accusation, and reasonable attorney's fees incurred in recovering the sanctions, against the person making the accusation. For the purposes of this section, "person" includes a witness, a party, or a party's attorney.

(b) On motion by any person requesting sanctions under this section, the court shall issue its order to show cause why the requested sanctions should not be imposed. The order to show cause shall be served on the person against whom the sanctions are sought and a hearing thereon shall be scheduled by the court to be conducted at least 15 days after the order is served.

(c) The remedy provided by this section is in addition to any other remedy provided by law.

California Penal Code 135 PC:  I have supported in previous court testimonies filed from my October 3rd of 2018 declaration, that the Respondent used a CalOptima Health Insurance password to deny me as the father, medical records other than immunizations now known to me to be from **Afagh (Kathryn)** Khorashadi, **MD**. The Respondent's actions further denied the Orange County Superior Courts medical records of the children from Afagh (Kathryn) Khorashadi, MD, Saint Joseph's **Medical Center and CHOC Hospital**. The Respondent also had an opportunity to inform our daughters Riverside pediatrician and current Corona-Norco school district of pertinent medical records in relation to properly treating our daughters diagnosed pre-diabetes, Skin Picking Disorder, Anxiety Disorder and Seizure activity requiring a referred Neurologist and EEG as a means to update our the transferred Orange County IEP with a Seizure Action Plan for preventative measures to support Corona-Norco School teachers in protecting our child in case she has yet, another onset of seizure activity, however, she chose not to provide such medical information once again.

**3025. Parental access to records**
Notwithstanding any other provision of law, access to records and information pertaining to a minor child, including, but not limited to, medical, dental, and school records, shall not be denied to a parent because that parent is not the child's custodial parent.

In representing myself, I can say that I have made many legal mistakes in my filings in efforts to support my legal rights as a parent to support my daughters educational and health needs, however, any appeal that the court removed due to technicality never once stated I can be denied my rights to have knowledge, and access to

records and documents of my children in seeking a response from Orange County Superior Courts, Orange County Social Services, CalOptima Health Insurance,  Ultimate Software in Santa Ana, a Saint Joseph's Medical Center Pediatrician, **Afagh (Kathryn)** Khorashadi, **MD** and to Eastside Christian Schools Kim Van Geloof and L'amour Ellis Ponce, all in support of my attempted May, 2019 appeal of the Respondents continued actions in denying not only my rights but the rights of our children's health needs due to diagnosed conditions.

If Eastside Christian Schools Principal, Kim Van Geloof, and L'amour Ponce as a school volunteer or her mother, Ellis Ponce as a school instructor were either terminated or forced to resign from their employment positions due to related written testimony in my appeal documents of being denied my SELPA RIGHTS in California as a parent to my children, in no way should the Respondent then be able to legally retaliate with false statements of me being a threat around my daughters. In fact, the medical records unknown and denied to me in both 2017 and 2018 custody hearings in which led into 2019, the Respondent was given approval to see a Neurologist to perform an EEG due to Staring Spells to include a referral for Mental Health depression for our other child, were during the same time period in 2017 in which I was also denied knowledge to make educational decisions of my children per SELPA RIGHTS from both the Respondent and our children's 4th grade Eastside Christian School Instructor, Ms. Wozab of any Medical and Psychological Assessment in support of updating our daughters IEP and Seizure Action Plan I have attached to this investigative response, should support my prior and current allegations of the Respondent's continued actions in violating California Statute 3003, California Statute 3027.1, California Statute 3025, and California Penal Code 135 PC.

False Impersonation (California Penal Code Section 529 PC) is a criminal offense involving the use of someone else's name in order to cause harm to that other person or improperly gain a benefit. Both my wife and mother in law were used as agents along with various In Laws and County workers in positions such as Orange County Social Security agents, Orange County IRS Agents, Orange County Social Services Case Workers, Orange County and Riverside teachers, principals, nurses, doctors, judges, lawyers, all in similar fashion of actions of various community and County workers in support of in laws who took millions in inheritance from the Osage Indian Tribal murder cases, all to influence decisions in court, in school districts, in falsifying hospital treatment and diagnoses in efforts for Orange County as California state agencies to maintain millions in royalties and inheritance from Mr. Henderson's Native American Family heirs as Seminole Indians from Atoka, Oklahoma.

Mr. Henderson and his 3 daughters have a living Uncle (Quincy) who along with their 14 other siblings were enrolled in the historic Riverside Indian Boarding School in Oklahoma. That's 15 aunts and uncles of Mr. Henderson that shows how recent our history as a country denying the inheritance and land rights in moving and murdering the American Indian is from today. The Trail of Tears did not end in Oklahoma, as Mr. Henderson claims the U.S Government denies the millions of Black American Indians who were forced to come to Tulare and Northern California for survival, as his ancestors did.  The Ida #1 Oil Well and Nelly #1 Oil Wells that began the huge oil rush in Oklahoma were on Mr. Henderson's great-great grandmother's land, "Ida-Nelly"Hays Cochran as the mother of Lula Dunford, Mr. Henderson's grandmother, Laura McCullough's mother, Monica Henderson, Mr. Henderson's mother. It is the reason why nearly every major freeway, government buildings, hospitals, and various corporations have Mr. Henderson's ancestral heirs roll numbers tied into thousands of U.S businesses nationwide as they derive from the oil and gas from lands taken from his family heirs in the early 1900's.

Just as the Osage Indian Tribal Members were targeted for murder for their oil wealth, well so were the black Washita and Seminole Indian Tribal members, however, the Black Native American Indians were not only murdered and separated from their children as heirs, but they were denied knowledge of their cultural roots as American Indians and told they were slaves as part of the Trans Atlantic Slave Trade when many were always for many generations, remained near the Wichita River and various other locations throughout Oklahoma and the lands from the Louisiana Purchase.

25

# The Wolves of Anadarko

David McCullough, as Plaintiff, Monica McCullough Henderson's father and Plaintiff, Kenneth Henderson's grandfather, worked on the railroads for years and would leave at months at a time. During the months Mr. McCullough would be gone, his wife Laura would have to manage to keep the children alive from starvation until he got back.

Once, while waiting for her husband to return from working on the railroads (the Missouri-Kansas-Texas Railroad in which David named his daughter after) Laura McCullough walked out on the porch of the families small home in Anadarko and noticed a wild wolf prowling in the woods toward their daughter Katy. The child was unaware of the charging wolf while playing. Laura quickly grabbed a nearby shotgun, pointed, and as the wolf edged right up on her daughter, she fired, watching the wolf collapse to its death in-front of her frightened child.

It was Laura who was left often to find food for the children to eat as the days grew nearer for David to return from working on the railroads. Monica Henderson as a Plaintiff, remembers the oral story of her siblings stomachs protruding in starvation some months while waiting for their father to return from working on the railroads and when he did, they often were left to eat raw potatoes and some foods he was able to provide them until he had to leave again. There were times the family had to rely on getting food from the Anadarko reservation to survive until their father returned.

The KT Railroad passed right through Anadarko where David and Laura McCullough lived and began raising their children, even naming one of their daughters, Katy, after the railroad. Union Pacific Railroad resources later purchased the Missouri-Kansas-Texas Railroad before becoming Anadarko Petroleum. Many Black Native American railroad employees from Anadarko, such as David McCullough, along with their families, were placed on a one way ticket train ride away from their Anadarko reservation to Tulare, California in efforts to keep their families safe from the violence from settlers paying bounties to kill off tribal members with known allotments.

# Conclusion

Lamour Ellis Ponce as the grandmother, using the name L'amour Kim Ponce as the wife and mother, Joseph David Ponce Jr as the grandfather, David Joseph Ponce as the brother who all played key roles in targeting Mr. Henderson's family members for inheritance of oil and gas leases, and further involvement of the Petitioner's stepdaughter, Aaminah Emma L'amour Watkins, possibly working together with the above named individuals in using fraudulent names and identification of others for fraudulent medical claims, fraudulent social security and survivors benefits , while further depriving him, his children, his parents and siblings financially of the basic necessities of food, water and sheltering in efforts to claim millions from oil, gas, and minerals from his families willed land inheritance.

Furthermore, in viewing the Henderson and Watkins cases historically, it would appear, just as Eastside Christian Schools may have violated their own enrollment policies in creating some form of financial agreement with the Ponce family in intentionally leaving out the Petitioner, father who in what was a matter of days that the married couple had separated from one another, the same form of an agreement with the Ponce family legally with the Orange County Superior Courts and Milton C. Grimes could have involved a sealed Judgment ruling of Aaminah Watkins, requiring the Ponce family take part with a group of individuals in efforts take Mr. Henderson's 3 daughters from him, and target his eldest biological daughter to claim the family inheritance with identity theft.

The impact of numerous libel acts by Orange County in support of the Ponce family as agents triggering the

26

heart attack and stroke of Mr. Henderson's mother and grandmother of his American Indian children, Monica Henderson who California further targeted her as a senior citizen while having her ambulance drive nearly an hour and a half away from Corona to Temecula Valley Hospital near San Diego as she was fighting for her life. Such support of Monica Henderson of her grandchildren to have her leave her retirement home in Georgia was simply that she feared Lamour Ponce and Orange County were scheming to separate her and her son as Native American parents and grandparents from years of continuing to claim all oil and gas royalties willed to Mr. Henderson. Mr. Henderson, eventually believed every word his mother was saying in her belief that the Ponce family were scheming to take the children for financial gain.

Mr. Henderson states Orange County Government Agencies used his mother in law and wife's last name of Ponce to have his daughter Maya Henderson born in Washington DC's George Washington University Hospital under 2 Social Security Numbers, with one given from the hospital to Lamour Ponce Sr in DC and the other Social Security Number given as recently as 2019 stating Maya was born in a hospital in Virginia when she was not. Throughout Kenneth Henderson and Lamour Ponce Jr's marriage, his wife continued to go against Mr. Henderson's wishes and include her mother in all financial tax return decisions in completing over 12 years of the couples tax returns in which both mothers in using the same name of Lamour Ponce and California have attempted to conceal to cover up all fraudulent activities of inheritance theft.

Mr. Henderson states that **the American Indian Probate Reform Act put into law on June 20th, 2006,** denies fractionization of ownership of allotments of land from non-Native American Indian heirs or Non Native American descendant spouses (such as Lamour Ponce as a spouse, or Aaminah Watkins attempting to be a non-Native American heir as Aaminah Henderson through marriage, both capable of taking away or minimizing royalties owned to Kenneth Henderson or his Native American children as heirs). A living will does exist from Lula Dunford, given to Mr. Henderson's grandmother Laura McCullough and that any conspired plan over many years by Orange County and its Superior Courts to use Ponce family members and various other

Government employees working within the County as Agents was meant to keep the Henderson family from their inheritance. However, due to the **American Indian Probate Reform Act (AIPRA),** Lula Dunford's land rights to oil and gas leases in Oklahoma that she willed to daughter, Laura McCullough, would make Monica Henderson as Laura's daughter, Kenneth Henderson as Laura's grandson, and Maya, Kayla and Jordyn Henderson as Laura's great-granddaughters as direct descendants and heirs to Lula's inheritance.

**The Amendment of the Stigler Act of 1947** was signed on December 31st, 2018. This 2018 Amendment of the Stigler Act directly impacts Lula Dunford's Allotted Land restrictions of her willed property in Oklahoma to her heirs due to having less than 50% blood quantum after she passed in 1950. Mr. Henderson states her land should have remained restricted but recognized her ownership name on her property was removed in 1993.

**Please review the following related court documents:**

1)    Lula Dunford's Native American Indian Roll #58 Will to daughter, Laura McCullough
2)    Oil & Gas Leases on land allotted to Lula Dunford (Heirs have right to land, deny those trespassing)
3)    Eastern District Court of Virginia: Kenneth Henderson v Fairfax County Government et el.,
4)    Kenneth Henderson v Fairfax SEIU-VA 512 Union (**Baltimore** Department of Labor, **CSX** involved)
5)    Virginia 4th District Court of Appeals "Kenneth Henderson v Fairfax County Government et el,
6)    Orange County, California 4th District Court of Appeals "Kenneth Henderson v Lamour Ponce"
7)    Tulare Probate of Property of David McCullough to Monica Henderson (Railroad Co Holdings to Heirs?)
8)    The County of Orange v Alvin **Watkins** (Heirs of **CSX** Executive **Hays T. Watkins** may be involved)
9)    Ellis Ponce v Alvin **Watkins** (Watkins name may attempt to link **Hays T. Watkins** of **CSX** Holdings)
10)   Corona Norco School District HR filings: Kenneth Henderson v Corona Norco School District
11)   Request for either Federal Court and Tribal Court take over children's case with Riverside D.A support.

27

Systemic Institutionalized Racism does exist within the infrastructure of our County Agencies the exchange of Government Agency Family Benefits through the Social Security Administration to give to Agents as Guardians of Inheritance of Oil and Gas leases in financial trust account (SNT) to support of California Government Agencies from an attorney working with the in laws in which they targeted Mr. Henderson's family. For the above reasons the Petitioner is requesting in relief $975,000,000 (675 Million Dollars in damages owed to him, his 3 children, to include his biological parent, Monica Henderson, who gave up everything to protect her Native American grandchildren from being taken and claimed for inheritance from the Ponce family and Orange County, while continuing to recover from a major stroke and heart attack, with the remaining relief of $300, 000,000 going to all remaining Native American McCullough heirs listed on the 2020 Tulare County McCullough Probate).

In the end, it is Mr. Henderson's belief that further investigations in similar vein as the Osage Indian Tribal investigations need to be conducted for possible criminal charges against his in laws in all actions taken by the Ponce, Dolphin, and Dillett families ties to U.S Intelligence Agencies in using their Cyber capabilities and training to repeatedly target him and his Henderson family as McCullough heir's to criminally take away their inheritance. The Osage Indian Tribal Murders which involved the theft of potentially billions in inheritance was organized criminal activity in the early 1900's which included doctors, nurses and spouses poisoning heirs to wither and die of unusual deaths, die from paid gunmen, and die poverty related illnesses with appointed guardians and in laws taking the land and mineral rights without feeling any empathy or love for the child heirs.

Tulsa, Oklahoma, one of the most vibrant and thriving cities throughout the world in the early 1920's was called the Black Wall Street for its creation of small business wealth of many Native American Black owners remaining with oil and gas leases. However, today, after nearly 100 years after white settlers, members of the KKK, and the military used machine guns, bomber airplanes, and angry white mobs to enter into the City and kill at will, knowing the outcome would financially benefit one race over the other. So the killings of Black Native Americans from Tulsa to other cities throughout Oklahoma continued year after year into rural small and big towns such as Wewoka, Atoka, and Anadarko, where the Riverside Indian Boarding School my grandmother and aunts and uncles attended. Such continued tensions between the white settlers and Mr. Henderson's Native American ancestors came at a price tag higher than the other hundreds of Native American Indian tribes, as Mr. Henderson and his children, like many other black Americans, were raised to believe in false history given in school systems in labeling black Americans as slaves from Africa. However, it was years of forced tribal separations by KKK in supporting white settlers to root out Native American heirs before the 1946 Stigler Act.

From 1917 to 1993 Lula Dunford's land remained in her name and was illegally taken by the hands of people in Orange County, California with the same mentality as those white settlers who destroyed the black lives of those American Indians already as owners of the land before them. Today White Hall and Grayson Cemetery's in Choctaw and Seminole County's show clearly where Mr. Henderson's ancestors rest is where many allotments of 160 acres were granted to tribal members of the Eastern part of Oklahoma as Native American Territories. It is where black Native American cemeteries remain with aged tombstones showing handprints of babies and children who lost their parents as did Kenneth Henderson's grandmother as Monica McCullough Henderson's mother, Laura McCullough did in losing both of her parents mysteriously in death (Possibly in similar vein as the Osage Tribal Inheritance Murders) on the same day. Laura was left to be raised by her aunt Lula. No way should history be written that Laura as a Dunford growing up with Lula should allow criminals in Tulare and Orange County, California to deny her living will and wish at death for her appointed heirs in the Richardson's and McCullough's to "share and share alike" in taking over her Oklahoma land and mineral rights.

In 1906 the United Stated Supreme Court ruled that the Anadarko Reservation was aboriginal Washita land and further ordered a land surveyor to convert it into 957 allotments. The plaintiff, Kenneth Henderson's grandparents, Laura and David McCullough were born & raised before being married on the Anadarko

28

reservation, where they had several children who attended the Historic Riverside Indian Baording School of Anadarko. Today, the Anadarko basin of Oklahoma is worth billions in land and mineral rights. Just last year, defendant, Anadarko Petroleum was sold for 38 billion, a profit made without including the 957 allotted heirs. As a Seminole, Washita, Lula Dunford took in Laura McCullough, like her own daughter but made sure Laura knew she was a Washita Indian by blood by enrolling her into the Washita Boarding School in Anadarko, where Laura and David were raised before having their own children. Lula's land for years has been producing oil and gas from Humble oil, now Exxon-Mobil, with energy drilling company, Eaton Corp potentially involved in concealing their financial profits in over 40 plus oil wells on her land.

However, it is David McCullough and Laura McCullough, as Anadarko Reservation descendants and heirs who continue to be denied millions in mineral rights as 2 of the 957 allottee heirs born and raised from the Anadarko Reservation as Washitaw and Seminole Indians. With plaintiff, Kenneth Henderson's grandfather, David, spending much of his life working on the railroads, supported by his wife Laura, while married on the Anadarko Reservation, they continued to have their heirs denied concealed inheritance documents in courts supporting potentially millions upon millions of billions profited in mineral rights from the Anadarko Basin. Mr. Henderson states the Plaintiff's deserve at least relief in damages that should include maintaining millions in future profits as title and Anadarko land owners, as appointed allotted heirs as stated in the Supreme Court ruling, with the remaining McCullough heirs on the David McCullough Probate deserving relief in damage as well as Anadarko descendents and heirs denied millions from the billions profited by the defendants.

Oral Busby and the Ada, Oklahoma court and all court associates, to include appointed Guardians, as did those Orange County Superior Courts, and Tulare Court judges, and attorneys who appointed the Ponce, Dolphin, and Dillett family members as Guardians and Government Agents to target heirs Kenneth Henderson, Amillia Henderson, Monica Henderson, Maya Henderson, Jordyn Henderson, and Kayla Henderson for criminal profit and gain of inheritance through murder of Laura McCullough's parents and 2 brothers, with potential harm to the withering health and death of defendant, David Ponce's wife, Dominique Ponce for financial profit of Ponce family members as well by continued manipulation and fraudulently altering medical records, altering EMR records to Dominique's medical treatment to mimic cancer diagnoses, symptoms before her death in Orange County in similar way of targeting Monica Henderson for her New York Life Insurance Policy, similar to Lamour Ponce's ability to receive Survivor's Benefits at 42 years of age when her husband was actually alive to divert further moneys of inheritance into a Trust account, further able to claim inheritance from David McCullough and Laura McCullough, all to assist the courts in collusion with many defendants to continue to claim the millions profited in mineral rights and lands taken from Judge Orel Busby and his court over 100 years ago.

It is time that California Grave Robbers give back the land and mineral rights to what was never there's to take, as those baby handprints on the tombstones of hundreds of Oklahoma graveyards of black Native American child heirs who lost their parents, cultural identity as a Native American, and inheritance simultaneously, should recognize we as a country are living in a time in 2020 where the world united together is recognizing systemic discrimination and how it has negatively impacted millions of black lives in America.

 With today's awareness in advancements of Electronic Medical Records (EMR), all running under one system, and with Government Agencies now merging with various hospitals &  medical centers under one CITRIX/EPIC System, someone can see today how much easier it would be for the above defendants to secretly assign Guardians and Trustees in a child custody court, then claim the Native American Spouse's family inheritance by way of a gift and diagnosed disability through the Social Security System to be used in a trust account. Aaminah Watkins, her mother Lamour Ponce Jr, and her mother, Lamour Ponce Sr as the assigned Trustee Guardian, colluded with major Oil and gas energy companies, U.S banks, judges, and attorneys, all with ties to a sealed August 8th, 2004 Judgment with the Orange County Superior Courts.

29

March 24, 2015

Ex: A

ATTENTION: MR. PEARY ROBERTSON
FAX: 405-382-2887

My maiden name is Monica McCullough. I was born in Bakersfield, California in 1946.
I am the 16th of 17 children of David and Laura McCullough (many surnames). Both of
my parents were born in Coal County Indian Territory that is now known as Coalgate,
Oklahoma. They relocated to Bakersfield, California a few years before I was born, and
a couple of years later relocated to Teviston, California which is approximately 45 miles
south of Bakersfield. Having many elder siblings, in which 15 were born in the State of
Oklahoma, I would often hear them talk about Granny Lula Dunford. My Mother always
kept a picture of Granny Lula, her Mother Nellie Ida/Choteau Cochran, and her brother
Willie Hays, and her husband Uncle Ned Duncan (is what my siblings called him) in her
top dresser drawer at home. Per my elder siblings, Uncle Ned Duncan was also known as
Monroe William Dunford.

My parents grew up in a matrilineal family structure where everyone was kin and double
kin. They each had 20 plus siblings.

My Mother Laura Dansby Richardson Washington Cochran Nolitubby (many surnames)
had many siblings that were listed by Blood at the Chickasaw Land Office. The
Department of the Interior, Commission to the Five Civilized Tribes, Tishomingo, I.T.,
dated May 2, 1904 – In the matter of the selection of an allotment and designation of a
homestead for Walton Richardson, Chickasaw Card 173, Chickasaw Roll No. 557.
Walton Richardson was 21 years old.

July 14, 1904, The Department of the Interior, Commission to the Five Civilized Tribes,
Chickasaw Land Office, Tishomingo, I. T. Testimony of Walton Richardson relative to
the character of land allotted to Frank Richardson, Chickasaw by Blood, Roll No. 560.

July 14, 1904, The Department of the Interior, Commission to the Five Civilized Tribes,
Chickasaw Land Office, Tishomingo, I.T. Testimony of Walton Richardson relative to
the character of land allotted to Dora Richardson, Chickasaw by Blood, Roll No. 559.

Walton Richardson's allotment description is listed in Court Case No 1533, Filed in the
State of Oklahoma, County of Pontotoc – In re the Estate of Viola and Susan Nolitubby,
Minors, M. R. Chilcutt, Guardian – June 10, 1912 – November 1920, ending with Orel
Busby as Judge.

Walton Richardson died the next year, at age 22, in 1905, after giving the allotments to
his under aged siblings Frank and Dora Richardson Nolitubby. During this time,

1 of 4

Walton's Father Cyrus Richardson Cochran Nolitubby (many surnames) was still living. Walton's wife Louvinia died around 1910, their daughter Eliza died around 1913. Louvinia's ex husband Mose Pettigrew died at the same time Walton did.

According to a letter dated May 19, 1928 from Judge Orel Busby, to Robert Washington - Walton Richardson and Mose Pettigrew was killed, and that he and Gale Statler had owned those lands since 1905.

November 5, 1920, in the Oklahoma Pontotoc County Court Case Number 1533 of Susan and Viola Nolitubby, the Guardian M. R. Chilcutt is petitioning the court for Walton Richardson, Louvinia Pettigrew and Eliza Richardson's land.

The East half of the Northeast quarter; and the Southwest quarter of the Northeast quarter; and the East half of the Southeast quarter of the Northwest quarter; and the Southwest quarter of the Southeast quarter of the Northwest quarter; and the Southeast quarter of the Southwest quarter of the Northwest quarter of Section 13, Township 2 North, Range 8 East; and the North half of the Southwest quarter; and the East half of the Southeast quarter of the Southwest quarter; and the Northwest quarter of the Southeast quarter of Section 13, Township 2 North, Range 8 East;

The allotments of Walton Richardson, described as follows:

Lots 1 and 2; and the North half of the Southwest quarter of the Northeast quarter of Section 6, Township 2 North, Range 8 East; and Lots 3 and 4; and the North half of the Southwest quarter of the Northwest quarter of Section 6, Township 2 North, Range 8 East.

Allotment of Robert Nolitubby, described as follows:

Allotment selected May 20, 1904, as follows: The W. ½ of the N. W. ½ of the S. E. ½ of Section 13, and the N ½ of the S. E. ¼ of the N. E. ¼ of Section 24, all in Township 4 North, Range 8 East, being 40 acres appraised at $130. Choctaw freedman Allotment Certificate No. 2532 issued and delivered. Choctaw-Chickasaw Freedman Allotment Patent No. 5200 executed by McCurtain only. The earlier Census has Robert Nolitubby listed as an Native American.

Robert Nolitubby is the Father of Susan and Viola Nolitubby in Pontotoc County Court Case 1533 listed above. M. R. Chilcutt is Guardian over Robert and Louvinia's daughters Susan and Viola, and Walton and Louvinia's daughter Eliza, and Bynum Pettigrew whose parents are Mose and Louvinia Pettigrew.

This only list a few of my Native American Family Members and their legal descriptions. Minerals are on their land and have been incorporated into Royalty Trust Funds of others.

Many of the above are my Mother Laura's siblings, as well as Lula Dunford's husband Monroe Dunford's siblings by his Mother Hannah, and Lula's brother Cyrus/Si

2 of 4

Richardson Nolitubby (many surnames). Lula Dunford is the Aunt of Walton, Stephen, Melvina Blue, Dora and Frank Richardson Nolitubby, who are the children by Jenny Richardson and her brother Cyrus/Si Richardson Nolitubby. She is also the Aunt of my Mother Laura Dansby Richardson Washington Cochran Nolitubby McCullough (many surnames) by Katy and her brother Cyrus/Si.

Granny Lula married Denyvenous O'Guynn/O'Guinn after her husband Monroe Dunford died. I also have a picure of Denyvenous. He predeceased Granny Lula around 1948. Granny Lula O'Guinn passed away around July 1950. She was the blood Aunt of my Mother Laura. However, their relationship ran much deeper than that of a traditional aunt/niece. I was well known that "Auntie Lula" had taken in Laura at an early age, and per my siblings, she was adopted by Granny Lula, and was raised as her own after Laura's Mother passed away in 1910. It was also known that "Auntie Lula" had no children of her own.

What I discovered early on is that most of my known ancestors, including my mother and father, were born in the Oklahoma Indian Territory. They were born there, and according to their testimony, never lived anywhere else. This includes my Grandparents Cyrus Richardson Cochran Nolitubby and Katy, Great Grandparents Nath/Nathan Frazier Cochran and Dinah (Nath Frazier Cochran and Nellie – Lula Dunfords parents), and Great, Great Grandparents Richard and Dicey Frazier Cochran (b. 1700's).

As more and more legal and historical documents were recovered from State and Federal archives, and through use of the internet, it became abundantly clear that my family had been, in as few words as possible, "royally shafted". Not by simple, low level swindlers or con-artists, but by what the Bible accurately describes as a fight against principalities, against powers, against the rulers of darkness of this world. In short, the laws and the court system in place to protect against such unscrupulous activity is exactly what was used-or abused- to defraud them of their land and minerals.

Records show my Mother Laura's brothers Robert Richardson Nolitubby, Walton Richardson Nolitubby, and Mose Pettigrew and wife Louvinia Pettigrew-Richardson were among the many Native Amerians that received Federal land allotments from the Department of the Interior in 1904. The total amount of land these four received at that time was approximately 540 acres.

I have since that time recovered numerous documents, such as land deeds and maps, oil leases, photos, ect., that show Lula Dunford had acquired a sustantial amount of personal and real property, as well as mineral rights, by the time she passed away. One half of this would have belonged to my mother Laura according to the will.

While brousing the internet of Oklahoma's on line land records a few years ago, I came across an "oil and gas lease" in Lula Dunford's name that is dated in 1917. It is located in Seminole County. What I noticed is that neither this land or "oil and gas lease" was included among the properties probated in Atoka County even though they are clearly shown on her will.

3 of 4

My Aunt Lula passed away in Atoka County in 1950, but for some reason her will was not probated until 1955. The probate records only list some of her land located in Atoka County, and it list none of her oil leases.

The Oklahoma Records also show many individuals invested in the land and minerals of Lula Dunford's Seminole land which is approximately 200 plus or more acres.

I have spoken with several of the individuals in 2012 regarding how they were able to get a Lease to the land and minerals that are still in Lula Dunford's name. One of the individuals used to be a former Chickasaw Housing Authority Commissioner leasing the Royalties to Texas, and Sacramento Valley, with a Texas address and a Royalty percentage. The other investor stated in 2014, that they received their Lease from Humble Oil. This is the latest information that I have received and documented.

The Former Chickasaw Housing Authority Commissioner stated that he could not pay me Royalties going backwards, but he could pay going forward, but he would have to check with his attorney and would call me back. He never called or returned my call.

This came as quite a shock to hear this, because it simply means my family has owned gas and oil leases since the 1950's. Yet, I vividly recall growing up dirt-poor in the San Joaquin Valley of central California after my family was forced to leave Oklahoma and relocate to Bakersfield, California just prior to my birth. I feel certain any amount of the funds being generated, or that could have been generated from the property and minerals left by Granny Lula for my Mother would have lessen or alleviated the pain and suffering my family endured had these funds been directed to where they legally should have gone.

-In my recent review of the documents, I cannot understand why it appears some of Granny Lula's land and none of her mineral leases were ever probated.

Thanks for your cooperartion on this matter.

Sincerely,


Monica McCullough


4 of 4



THE SEMINOLE LEGACY OF
CHIEF WILLIAM "BILLY" BOWLEGS
DISENFRANCHISED AND DISENHERITED
BY
LAWMAKERS OF THE STATE OF OKLAHOMA

By
Monica Josephine McCullough Henderson

· April 5, 2011

Lawmakers:

Department of the Interior – Commission to the Five Civilized Tribes
Chickasaw Land Office – Tishomingo, Indian Territory –
Dated May 2, 1904:

Walton Richardson – Chickasaw Roll #557 and Card #173 – Age: 21 (Walton was killed at age 22 with his brother Moses Pettigrew in 1905 per Judge Orel Busby's letter dated December 13, 1928).  He is the Son of Si Richardson – Chickasaw Card #173 and Jennie Richardson – Chickasaw Card #173 – (Both Walton Richardson and his Father Si Richardson are Seminoles by Blood that came into the Arkansas/Oklahoma Indian Territory under the umbrella of "Mississippi Choctaws").  (Walton is my Uncle and Si (Cyrus/Ci/Cy/Si/Sid/Sy Richardson aka David/George L. Washington is my Mother Laura's Father).  Seminole Bloodline:  Father: (William "Billy" Bowlegs Connor aka Meca-Moharjo/Nath Cochran), Son: Cyrus Richardson, Grandson: Walton Richardson, Great Granddaughter: Eliza/Liza Richardson.

(See Lawsuit Case #1533 of M. R. Chilcutt as Guardian of Susan Nolitubby and Viola Nolitubby, minors dated October 2, 1920, Pontotoc County, State of Oklahoma – County Judge Orel Busby), (Nieces of my Mother Laura).  M. R. Chilcutt, according to the Ada, Oklahoma Weekly was the President of the "Planters and Merchants Bank", as well as head of a Fraternity, and was on the Ada Council Board.  He and Judge Orel Busby had the same circle of friends according to the Ada Weekly Newspaper of January 1922.

Allotment of Walton Richardson:

Lots 1 and 2; N/2 of the S/W Qtr. of the N/E Qtr of Section 6, 2N, 8E – Coal County Indian Territory

Allotment of Walton Richardson:

Lots 3 and 4; N/2 of the S/W Qtr of the N/E Qtr. of Section 6, T2N, R8E – Coal County Indian Territory.

Home Surplus Allotment of Liza Richardson: (Daughter of Walton Richardson and Louvinia Pettigrew) – 320 Acres: (Niece, Brother, Sister-in-law and First Cousin of my Mother Laura).

E/2 of N/E Qtr.; and,
S/W Qtr. of the N/E Qtr; and,
E2 of the SE Qtr. of the NW Qtr; and,
SW Qtr. of the SE Qtr of the NW Qtr; and,
SE Qtr. of the SW Qtr of the NW Qtr. of Section 13, T2N, R8E

N2 of the SW Qtr; and,
E/2 of the SW Qtr. of the SW Qtr; and,
W2 of the SE Qtr. of the SW Qtr; and,
NW Qtr. of the SE Qtr. of Section 13, T2N, R8E



Louvinia Pettigrew – Chickasaw Roll #555 and Card #171 – Wife of Three Brothers: Moses Pettigrew, Walton Richardson and Robert Richardson Nolitubby, (My Mother Laura's Brothers and her First Cousin).

Louvinia Pettigrew -Daughter of Jennie Richardson (Jennie is an Aunt
          to my Mother Laura and Stepmother)
      - Mother of Walton Richardson's Daughter Eliza
          Richardson
      - Mother of Moses Pettigrew's Son Bynum Pettigrew (See Case
          #16649 – Moses Pettigrew – Johnson v. Statler – Supreme
          Court of Oklahoma – Judge Busby and Harrell, for defendant
          in error.
      - Mother of Robert Richardson's Daughters:–
          Susan and Viola Nolitubby – Case No. 1533

Louvinia Pettigrew – (See Lawsuit of M. R. Chilcutt – Case No. 1533, Dated October 2, 1920) – 100 Acres – Surplus Allotment - (60 Acres for Cultivation and 40 Acres for Pasture) – Leased to U. G. Winn for $125 Annually.

E/2 of SE Qtr. and,
SW Qtr. of the NW Qtr. of the SE Qtr. of Section 32, T3N, R8E

Department of the Interior – Commission to the Five Civilized Tribes
Chickasaw Land Office – Tishomingo, Indian Territory –
Dated July 14, 1904:

Walton Richardson – Chickasaw Roll #557 and Card #173 – Age: 21 –
Relative to the character of land allotted to Dora Richardson – Chickasaw Roll #559 and Card #173 and Frank Richardson – Chickasaw Roll #560 and Card #173 (Sister and Brother). (All three of the above individuals are my Mother Laura's Brothers and Sister by her Seminole Father Si Richardson Nolitubby).

Dora Richardson – Daughter of Si Richardson and Jennie Richardson – 159.47 Acres – Pontotoc County, Oklahoma

N2 of NW4 of SW4 of Section 10, T4N, R8E, and
SW4 of NW of SW4 of Section 10, T4N, R8E, and
Lots 5 and 6 of Section 15, T4N, R8E, and
S2 of NW4 of NW4 of Section 15, T4N, R8E, and
SW4 of NW4 of Section 15, T4N, R8E, and
S2 of NW4 of NW4 of Section 22, T4N, R8E

Exclusive of Homestead of Dora Richardson – 110 Acres – Pontotoc County, Oklahoma

NW/4 of NW/4 of SE4 of Section 19, T3N, R8E and
N2 of SE 4 of Section 29, T3N, R8E and
N2 of SW4 of SE4 of Section 29, T3N, R8E

Frank Richardson – Son of Si Richardson and Jennie Richardson – 173.18 Acres – Pontotoc County, Oklahoma

Lots 7 and 8, of Section 15, T4N, R8E, and
W2 of SW4, of Section 15, T4N, R8E, and
Lot 5, N2 of NW4 of Section 22, T4N, R8E

Exclusive of Homestead of Frank Richardson – Pontotoc County, Oklahoma

2 of 4

SW4 of NW4 of Section 20, T3N, R8E
S2 of SW4 of SE4 of Section 29, T3N, R8E
SE4 of SE4 of Section 29, T3N, R8E
S2 of S2 of SE4 of Section 30, T3N, R8E

Department of the Interior – Commissioner to the Five Civilized Tribes – Ada Indian Territory – Dated March 28, 1907.

Stephen Richardson – Chickasaw Roll #558 – (was later given Chickasaw Card #173) - Homestead #17583, Allotment #15432 – by: Bruno Mayer – Guar.
Conway, Indian Territory.

Department of the Interior #4021– Commission to the Five Civilized Tribes – Choctaws and Chickasaws – Chickasaw Nation – Arbitrary Allotment – December 12, 1902 – Approved by Chairman W.C.B. – Tishomingo, Indian Territory – Dated October 12, 1904.

Stephen Richardson – Roll #558 (was later given Chickasaw Card #173)
     (Stephen is also the Brother of my Mother Laura by their Father Si
       Richardson Nolitubby).

Orel Busby – County Judge – State of Oklahoma – County of Pontotoc
                    Estate of Viola and Susan Nolitubby – Case No. 1533
                    April 15, 1920.

Orel Busby- District Judge – Seventh Judicial District- Ada, Oklahoma
                    Mr. Robert Washington- Letter dated November 13, 1928
                    (Robert Washington is a Brother of my Mother
                      Laura by her Father Si Richardson Nolitubby)

Martin R. Chilcutt – President of the "Planters and Merchants Bank" – Wife: Minnie
per Ada Weekly Newspaper.

Martin R. Chilcutt – Guardian of Viola and Susan Nolitubby –
                    Agricultural Lease Contract – To U. G. Winn of
                    Ada, Oklahoma – Beginning January 1, 1918 –
                    December 31, 1922

Martin R. Chilcutt - Guardian of Viola and Susan Nolitubby -
                    Case No. 1533 – April 15, 1920

B. C. King and W. W. Delaney, Jr. – Law Partners – Pontotoc County, SS. – Contractual Agreement Dated May 19, 1928 with Mr. Robertson/Robert Johnson Washington. (See District Judge Orel Busby's letter dated November 13, 1928 to Uncle Robertson Johnson Washington regarding his friend Gale Statler and our family deeds that they have in their possession, as well as trying to get the deed to the following property).

Land Legal Description:

The Northeast Quarter of the southeast Quarter of Section Sixteen (16), Township Four (4) North, Range Eight (8) East, Pontotoc County, State of Oklahoma.

Robertson Johnson Washington - (Is a half brother to Walton Richardson, Stephen Richardson, Dora Richardson, Frank Richardson, and First Cousins to Susan and Viola Nolitubby, etc. He was born in a matrilineal family structure and is the Son of Sarah Richardson Nolitubby who is the Daughter of Si Richardson Nolitubby. Si Richardson Nolitubby is Robertson Johnson Washington's Father. Uncle Robertson Johnson Washington and my Mother Laura Richardson Washington had many siblings that are

3 of 4

not listed on this document in which our Seminole by Blood men fathered in a matrilineal family structure on the Indian Reservations.

NOTICE - SALE OF OIL AND GAS MINING LEASES – KIOWA, COMANCHE, APACHE, FORT SILL APACHE, CADDO, DELAWARE AND WICHITA TRIBAL AND ALLOTTED INDIAN LANDS – DEPARTMENT OF THE INTERIOR, BUREAU OF INDIAN AFFAIRS, ANADARKO AGENCY, UNDER SEALED BIDS AND ORAL AUCTION, DECEMBER 2, 3 AND 4, 2008 – SALE LOCATION HAS BEEN CHANGED TO RENAISSANCE HOTEL'S "COX CONVENTION CENTER – (MEETING ROOMS 16, 17, AND 18) – 1 MYRIAD GARDENS, OKLAHOMA CITY, OKLAHOMA.

Many of my Seminole Native American Family Members Allotment Numbers are associated with the above Notice.

Attorney H. H. Cook who handled my Seminole Great Aunt Lula Dunford's husband Monroe Dunford estate on October 10, 1936, also signed an Oil and Gas Lease dated March 19th, 1934 in the County of Atoka, Oklahoma, from my Seminole Great Aunt Lula and Uncle Monroe Dunford, husband and wife, who were also kin to each other.

Case No. P-73-142 – Judge Ronald L. James – District Court – December 21, 1973
Attorney George B. Thompson/Thompson and Johnson Law Firm of Ada, Oklahoma was paid by my Uncle Melvin aka Melton/Milton Harp and his wife Helen Harp for wills. My family never saw these wills. Uncle Melton died in 1973. Attorney George B. Thompson has died, however, a new Attorney by the name of Kenneth Johnson has become the new law partner. Notary June Lawson is the same Notary that notarized the wills originally (these wills were also notarized in Sacramento, California by Matsuko K. Maeda). June Lawson was still working for the firm a few months ago, but is refusing to talk to me. My brother Augustus McCullough and someone by the name of Delnado McClouity/Delgado McClarty, Step-grandson was listed on the will with a total different name to share and share alike in the home of Uncle Melvin Harp/Harper.

Warranty Deed is in both of my Parent's names: Laura McCullough and David McCullough deeded to "Thomas E. Graham and Ruth Graham, husband and wife" on August 22, 1955 – County Clerk: Katie M. Wells, and Notary: A. Edison Struck. The signatures of my parents were written by a person of learned abilities.

Oil and Gas Mineral Lease – Filed: July 28, 1948 for ten years between Denyveous N. O'Guynn and Lula O'Guynn and "R. B. Graham in Atoka County, Oklahoma in consideration of $1.00 – 130 Acres more or less. Notary Public: Ross B. Wommack, S. T. Sample, County Clerks. Signatures are typed. (My Mother Laura was raised by Seminole Great Aunt Lula).

Oklahoma and Northern Oil Corporation of Pittsburgh, Pennsylvania entered into an Oil and Lease Contract with Monroe Dunford and Lula Dunford on April 16, 1924 – 80 Acres more or less – Filed June 30, 1924, County of Atoka, Oklahoma. J. L. Green, County Clerk. Both signatures were typed.

Oil and Gas Lease was assigned to Oklahoma and Northern Oil Corporation – Filed March 29, 1935, as an Affidavit of Non-Development. Affiant further states that during the year 1925 or 1926 the Oklahoma and Northern Oil Corporation ceased operation on the well in Section 1, Township 2 South, Range 9 East, which was in the block that my lease was given.

A CONCERTED EFFORT BY "THE NATIONAL ARCHIVE RECORDS ADMINISTRATION", BUREAU OF INDIAN AFFAIRS, OKMULGEE ROLL ADMINISTRATION, COURT ADMINISTRATORS, JUDGES, BANKING PRESIDENT'S, ETC., CREATED LAWS TO PROTECT THEIR WRONG DOINGS, THEREBY DISENFRANCHISING AND DISINHERITING MY SEMINOLE SIBLINGS, PARENTS, GRANDPARENTS, GREAT GRANDPARENTS, AND GREAT, GREAT GRANDPARENTS, AND MANY UNCLES, AUNTS AND FIRST COUSINS THAT WERE BORN BEFORE OKLAHOMA BECOME A STATE.



4 of 4

*Individuals of corporations now utilizing Granny Lula Dumford's Seminole minerals.* (handwritten)

| Count y | Instrument Details | Type | Recorded On | Parties | Book | Page | Legal Description | Images |
|---|---|---|---|---|---|---|---|---|
| | | | | CLARKE III LLC Grantee - SAUNDERS-WALLACE LLC **More Parties...** | | | | |
| Seminole | 2009-007531 | MD | 12/01/2009 | Grantor - HLM OIL & ROYALTIES INC Grantee - BODARD MINERALS LLC Grantee - KIRCHNER INVESTMENTS LLC Grantee - THE CLARKE III LLC Grantee - SAUNDERS-WALLACE LLC Grantee - W B RATLIFF MINERALS LLC **More Parties...** | 0032 35 | 000 1 - 001 2 | 10-5-5 15-5-5 3-6-5 22-6-5 27-6-5 28-6-5 **More Legal Descriptions...** | • Preview • Print copies  1 2 |
| Seminole | 2009-007530 | POWER OF A | 12/01/2009 | Grantor - HLM OIL & ROYALTIES INC Grantee - BODARD MINERALS LLC Grantee - | 0032 34 | 029 5 - 029 6 | | • Preview • Print copies  2 |

*EX C     1 of 3* (handwritten)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Seminole | 2012-004800 | COR OGL | 06/07/2012 | Grantor - SAUNDERS WALLACE L L C  Grantee - LEHIGH ENERGY PARTNERS L L C | 003475 | 0015 - 0017 | 10-5-5 | 3 |

- Preview
- Print copies

Ex C    2 of 3

| Pontoto c | 2012-00550 4 | ASS N | 08/13/201 2 | Grantor - LIBERTY OPERATING INC Grantee - SEGOVIA CAPITAL LLC Grantee - SACRAMENT O VALLEY RESOURCES LLC | 00266 2 | 028 6 | S15 T5 R5 N W | 1 | • Previe w • Print copies |

« 1 »

Ex. C   3 of 3

Kenneth Henderson with daughters

the Whitehall Cemetery visiting Great-Granny Lu's headstone (we have several family members buried there)...: Her full name was Lula (Washington) Cochran Dunford O'Guynn... Washington because Lula, her mother and brother were members of the George Washington Band of the Seminole Indians (from Mississippi). Lula's father's name was Nathan Cochran, Sr.. Lula's first husband's name was Monroe William "M.W." Dunford. Lula's second husband's name was Denyveous O'Guynn, Sr. (his great-grandchildren are Reginald O'Guynn and Marlo O'Guynn). Lula's name is misspelled on her headstone as Lula O. Guinn.

Kenneth Henderson   Kenneth Henderson      Monica McCullough Henderson      Atoka, Oklahoma



Ex. P          1 of 11



**Amillia Henderson**
*November 3, 2017 near Oklahoma, OK · Twitter ·*

My mother's Monica McCullough Henderson mother, Laura Washington McCullough, family is listed on the Dawes Final Rolls: Sitting left is Great-Great-Grandma Choteau "Nelly Ida" (Washington) Cochran Hayes (a Full-Blood Seminole Indian with the George Washington Band), next to her is Great-Granny Lula (Washington- Cochran) Dunford O'Guynn (Seminole By Blood card 14, roll 58, her father is Nathan Cochran, Sr.). Top Left is Great-Uncle Willie Hayes (Lula's brother, Seminole By Blood card 209, roll 724) and next to him is Great-Grandpa Monroe Dunford (Lula's first husband who died in 1935, Chickasaw Freedmen card 125, roll 474)

2 of 11



**Amillia Henderson** is with Violai Mitchell and 61 others.

October 16, 2017 · Luella, GA ·

Lula Washington (Cochran) Dunford O'Guynn (1871-1950) – My Great-Grandmother was born in the Indian Territory of Oklahoma to Nathan Cochran and Choteau "Nelly Ida" (Washington) Cochran Hays. She was an educated woman who owned land in both the Choctaw and Seminole Nations of Oklahoma. My mother and my uncles and aunts called her "Granny Lu".

1st Picture: Sitting left is Great-Great-Grandma Choteau (a Full-Blood Seminole Indian with the Washington Band), Great-Granny Lu is next to her. Top Left is Great-Uncle Willie Hays (Lula's brother) and next to him is Great-Grandpa Monroe Dunford (Lula's first husband who died in 1935).

In the second picture: My Grandmother Laura Washington-McCullough, mother of Monica McCullough Henderson.

In the third picture: My mother, Monica McCullough Henderson, with grand daughters, Maya, Kayla and Jordyn Henderson (daughters of Kenny Henderson).

In the fourth picture: My brother, Kenny Henderson, with his children at the Whitehall Cemetery in Atoka, Oklahoma visiting Great-Granny Lu's headstone (we have several family members buried there).

In the fifth picture: A copy of the 1920 Census which shows my great-grandparents, grandmother and great-uncle. And, a copy of my great-grandmother's Dawes Final Rolls Card from the Seminole Nation in Oklahoma.



3 of ((

Amillia Henderson

**Part II: My Maternal Great-Grandmother from the Seminole Nation of Oklahoma Indian Territory, Mrs. Lula Washington (Cochran) Dunford O'Guynn! Here is some information about her Land (which she had oil & gas leases) allotted to her by the Dawes Final Rolls Enrollment Commission...** Atoka, Oklahoma

# APPLICATION FOR ALLOTMENT.

SEMINOLE NATION.

WEWOKA LAND OFFICE.

I, *Lula Sanford* . do hereby make application to have set apart to me, and to those whom I lawfully represent, lands selected by me. as follows:

4 of 11

**Amillia Henderson** 15 (or more) Oil Wells Located at:
Section: S15 T5N R5E
Meridian: Indian...See More



5 of 11



# Oklahoma County Records: Search results in Seminole County



| County | Instrument | Type | Book | Page | People | Legal Description | Recorded |
|---|---|---|---|---|---|---|---|
| Seminole | | | 00175 | 0229 - 0230 | JETER, FLOYD RAPER, KARL E RAPER, CAROLYN R | 15-5-5 | 07 26 1994 |
| Seminole | | | 000052 | 0553 | DUNFORD, LULA DUNFORD, MONROE MITCHAM, TOM | 10-5-5 15-5-5 | 05 09 1917 |

## ACTIVE WELL

PUN #: 133-062145-0-0000
Lease Name: RAPER #1
Well Name/Number:
Well Classification: Unknown
Tract #:
Shut-in Date:
Plugged Date:

Legal Description: -SW-15-05N-05E
API:
County Name: Seminole
County Percent:
Total Lease Acreage:
Active Date:
Active Product code: 1

1 = Crude Oil





Amilita Henderson

Oil wells still A!   Turn on notifications

**Find Support or Report Post**
I'm concerned about this post

October   Save post

Amilita Henderson

Like        Comment

Write a reply...

**Lula Dunford**       **United States Census, 1920**

| Name | Lula Dunford |
|---|---|
| Event Type | Census |
| **Event Date** | **1920** |
| Event Place | Wilson, Atoka, Oklahoma, United States |
| Gender | Female |
| Age | 50 |
| Marital Status | Married |
| Race | Mulatto |
| Can Read | Yes |
| Can Write | Yes |
| Relationship to Head of Household | Wife |
| Birth Year (Estimated) | 1870 |
| Birthplace | Oklahoma |
| Father's Birthplace | Mississippi |
| Mother's Birthplace | Mississippi |

| Household | Role | Sex | Age | Birthplace |
|---|---|---|---|---|
| Hansen Dunford | Head | M | 52 | Oklahoma |
| ... | Wife | M | 50 | Oklahoma |
| Laura Washington | Daughter | F | 12 | Oklahoma |
| Lee Washington | Son | M | 8 | Oklahoma |

Search the Dawes Final Rolls

| Name | Age | Sex | Blood | Roll No. | Tribe | Card No. |
|---|---|---|---|---|---|---|
| Lula Dunford | 28 | F | 1 2 | 58 | Seminole by Blood S ... | ... |

Oklahoma and Indian Territory, Dawes ...
ards for Enrollment of Tribes, 1898-1914

Lula Dunford

Nath Cochran

Choteau

..

https://okcountyrecords.com/results/omni=Dunford%2C+lula:site=seminole/page-1



## Search results in Seminole County

| County | Instrument | Type | Book | Page(s) | People | Legal Description | Recorded |
|--------|-----------|------|------|---------|--------|-------------------|----------|
| Seminole | 1917-040324 | Oil & Gas Lease | 000053 | 0353 | DUNFORD, LULA DUNFORD, MONROE MITCHAM, TOM | 10-5-5 15-5-5 | 05/09/1917 |

8 of 11

(22)

# DEPARTMENT OF THE INTERIOR.

# COMMISSION TO THE FIVE CIVILIZED TRIBES,

## SEMINOLE LAND OFFICE.

An allotment of land as hereinafter described, is hereby made to the following named person, in accordance with the Resolution of the Commission

adopted

| | | | | | 1ST CLASS | 2ND CLASS | 3RD CLASS | VALUE | |
|---|---|---|---|---|---|---|---|---|---|
| ROLL NO. | NAME | SUBDIVISION OF | SEC. | TWP | RANGE | Acres 100ths | Acres 100ths | Acres 100ths | Dolls Cents | REMARKS |
| 58 | Lula Bumford | Lots 7 & 9 of | 9 | 5 | 5 | | | 5 | 56.6.95 | 111 |

Information

**https://okcountyrecords.com/results/recorded-start=1917-05-09:recorded-end=1994-07-26:section=15:township=5:range=5:site=seminole/page-1**

**Search results in Seminole County, Oklahoma**

| County | Instrument | Type | Book | Page(s) | People | Legal Description | Recorded |
|--------|-----------|------|------|---------|--------|-------------------|----------|
| Seminole | 1994-004497 | Assignment Of Oil & Gas Lease | 001875 | 0229 - 0230 | JETER, FLOYD RAPER, KARL E RAPER, CAROLYN R | 15-5-5 | 07/26/1994 |
| Seminole | 1917-040324 | Oil & Gas Lease | 000053 | 0353 | DUNFORD, LULA DUNFORD, MONROE MITCHAM, TOM | 15-5-5 | 05/09/1917 |

**ACTIVE WELL: SW-15-05N-05E:**
https://www4.oktax.onenet.net/GrossProduction/gp_displayPublicPUNListSearch Download.php

**Production Unit (PUN) Details**

**PUN #:** 133-062245-0-0000          **Legal Description:** -SW-15-05N-05E
**Lease Name:** RAPER #1              **API:**
**Well Name/Number:**                **County Name:** Seminole
**Well Classification:** Unknown     **County Percent:**
**Tract #:**                         **Total Lease Acreage:**
**Shut-in Date:**                    **Active Date:**
**Plugged Date:**                    **Active Product code:** 1

1 = Crude Oil
3 = Reclaimed Oil
**Status:** Active                   5 = Natural Gas
6 = Natural Gas Liquids

**Current Tax Rate:** 7.00%

10 of 11

## Search the Dawes Final Rolls

| Name | Age | Sex | Blood | Roll No. | Tribe | Card No. |
|------|-----|-----|-------|----------|-------|----------|
| **Lula Dunford** | 28 | F | 1·2 | 58 | Seminole by Blood | Search card 14 |

📄 **Oklahoma and Indian Territory, Dawes Census Cards for Five Civilized Tribes, 1898-1914**

1901 DEC-04

View Image

| | |
|---|---|
| Name | **Lula Dunford** |
| Father | **Nath Cochran** |
| Mother | **Choteau** |
| Age | **28** |

11 of 11



# Superior Court of California
## County of Orange



Case Number : 97P003603

Copy Request: 3862017

Request Type: Case Documents

Prepared for: KH

Number of documents: 1
Number of pages: 19



ATTORNEY OR PARTY WITHOUT ATTORNEY (Name and Address):
ALVIN WATKINS
175 EAST LAKESHORE DRIVE
CHEROKEE VILLAGE, ARKANSAS 72529
TELEPHONE NO.: (870) 257-5686

ATTORNEY FOR (Name):

NAME OF COURT: SUPERIOR COURT OF CALIF., COUNTY OF ORANGE
STREET ADDRESS: 341 THE CITY DRIVE
MAILING ADDRESS: P.O. BOX 14170
CITY AND ZIP CODE: ORANGE, CALIFORNIA 92613-1570
BRANCH NAME:

PLAINTIFF/PETITIONER: COUNTY OF ORANGE

DEFENDANT/RESPONDENT: ALVIN WATKINS

**DECLARATION**

FOR COURT USE ONLY

FILED
ORANGE COUNTY SUPERIOR COURT
JUL 29 1997
ALAN SLATER, Executive Officer/Clerk
M. Felix
BY M. FELIX

CASE NUMBER
97PO03603

I, ALVIN WATKINS, AM HEREBY NOTIFYING THIS COURT THAT I AM THE PATERNAL PARENT OF AAMINAH WATKINS BORN 091591. SINCE HER BIRTH I HAVE NEITHER DENIED OR NEGLECTED MY RESPONSIBILITIES AS A PARENT. HOWEVER I HAVE ENCOUNTERED CONTINUOUS OBSTACLES AND INCONSIS-TENCIES FROM HER MOTHER/GRANDPARENTS.

I HAVE BEEN SENDING MONITARY SUPPORT TO THE CHILD'S MOTHER AND MAINTAIN CONTINUOUS ATTEMPTS TO COMMUNICATE WITH AAMINAH BY PHONE AND BY MAIL. I SAY ATTEMPTS BECAUSE ON FREQUENT OCCASSIONS I AM NOT ABLE TO CONTACT HER OR HER MOTHER PER-SONALLY. I LEAVE MESSAGES WITH FAMILY MEMBERS AND ON THE ANSWERING MACHINE BUT RARELY GET A RESPONSE IN RETURN.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 072497

ALVIN WATKINS
(TYPE OR PRINT NAME)

(SIGNATURE OF DECLARANT)
☐ Petitioner/Plaintiff ☐ Respondent/Defendant ☐ Attorney
☐ Other (specify):

(See reverse for a form to be used if this declaration will be attached to another court form before filing)

Form Approved by the
Judicial Council of California
MC-030 (New January 1, 1987)

**DECLARATION**

2 of 8

JUL.17-97 THU 11:02 213-329-1729→OFFISYS                    P.02

| PLAINTIFF/PETITIONER: COUNTY OF ORANGE | CASE NUMBER: |
| DEFENDANT/RESPONDENT: ALVIN WATKINS | 97P003603 |

*This form must be attached to another form or court paper before it can be filed in court.*

THIS TYPE OF SITUATION IS COMMON WITH AAMINAH'S
MOTHER / GRANDPARENTS. AS IS WITHHOLDING OF AAMINAH'S
LOCATION AND EVEN WELL BEING. i.e. IN SEPTEMBER
OF 1995 I RECIEVED A PHONE CALL AT MIDNIGHT AT WHICH
TIME AAMINAH'S MOTHER INFORMED ME THAT SHE
WOULD BE LEAVING IN 3 HOURS TO ATLANTA, GEORGIA.
I, AT THE TIME, WAS LIVING IN MODESTO, CA AND COULD
NEVER HAVE GOTTEN TO ORANGE COUNTY IN TIME ENOUGH
TO SEE MY CHILD. I WAS NEVER CONSULTED ABOUT THE
MOVE OR GIVEN AN OPPORTUNITY TO TAKE OVER MY CHILD'S
CARE WHILE HER MOTHER ATTEMPTED THESE CHANGES.
I WAS TOLD, BY HER MOTHER, THAT IF I CONTACTED
THE AUTHORITIES THAT SHE WOULD DENY THAT I WAS
AAMINAH'S FATHER, AND THAT I COULD NOT DO ANYTHING
ABOUT THIS DECISION SHE MADE FOR OUR CHILD. MY
UNDERSTANDING IS THAT WHEN SHE ARRIVED TO GEORGIA
THERE WAS NO WORK, SHE HAD NO PLACE TO STAY,
AND THE WHOLE SITUATION WAS NOT CONDUSIVE TO
AAMINAH'S WELL BEING AS FAR AS STABILITY AND SECURITY
GOES. AND YET, STILL I WAS DENIED THE OPPORTUNITY TO
PROVIDE A STABLE AND SECURE ENVIROMENT FOR AAMINAH
WHILE HER MOTHER ESTABLISHED HERSELF IN THIS NEW
ENVIROMENT.

IN 1996, NOVEMBER, HER MOTHER BECAME MEDICALLY
ILL AND UNABLE TO CARE FOR AAMINAH AT ALL.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 072497

..... ALVIN WATKINS .....
         (TYPE OR PRINT NAME)

(SIGNATURE OF DECLARANT)

☐ Petitioner/Plaintiff  ■ Respondent/Defendant  ☐ Attorney
☐ Other (specify):

*(See reverse for a form to be used if this declaration is not to be attached to another court paper before filing)*

Form Approved by the
Judicial Council of California
MC-031 (New January 1, 1997)                    **ATTACHED DECLARATION**

33

3 of 8

| PLAINTIFF/PETITIONER: COUNTY OF ORANGE | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT. ALVIN WATKINS | 97P003603 |

This form must be attached to another form or court paper before it can be filed in court.

I LOST CONTACT WITH AAMINAH AND HER MOTHER. I CONTINUALLY PHONED AND WROTE LETTERS TO THE ADDRESS I WAS GIVEN. I CONTACTED AAMINAH'S GRANDPARENTS AND WAS NEVER INFORMED ABOUT LAMOUR'S HOSPITALIZATION OR THAT AAMINAH WAS ONCE AGAIN MOVED TO ANOTHER STATE (NEW YORK). I NIETHER GAVE CONSENT OR WAS GIVEN THE OPPORTUNITY TO TAKE MY CHILD INTO MY CARE. I WAS DENIED ANY INFORMATION AS TO MY CHILD OR HER MOTHER'S CONDITION FOR FOUR MONTHS. IN FEBRUARY LAMOUR CALLED AND INFORMED ME THAT SHE HAD BEEN HOSPITALIZED, HAD A SURGICAL REMOVAL OF A MENINGIOMA, HAD BEEN IN ACOMA, AND THAT AAMINAH WAS IN SOMEONE ELSES CARE IN THE STATE OF NEW YORK AT THIS TIME, SHE SAID AAMINAH WOULD BE BACK IN CALIFORNIA AROUND THE END OF THE MONTH OF FEBRUARY.

AT THE END OF FEBRUARY WAS THE FIRST TIME IN FOUR MONTHS THAT I WAS ALLOWED TO COMMUNICATE WITH AAMINAH. AT THIS TIME I ONCE AGAIN BEGAN SENDING MONITARY SUPPORT FOR MY CHILD. I EXPLAINED, TO HER MOTHER, THAT IT WAS DIFFICULT TO SEND LARGE AMOUNTS CONSISTANTLY

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct

Date: 072497

ALVIN WATKINS
[TYPE OR PRINT NAME]

☐ Petitioner/Plaintiff ☒ Respondent/Defendant ☐ Attorney ☐ Other (specify)

(See reverse for a form to be used if this declaration is not to be attached to another court paper before filing)

Form approved by the Judicial Council of California MC-031 [New January 1, 1987]

**ATTACHED DECLARATION**

4 of 8

| PLAINTIFF/PETITIONER: COUNTY OF ORANGE | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: ALVIN WATKINS | 97P003603 |

*This form must be attached to another form or court paper before it can be filed in court.*

BUT I WOULD SEND AS MUCH AS I COULD UNTIL
I FOUND STEADY WORK.

THIS INCIDENT IS BY NO MEANS THE FIRST
TIME MY CHILD'S WELFARE/CARE HAD BEEN HANDED
OVER TO OTHER PARTIES WITHOUT MY CONSENT OR
NOTIFICATION. IN 1992 AAMINAH'S MOTHER LEFT
TO MASSACHUSETTES. SHE ASSURED ME THAT
AAMINAH WOULD BE IN HER CARE WHILE IN
MASS. I LATER DISCOVERED THAT AAMINAH WAS
ACTUALLY LIVING IN NEW YORK AND HER MOTHER
ONLY VISITED ON WEEKENDS WHEN SHE WAS ABLE.
I OBJECTED PROFOUNDLY BUT, ONCE AGAIN,
WAS DENIED MY PARENTAL RIGHTS. LAMOUR
ONCE AGAIN INFORMED ME THAT SHE WAS THE
MOTHER AND WOULD MAKE THE DECISIONS
FOR AAMINAH'S WELFARE HERSELF.
IN 1993, HER MOTHER, ONCE AGAIN UPROOTED
AAMINAH FROM NEW YORK BACK TO CALIFORNIA.
THERE I WAS ONCE AGAIN FINALLY ABLE TO MAKE
PHYSICAL CONTACT WITH MY CHILD.
HOWEVER, EVEN THE SCHEDULED VISITATION DAYS

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 072497

ALVIN WATKINS
(TYPE OR PRINT NAME)

(SIGNATURE OF DECLARANT)

☐ Petitioner/Plaintiff  ☒ Respondent/Defendant  ☐ Attorney
☐ Other (specify):

[Use reverse for a form to be used if this declaration is not to be attached to another court paper before filing.]

Form Approved by the
Judicial Council of California
MC-031 [New January 1, 1987]

**ATTACHED DECLARATION**


5 of 8

| PLAINTIFF/PETITIONER: COUNTY OF ORANGE | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: ALVIN WATKINS | 97P003603 |

This form must be attached to another form or court paper before it can be filed in court.

WERE INFRINGED UPON BY HER MOTHER/GRANDPARENTS.
ON MANY OCCASSIONS I WAS TOLD I COULD SEE MY
CHILD, AFTER DRIVING SIX OR SEVEN HOURS FROM
MODESTO, CALIFORNIA I WAS DENIED ACCESS TO
HER EITHER BY HER MOTHER OR HER GRANDPARENTS

THIS IS JUST A BRIEF SUMMATION OF AN
ACCUMALATION OF CIRCUMSTANCES AND CONFLICTS
THAT HAVE SURFACED WITH LAMOUR AND HER
FAMILY INTERFERING WITH MY RIGHTS AS A
FATHER TO MY CHILD. CONTINUOUS DENIAL OF
COMMUNICATION WITH AAMINAH, WITHHOLDING
AND LYING ABOUT LAMOUR'S ACTUAL CAPACITY
TO CARE APPROPRIATELY AND STEADILY FOR MY
CHILD HAS MOVED ME TO MAKE THIS
DECISION. I AM HEREBY REQUESTING
FULL LEGAL AND PHYSICAL CUSTODY OF MY
DAUGHTER, AAMINAH WATKINS (091591),
I AM MARRIED, HAVE STEADY EMPLOYMENT,
WE HAVE GOOD STANDING IN OUR COMMUNITY,
WE HAVE LIVED IN OUR HOME FOR OVER A
YEAR AND A HALF. I'M WORKING TOWARDS MY
LICENSE AS A PHYSICAL THERAPIST ASSISTANT. I CAN

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: 072497

ALVIN WATKINS
(TYPE OR PRINT NAME)

(SIGNATURE OF DECLARANT)

☐ Petitioner/Plaintiff ☒ Respondent/Defendant ☐ Attorney
☐ Other (specify)

(See reverse for a form to be used if this declaration is not to be attached to another court paper before filing)

Form Approved by the
Judicial Council of California
MC-031 [New January 1, 1987]

ATTACHED DECLARATION



6 of 8

| PLAINTIFF/PETITIONER: COUNTY OF ORANGE | CASE NUMBER. |
|---|---|
| DEFENDANT/RESPONDENT. ALVIN WATKINS | 97P003603 |

This form must be attached to another form or court paper before it can be filed in court.

AND WILL CONTINUE TO PROVIDE HEALTH/DENTAL
INSURANCE FOR MY CHILDREN, AND I WANT THE
OPPORTUNITY TO PROVIDE A <u>STABLE AND
ENRICHING</u> HOME ENVIROMENT FOR AAMINAH.
AND HER SIBLINGS.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date· 072497

ALVIN WATKINS
(TYPE OR PRINT NAME)

(SIGNATURE OF DECLARANT)

☐ Petitioner/plaintiff  ■ Respondent/defendant  ☐ Attorney
☐ Other (specify)

(Use reverse for a form to be used if this declaration is not to be attached to another court paper in future filings)

Form Approved by the
Judicial Council of California
MC-031 [New January 1, 1991]

ATTACHED DECLARATION

7 of 8

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address)* | TELEPHONE NO. | FOR COURT USE ONLY |
|---|---|---|
| ALVIN WATKINS<br>175 EAST LAKESHORE DRIVE<br>CHEROKEE VILLAGE, ARKANSAS 72529 | (870) 2575686 | **FILED**<br>ORANGE COUNTY SUPERIOR COURT<br>JUL 2 9 1997<br>ALAN SLATER, Executive Officer/Clerk<br>M. Snell<br>BY M. SNELL |

ATTORNEY FOR *(Name)*

SUPERIOR COURT OF CALIFORNIA, COUNTY OF ORANGE
FAMILY LAW DIVISION
341 THE CITY DRIVE
POST OFFICE BOX 14170
ORANGE, CA 92613-1570

PETITIONER/PLAINTIFF: COUNTY OF ORANGE

RESPONDENT/DEFENDANT: ALVIN WATKINS

INCOME AND EXPENSE DECLARATION

CASE NUMBER: 97P003603

**Step 1** Attachments to this summary

I have completed ☒ Income ☒ Expense ☒ Child Support ☐ Information forms.
*(If child support is not an issue, do not complete the Child Support Information Form. If your only income is AFDC, do not complete the Income Information Form.)*

**Step 2** Answer all questions that apply to you

1. Are you receiving or have you applied for or do you intend to apply for welfare or AFDC?
   ☐ Receiving   ☐ Applied for   ☐ Intend to apply for   ☒ No
2. What is your date of birth *(month/day/year)*? DECEMBER 25, 1967 ... 122567
3. What is your occupation? REHABILITATION TECH/AIDE
4. Highest level of education completed: COLLEGE 2 YRS.
5. Are you currently employed? ☒ Yes ☐ No
   a. If yes: (1) Where do you work? *(name and address)*: ASH FLAT CONVALESCENT CENTER HC67 BOX 5A ASH FLAT, ARKANSAS 72413
   (2) When did you start work there *(month/year)*? 063097
   b. If no: (1) When did you last work *(month/year)*? ——
   (2) What were your gross monthly earnings? ——
6. What is the total number of minor children you are legally obligated to support? 3

**Step 3** Monthly Income Information

7. Net monthly disposable income *(from line 16a of Income Information)*: $30.00
8. Current net monthly disposable income *(if different from line 7, explain below or on Attachment 8)*: $-126.00

**Step 4** Expense Information

9. Total monthly expenses from line 2q of Expense Information: $3951.00
10. Amount of these expenses paid by others: $2716.00

**Step 5** Other party's income

11. My estimate of the other party's gross monthly income is: $UNKNOWN

**Step 6** Date and sign this form

I declare under penalty of perjury under the laws of the State of California that the foregoing and the attached information forms are true and correct.

**RECEIVED**

Date: 072497    JUN 2 5 RECD

ALVIN WATKINS
*(TYPE OR PRINT NAME)*

T.J. POWELL SHERIFF, SHARP CO. ASH FLAT, AR 72513
SIGNATURE OF DECLARANT

☐ Petitioner  ☒ Respondent

Page one of ____

Form Adopted by Rule 1285.50
Judicial Council of California
1285.50 (Rev. January 1, 1995)
311 (R1/95)

INCOME AND EXPENSE DECLARATION
(Family Law)

DEC 112

8 of 8



### Welcome to Topher's Castle - A Great Site for Everyone!

# Topher's "Incredibly Useful Information"

## How to Decipher a Social Security Number

This information isn't really a secret. It just isn't very well known. According to the Social Security Administration, your nine-digit Social Security Number (SSN) is divided into three parts:

1. The first three digits are known as the "area number". Until June 25, 2011, this is generally the State or territory where your SSN was assigned. Thereafter, the number was randomly assigned.

2. The second two numbers are known as the "group numbers". They really do not have any geographical or data significance.

3. The third set of four numbers is simply the numerical sequence of digits 0001 to 9999 issued within each group.

By using the first three numbers of anyone's SSN, you can often tell in which State they were born, or at the least, one of the States where they once lived. Try it!

## Social Security "Area Code" Number Chart

| The first three digits of a Social Security Number correspond to locations as follows: | | | |
|---|---|---|---|
| SSN | State | SSN | State or Territory |
| 001-003 | New Hampshire | 449-467 627-645 | Texas |
| 004-007 | Maine | 468-477 | Minnesota |
| 008-009 | Vermont | 478-485 | Iowa |
| 010-034 | Massachusetts | 486-500 | Missouri |
| 035-039 | Rhode Island | 501-502 | North Dakota |
| 040-049 | Connecticut | 503-504 | South Dakota |
| 050-134 | New York | 505-508 | Nebraska |
| 135-158 | New Jersey | 509-515 | Kansas |
| 159-211 | Pennsylvania | 516-517 | Montana |
| 212-220 | Maryland | 518-519 | Idaho |
| 221-222 | Delaware | 520 | Wyoming |
| 223-231 691-699 | Virginia | 521-524 650-653 | Colorado |
| 232-236 | West Virginia | 525, 585 648-649 | New Mexico |



4/25/2020                              How to Decipher a Social Security Number

| | | | |
|---|---|---|---|
| 232<br>237-246<br>681-690 | North Carolina | 526-527<br>600-601<br>764-765 | Arizona |
| 247-251<br>654-658 | South Carolina | 528-529<br>646-647 | Utah |
| 252-260<br>667-675 | Georgia | 530, 680 | Nevada |
| 261-267<br>589-595<br>766-772 | Florida | 531-539 | Washington |
| 268-302 | Ohio | 540-544 | Oregon |
| 303-317 | Indiana | 545-573<br>602-626 | California |
| 318-361 | Illinois | 574 | Alaska |
| 362-386 | Michigan | 575-576<br>750-751 | Hawaii |
| 387-399 | Wisconsin | 577-579 | District of Columbia |
| 400-407 | Kentucky | 580 | Virgin Islands |
| 408-415<br>756-763 | Tennessee | 580-584<br>596-599 | Puerto Rico |
| 416-424 | Alabama | 586 | Guam |
| 425-428<br>587-588<br>752-755 | Mississippi | 586 | American Samoa |
| 429-432<br>676-679 | Arkansas | 586 | Philippine Islands |
| 433-439<br>659-665 | Louisiana | 700-728 | Railroad Board* |
| 440-448 | Oklahoma | 729-733 | Enumeration at Entry |
| 237-246, 587-665, 667-679,<br>681-699, 750-772 | | Officially: Not Issued | |
| 734-749, 773-899 | | Unknown | |
| 000, 666, 900-999 | | Never valid numbers | |

**Important Notes:**

1. * = 700-728 issuance of these numbers to railroad employees was discontinued July 1, 1963.

2. If the same area number appears above more than once, it is because certain numbers were transferred from one State to another or that the area number was divided for use amongst certain geographical locations.

3. Any number beginning with "000", "666", "900-999", has a middle "00", or ends in "0000" will never be a valid SSN.

4. Originally, the first three digits were assigned by the geographical region in which the person was residing at the time the number was assigned. "Generally, numbers were assigned beginning in the northeast and moved westward. So people on the east coast had the lowest numbers and those on the west coast had the highest numbers".

5. Since 1972/1973, when SSA started assigning SSNs and issuing cards centrally from Baltimore, the Area Number assigned has been based on the ZIP code in the mailing address provided on the application for the original Social Security card. The applicant's mailing address does not have to be the same as their place of birth or residence. Prior to 1972/1973, social security numbers were assigned by field offices. Therefore, the Area Number does not necessarily represent the State of residence of the applicant, either prior to 1972/1973 or since.

6. People born in the United States since 1987 may have had their SSN applied for them by the hospital at birth. This policy varies by State.

7. Effective June 25, 2011, the SSA began a new randomized assignment methodology, called "SSN Randomization", in an effort to extend the longevity of the nine-digit SSN nationwide as well as for security since randomization makes the newly assigned SSN's more difficult to reconstruct using public information. Unused area numbers previously assigned to states, as well as previously unassigned area numbers, will now be available in the new randomization system.

8. Numbers in red were originally assigned to these states but were subsequently *unassigned* come June 2011 and used in the new randomized assignment. Numbers in these "officially" unissued series may still have been issued for applicants in these states prior to randomization.

9. Social Security Numbers are never reassigned after someone dies. Despite issuing over 450 million SSN's since 1936, and assigning about 5.5 million new numbers a year, they can still issue new numbers for several generations.

Original Source: www.socialsecurity.gov. All data is current as of April 15, 2019.

### Protecting Your Privacy
Information to assist you in protecting your identity and personal data.

### My Identity Has Been Stolen!
We present a number of actionable ideas you should begin today which will help limit the damage, get your identity back, and maybe even stop the thieves.

### Credit Report Directory
Quickly locate all the contact information and links you need for getting in touch with Experian, Equifax, TransUnion, and Innovis, and how to get a free credit report.

### Opt Out!
Contact information and tips for getting yourself removed from junk mailing lists and telemarketing lists.

**Information is from sources believed to be reliable but cannot be guaranteed. The information presented is solely intended to assist site visitors in better understanding Social Security Numbers.**

**Since we do not have complete control over the "Ads by Google" appearing on this page, we do not directly endorse their sites or products. Please notify us if you find any of the advertisers to be misleading.**



B1 (Official Form 1)(12/11)

| United States Bankruptcy Court<br>**Eastern District of Virginia (Alexandria Division)** | **Voluntary Petition** |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>**Henderson, Kenneth Karl** | Name of Joint Debtor (Spouse) (Last, First, Middle):<br>**Ponce, L'amour Kim** |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names):<br><br>**AKA L'amour Kim Henderson** |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all)<br>**xxx-xx-0734** | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN) No./Complete EIN<br>(if more than one, state all)<br>**xxx-xx-9992** |
| Street Address of Debtor (No. and Street, City, and State):<br>**12893 Effingham Court**<br>**Woodbridge, VA**<br>ZIP Code **22192** | Street Address of Joint Debtor (No. and Street, City, and State):<br>**12893 Effingham Court**<br>**Woodbridge, VA**<br>ZIP Code **22192** |
| County of Residence or of the Principal Place of Business:<br>**Prince William** | County of Residence or of the Principal Place of Business:<br>**Prince William** |
| Mailing Address of Debtor (if different from street address):<br><br>ZIP Code | Mailing Address of Joint Debtor (if different from street address):<br><br>ZIP Code |
| Location of Principal Assets of Business Debtor<br>(if different from street address above): | |

| Type of Debtor<br>(Form of Organization) (Check one box) | Nature of Business<br>(Check one box) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box) |
|---|---|---|
| ■ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☐ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☐ Other (If debtor is not one of the above entities,<br>check this box and state type of entity below.) | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined<br>in 11 U.S.C. § 101 (51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☐ Other | ■ Chapter 7<br>☐ Chapter 9<br>☐ Chapter 11<br>☐ Chapter 12<br>☐ Chapter 13    ☐ Chapter 15 Petition for Recognition<br>of a Foreign Main Proceeding<br>☐ Chapter 15 Petition for Recognition<br>of a Foreign Nonmain Proceeding |

| Chapter 15 Debtors | Tax-Exempt Entity<br>(Check box, if applicable) | Nature of Debts<br>(Check one box) |
|---|---|---|
| Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding<br>by, regarding, or against debtor is pending: | ☐ Debtor is a tax-exempt organization<br>under Title 26 of the United States<br>Code (the Internal Revenue Code). | ■ Debts are primarily consumer debts,<br>defined in 11 U.S.C. § 101(8) as<br>"incurred by an individual primarily for<br>a personal, family, or household purpose."    ☐ Debts are primarily<br>business debts. |

| Filing Fee (Check one box) | Chapter 11 Debtors |
|---|---|
| ■ Full Filing Fee attached<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must<br>attach signed application for the court's consideration certifying that the<br>debtor is unable to pay fee except in installments. Rule 1006(b). See Official<br>Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☐ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates)<br>are less than $2,343,300 *(amount subject to adjustment on 4/01/13 and every three years thereafter).*<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors,<br>in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR COURT USE ONLY |
|---|---|
| ☐ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>■ Debtor estimates that, after any exempt property is excluded and administrative expenses paid,<br>there will be no funds available for distribution to unsecured creditors. | EX: G<br><br>1 of 4 |

Estimated Number of Creditors

| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-5,000 | 5,001-10,000 | 10,001-25,000 | 25,001-50,000 | 50,001-100,000 | OVER 100,000 |

Estimated Assets

| ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

Estimated Liabilities

| ☐ | ☐ | ■ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| $0 to $50,000 | $50,001 to $100,000 | $100,001 to $500,000 | $500,001 to $1 million | $1,000,001 to $10 million | $10,000,001 to $50 million | $50,000,001 to $100 million | $100,000,001 to $500 million | $500,000,001 to $1 billion | More than $1 billion |

B7 (Official Form 7) (04/10)

# United States Bankruptcy Court
## Eastern District of Virginia (Alexandria Division)

In re   Kenneth Karl Henderson
        L'amour Kim Ponce                                    Case No.

                                    Debtor(s)               Chapter    7

# STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs. To indicate payments, transfers and the like to minor children, state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not disclose the child's name. See, 11 U.S.C. § 112; Fed. R. Bankr. P. 1007(m).

Questions 1 - 18 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 19 - 25. If the answer to an applicable question is "None," mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

## DEFINITIONS

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within six years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or owner of 5 percent or more of the voting or equity securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed full-time or part-time. An individual debtor also may be "in business" for the purpose of this form if the debtor engages in a trade, business, or other activity, other than as an employee, to supplement income from the debtor's primary employment.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any owner of 5 percent or more of the voting or equity securities of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. § 101.

---

**1. Income from employment or operation of business**

None
☐   State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the **two years** immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
|---|---|
| $20,425.00 | 2012 YTD: Debtor Employment Income |
| $60,490.00 | 2011: Debtor Employment Income |
| $48,778.00 | 2010: Debtor Employment Income |

2 of 4

5/22/12 11:37AM

2

**2. Income other than from employment or operation of business**

None ☐

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE |
|---|---|
| $4,070.00 | 2012 YTD: Wife SSI Benefits |
| $8,298.00 | 2011: Wife SSI Benefits |
| $8,298.00 | 2010: Wife SSI Benefits |

**3. Payments to creditors**

None ■

*Complete a. or b., as appropriate, and c.*

a.   *Individual or joint debtor(s) with primarily consumer debts.* List all payments on loans, installment purchases of goods or services, and other debts to any creditor made within 90 days immediately preceding the commencement of this case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $600. Indicate with an (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

None ■

b.   *Debtor whose debts are not primarily consumer debts:* List each payment or other transfer to any creditor made within 90 days immediately preceding the commencement of the case unless the aggregate value of all property that constitutes or is affected by such transfer is less than $5,850*. If the debtor is an individual, indicate with an asterisk (*) any payments that were made to a creditor on account of a domestic support obligation or as part of an alternative repayment schedule under a plan by an approved nonprofit budgeting and credit counseling agency.  (Married debtors filing under chapter 12 or chapter 13 must include payments and other transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS/ TRANSFERS | AMOUNT PAID OR VALUE OF TRANSFERS | AMOUNT STILL OWING |
|---|---|---|---|

None ■

c.   *All debtors:* List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR AND RELATIONSHIP TO DEBTOR | DATE OF PAYMENT | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|

**4. Suits and administrative proceedings, executions, garnishments and attachments**

None ☐

a. List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| CAPTION OF SUIT AND CASE NUMBER | NATURE OF PROCEEDING | COURT OR AGENCY AND LOCATION | STATUS OR DISPOSITION |
|---|---|---|---|
| Armstrong Management, Antietam Square Homeowners Association c/o Chadwick Washington Morirarty Elmore and Bunn v. Kenneth and L'amour Henderson | Warrant in debt | Prince William General Distric Court 9311 Lee Ave Manassas, VA 20110 | Pending |

* Amount subject to adjustment on 4/01/13, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

B6I (Official Form 6I) (12/07)

In re  **Kenneth Karl Henderson**
       **L'amour Kim Ponce**                                          Case No. _____
                                   Debtor(s)

## SCHEDULE I - CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by every married debtor, whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. Do not state the name of any minor child. The average monthly income calculated on this form may differ from the current monthly income calculated on Form 22A, 22B, or 22C.

| Debtor's Marital Status: | DEPENDENTS OF DEBTOR AND SPOUSE | |
|---|---|---|
| **Married** | RELATIONSHIP(S):<br>**Daughter**<br>**Daughter**<br>**Daughter**<br>**Daughter** | AGE(S):<br>**20**<br>**5**<br>**5**<br>**7** |

| Employment: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | **Counsler** | **Disabilty** |
| Name of Employer | **Community Systems Inc** | |
| How long employed | **5 yrs** | |
| Address of Employer | **8136 Old Keen Mill Rd**<br>**Springfield, VA 22152** | |

| INCOME: (Estimate of average or projected monthly income at time case filed) | DEBTOR | SPOUSE |
|---|---|---|
| 1. Monthly gross wages, salary, and commissions  (Prorate if not paid monthly) | $ 3,321.00 | $ 0.00 |
| 2. Estimate monthly overtime | $ 0.00 | $ 0.00 |
| 3. SUBTOTAL | $ 3,321.00 | $ 0.00 |
| 4. LESS PAYROLL DEDUCTIONS | | |
| a. Payroll taxes and social security | $ 364.00 | $ 0.00 |
| b. Insurance | $ 0.00 | $ 0.00 |
| c. Union dues | $ 0.00 | $ 0.00 |
| d. Other (Specify): | $ 0.00 | $ 0.00 |
| | $ 0.00 | $ 0.00 |
| 5. SUBTOTAL OF PAYROLL DEDUCTIONS | $ 364.00 | $ 0.00 |
| 6. TOTAL NET MONTHLY TAKE HOME PAY | $ 2,957.00 | $ 0.00 |
| 7. Regular income from operation of business or profession or farm (Attach detailed statement) | $ 0.00 | $ 0.00 |
| 8. Income from real property | $ 0.00 | $ 0.00 |
| 9. Interest and dividends | $ 0.00 | $ 0.00 |
| 10. Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above | $ 0.00 | $ 0.00 |
| 11. Social security or government assistance | | |
| (Specify): **Social Security (Survivor Benefits)** | $ 0.00 | $ 814.00 |
| | $ 0.00 | $ 0.00 |
| 12. Pension or retirement income | $ 0.00 | $ 0.00 |
| 13. Other monthly income | | |
| (Specify): **Part time Job** | $ 1,491.00 | $ 0.00 |
| | $ 0.00 | $ 0.00 |
| 14. SUBTOTAL OF LINES 7 THROUGH 13 | $ 1,491.00 | $ 814.00 |
| 15. AVERAGE MONTHLY INCOME (Add amounts shown on lines 6 and 14) | $ 4,448.00 | $ 814.00 |
| 16. COMBINED AVERAGE MONTHLY INCOME: (Combine column totals from line 15) | $ 5,262.00 | |

(Report also on Summary of Schedules and, if applicable, on Statistical Summary of Certain Liabilities and Related Data)

17. Describe any increase or decrease in income reasonably anticipated to occur within the year following the filing of this document:
    **-NONE-**

4 of 4

To: Riverside County Superior Courts and the Riverside District Attorney      Date: 05-04-2020

Any Oklahoma land Inheritance supporting acres of oil and gas leases with mineral rights from Lula Dunford that were then willed to her daughter, Laura McCullough, makes Laura's daughter, Monica Henderson an heir, makes Laura's grandson, Kenneth Henderson an heir, and makes Laura's 3 great-granddaughters, Maya Henderson an heir, Kayla Henderson an heir, and Jordyn Henderson an heir as Native American decedents to Mrs. Dunford's will.

Mr. Henderson states that **the American Indian Probate Reform Act put into law on June 20th, 2006,** denies fractionization of ownership of allotments of land from non Native American Indian heirs or Non Native American descendant spouses (such as Lamour Ponce as a spouse, or Aaminah Watkins attempting to be a non Native American heir as Aaminah Henderson through marriage, both capable of taking away or minimizing royalties owned to Kenneth Henderson or his Native American children as heirs). A living will does exist from Lula Dunford, given to Mr. Henderson's grandmother Laura McCullough and that any conspired plan over many years by Orange County and its Superior Courts to use Ponce family members and various other Government employees working within the County as Agents was meant to keep the Henderson family from their inheritance. However, due to the **American Indian Probate Reform Act (AIPRA),** Lula Dunford's land rights to oil and gas leases in Oklahoma that she willed to daughter, Laura McCullough, would make Monica Henderson as Laura's daughter, Kenneth Henderson as Laura's grandson, and Maya, Kayla and Jordyn Henderson as Laura's great-granddaughters as direct descendants and heirs to Lula's inheritance, **Please review the following related court documents:**

1) Lula Dunfords Native American Indian Roll #58 and Will to daughter, Laura McCullough
2) Oil & Gas Leases on land allotted to Lula Dunford
3) Eaastern District Court of Virginia: Kenneth Henderson v Fairfax County Government et el.,
4) Virginia 4th District Court of Appeals  "Kenneth Henderson v Fairfax County Government et el,
5) Orange County, California 4th District Court of Appeals "Kenneth Henderson v Lamour Ponce"
6) Tulare Probate of Property of David McCullough to Monica Henderson
7) The County of Orange v Alvin Watkins (California)
8) Ellis Ponce v Alvin Watkins (Any Orange County Custody hearing titles from 1996 -2005)
9) Corona Norco School District HR filings: Kenneth Henderson v Corona Norco School District
10) Request for either Riverside County District Attorney or Tribal Court take over children's case

EX: H          ( of 1



Ex: I        1 of 3 Pics





3 of 3 pics

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16  **The following** ·                            **written testimony by Plaintiff Kenneth Henderson against**
17  **Defendants, Corona Norco School District, Orange Unified School District, and Eastside**
18  **Christian Schools in violation of STAY PUT laws for a child with diagnosed learning disabilities**
19  **that was transferred over with an INVALID IEP previously implemented with both parents**
20  **involvement from out of state, are true statements of events to the best of his abilities.**
21
22  To start the 2ⁿᵈ semester of the 2020 school year with the Corona Norco School District, Jordyn
23  Henderson was abruptly removed from her IEP from Letha Raney Intermediate only days after her
24  father informed the School District to keep her in her current Special Education placement, which
25  supports "Stay Put" federal laws for many children diagnosed with a learning disability who school
26  districts may attempt to move their child out of their IEP before allowing the parent in disagreement to
27  have a Due Process Meeting.
28
29  The below Online Source was taken from: https://www.understood.org/en/school-learning/your-childs-
30  rights/basics-about-childs-rights/stay-put-rights-what-they-are-and-how-they-work
31
32  If your child is receiving special education and related services, you have important legal rights. One of
33  these rights is the "stay put" provision of the Individuals with Disabilities Education Act (IDEA).
34  This right comes into play when you disagree with (or "dispute") a change the school district wants to
35  make in your child's educational placement. The term "placement" means more than simply a location.
36  It includes the services set forth in the IEP, such as occupational therapy or counseling.
37  If you dispute a proposed change to your child's placement, the "stay put" provision allows him to do
38  just that—*stay put*. He'll continue to get the same amount of services while you and the school
39  complete a dispute resolution process.
40
41  Most of the time, parents and schools work together to make decisions about a child's education. But
42  disagreements sometimes arise. Maybe the school wants to reduce or eliminate services. Or maybe they

30

1  want to move a child from a general education class to a more restrictive environment.
2  If you want your child to "stay put" while you dispute a proposed change to his IEP, here's what you
3  need to know.
4
5  To use your "stay put" rights, you must take action quickly. IDEA says parents must invoke "stay put"
6  rights within 15 days of being told of the proposed change. The school is required to send you written
7  notice. The 15-day timeline begins when the notice is sent—not when you receive it.
8
9  If you don't take action within those 15 days—by <u>filing a due process complaint</u> or a request for
10 <u>mediation</u>—the school district may have the right to put its changes into effect.
11
12 Keep in mind some states have more protective "stay put" laws. In these states, "stay put" may go into
13 effect automatically, without you taking any action. In other states, you can invoke "stay put" rights
14 without filing a formal complaint. Check with <u>your Parent Training and Information Center</u> (PTI) for
15 your state's specific rules.
16
17 The school must follow the "stay put" rule until your dispute is resolved.
18
19 If you ask for a due process hearing, it might take months before a hearing officer decides your case
20 and any appeal process is completed. During that time, the school can't change your child's IEP. It must
21 *stay put* until the case is resolved.
22
23 In May of 2019, Eastside Christian Schools and the Orange Unified School District removed or
24 terminated the positions of Eastside Christian Schools Principal, Kim Van Geloof, removed or
25 terminated Eastside Classroom Instructor, Lamour Ponce Sr., and removed or terminated Eastside
26 Christian Schools volunteer, Lamour Ponce Jr., all just days after Mr. Henderson filed a complaint in
27 the 4tth District Court of Appeals Court in Orange County, California for violating the "STAY PUT"
28 laws once improperly enrolling all 3 girls without an assessment test, review of prior transcripts and
29 protest from the Mr. Henderson to not have his daughter, Jordyn removed from her IEP just
30 implemented in Georgia before the mother had all 3 girls enrolled without involving the father in
31 financial tuition payment decisions and a decision not to have the children assessed for academic
32 placement during the enrollment process.
33
34 The below actions denied Mr. Henderson's parental rights and ability to support his daughter, Jordyn's
35 diagnosed learning disability needs from Virginia and Georgia while attending Fullerton, California's
36 Eastside Christian Schools in the 2016-17 School Year.  Eastside Christian Schools colluded with the
37 Orange and Corona Norco School District in the assessment and transfer of an Invalid IEP due to never
38 involving the father or having equal supports offered from out of state but denied in California. School
39 IEP's (Individual Education Programs) are designed to support a child's diagnosed disabilities that
40 impact their ability to academically achieve at the same level as their peers or classmates unless
41 assisted with Special Education instruction from a plan financially approved from the School District.
42
43
44

3 1

1    Education Code section 56325, subdivision (a)(3), provides:

2        *As required by [20 U.S.C., section 1414, subdivision (d)(2)(C)(i)(II)], the following shall apply to*

3        *special education programs for individuals with exceptional needs who transfer from an*

4        *educational agency located outside the State of California to a district within California. In the*

5        *case of an individual with exceptional needs who transfers from district to district within the*

6        *same academic year, the local educational agency shall provide the pupil with a free*

7        *appropriate public education, including services comparable to those described in the*

8        *previously approved individualized education program, in consultation with the parents, until*

9        *the local educational agency conducts an assessment pursuant to [20 U.S.C., section 1414,*

10       *subdivision (a)(1)], if determined to be necessary by the local educational agency, and*

11       *develops a new individualized education program, if appropriate, that is consistent with federal*

12       *and state law.*

13

14   To facilitate the transition from one school district to another, the new school in which the student enrolls

15   shall take reasonable steps to promptly obtain the pupil's records, including the IEP and supporting

16   documents and any other records relating to the provision of special education and related services to the

17   pupil, from the previous school in which the pupil was enrolled. (Ed. Code, § 56325, subd. (b)(1).)

18   Above Source taken from: http://www.eduesq.com/special-education-student-ieps-upon-transfer/

19
20

21   **2014/15 – 2016/17 School Years** (IEP Implemented from School Districts in Virginia and Georgia)

22

23   Jordyn began her first 3 years of her IEP in Woodbridge Virginia's Prince William County School

24   District for school years 2014, 2015 and 2016, however, in her last triennial school year in 2016

25   L'amour Ponce Sr., as the grandmother to Jordyn while also an Eastside Christian Schools employee in

26   Fullerton, California began conspiring to assist her daughter, Lamour Ponce Jr. to end her marriage in

27   Virginia with Jordyn's father, Kenneth Henderson by having her first remove Jordyn from her Special

28   Education Plan by placing her in a K12 online program at the start of her 2016 school year in Loudoun

29   County, Virginia. It should be noted for court purposes that once implemented, the IEP follows the

30   child where ever they go.

31

32   **2017/18 – 2019/20 School Years**  (IEP 2nd Phase of Implementation in 2 School Districts in California)

33

34   For the  2nd Phase of implementation of Jordyn's IEP for her 2017, 2018, and 2019 school years,

35   Lamour Ponce Sr., as the grandmother to Jordyn, while employed at Eastside Christian Schools, and

1  her daughter Lamour Ponce Jr., as the mother to Jordyn, working as a volunteer, both colluded with
2  Eastside Christian School Principal, Kim Van Geloof to not follow their own enrollment procedures to
3  deny Jordyn her IEP into the private school along wit her 2 sisters, Maya and Kayla Henderson without
4  the father's involvement in never receiving a copy of a financial agreement for annual tuition cost for
5  all 3 children, and to never have the children given an assessment test to see where all 3 girls should be
6  placed academically in class aspart of the Eastside Christian Schools enrollment process. Without
7  involving Mr. Henderson in his daughter's improper enrollment at Eastside, not only was the father
8  denied his parental rights to be involved in his daughters educational decisions once the family arrived
9  to California with the grandmother and mother placing them into Eastside Christian Schools, but the
10 children were denied their own educational rights as well to be evaluated and academically placed into
11 the right class. Without the children being given an assessment test as part of the Eastside Christian
12 School enrollment process, Jordyn was immediately denied her rights to be academically supported
13 with her Special Education Program due to her diagnosed learning disability in the very year the
14 mother and grandmother as Lamour Ponce also pulled Jordyn from her IEP in 2016.to place her in an
15 online K12 program against the fathers wishes.
16
17 As Orange County Superior Court records in 2017 state Eastside Christian Schools did not meet
18 Jordyn's disability needs for the 2016-2017 IEP School Year. However, both the grandmother and
19 mother as Lamour Ponce, were already colluding with the head Principal and IEP Team from Orange
20 Unified School District to continue to deny the existence of Mr. Henderson and his equal educational
21 decision making rights with the mother over his children by having Jordyn secretly assessed and
22 psychoanalyzed by Orange School District School Psychologist, Eric Supedo.
23
24 The Orange County Superior Courts were made aware of the grandmother and mother as Lamour
25 Ponce, actions to collude with the private school to secretly implement Jordyn's IEP without informing
26 Mr. Henderson, only after he began questioning the private schools actions in December of 2016 to
27 never send over Jordyn's school transcripts from Virginia and Georgia or attempt to implement an IEP
28 that is suppose to follow a child where ever they go. However, the court in July of 2017 reviewed the
29 evidence, to include Jordyn nearly failing the 4th grade while at Eastside Christian without her IEP
30 supports, and decided to rule to have the father be able to decide to have all 3 children placed into the
31 Corona Norco School District after the Orange School District IEP for Jordyn was implemented
32 without the father's involvement and transferred to the Corona Norco School District as an Invalid IEP.
33
34 *The below only source was Originally published in the Summer 2005 Pacesetter, vol.*
35 *28(2). Reprinted with permission from PACER Center, (952) 838-9000.*

36 **Who can make special education decisions?**

37 IDEA and state laws stress that parents are the decision makers for their children.
38 Parents retain these rights unless a court order, state statute, or legally binding
39 instrument revokes them. In other words, each parent remains a decision maker in
40 special education after divorce unless the divorce decree or other court action specifically
41 removes that right.
42

33

**Joint legal custody is the current order of both parents:** means that both parents keep the right to make important decisions about their children's education, health care, and religious training. Under joint legal custody, unless the decree is written differently, both parents have the right to:

- Be members of their child's Individual Education Program (IEP) team
- Be given notice of team meetings
- Exercise their due process rights
- Receive progress reports
- Have the chance to agree or disagree with plans for initial evaluation and placement in special education

The school must provide written notice of special education meetings to each parent who has legal custody of the child and has provided the school with an address.

## What happens when parents with joint legal custody cannot agree about special education?

It is most helpful if parents work in a cooperative manner despite their divorce.

1. Some parents choose to come to an agreement or at least agree on a course of action before meeting with the other members of the IEP team (Mother never thought once to involve the father, only wanted to remove child from IEP for financial and custodial gain in court without fathers involvement once arriving to California.)

2. If the parents cannot find agreement, most school personnel use informal means such as school meetings to try to resolve the conflict (Yes, but only after denying the child the ability to Stay Put in their IEP while denying Mr. Henderson's request to not change his daughters IEP placement.)

3. If the parents still cannot agree, either parent or the school may be able to use the alternative dispute resolution processes available in that particular state (Mr. Henderson used the Family Law court Process and them the Dispute Resolution Process but only after the defendants had already denied Mr. Henderson the STAY PUT laws in California).

4. If they cannot agree yet, either parent can request a due process hearing. When the issue of the hearing involves a change in educational placement, the child will in most cases "stay put" in the current school program until the matter is decided (This option of STAY PUT was denied to Mr. Henderson by all 3 defendants).

5. If parents are in so much conflict that they are unable to work on behalf of the child in the special education process, either parent has the option of consulting an attorney about asking the court to alter the divorce decree (Request denied to Mr. Henderson)

34

# Conclusion

3  Jordyn's IEP Advocate at the time of the Superior Court ruling to have the IEP transferred over to the
4  Corona Norco School District did state as part of her written court testimony that an IEP assessment
5  completed on a child without the other parents involvement and signature while seeking to be involved
6  in their child's educational and health needs, would be invalid (See attached documents by Valerie
7  Aprahamian, IEP Advocate in support of Jordyn in 2017.

10  The final 2016/17 triennial IEP school year transcripts, once the Henderson family arrived to California
11  (2014-2015 and 2016 School Years) show Jordyn's Special Education Supports from her IEP for an
12  entire year at Eastside Christian Schools, had been denied in its 3rd and final triennial assessment year
13  without the school following proper procedure once receiving Jordyn's school records clearly showing
14  she was on a current IEP due to a diagnosed learning disability. It became clear in December that the
15  private school had no intention of including Mr. Henderson or implementing Jordyn's IEP from out of
16  state. due to the mothers desire to remove the IEP and due to employment ties the Ponce family
17  maintained as close friends with Principal Van Geloof. Mrs. Van Gelof assisted both Lamour Ponce Jr
18  and Lamour Ponce Sr in denying equal educational and medical decision making of the father while
19  advocating to maintain such Special Education supports for Jordyn.

21  Both the mother and grandmother while born in New York with New York social security cards, used
22  an additional California issued social security number with the name Lamour Ponce only to deny their
23  marriages, spouses income, due to receiving SSI (Supplemental Security Insurance) and the ability to
24  claim the children separately from their biological fathers for inheritance.

26  Lamour Ponce only as the name filed with no suffix into the Orange County Superior Court, continued
27  to give no distinction between her and her mothers identities, continues to leave unknown to the father,
28  sealed testimony as to who out of the grandmother and mother of the children was made the Power of
29  Attorney and given legal guardianship with Judgment of Mr. Henderson's stepdaughter, Aaminah
30  Watkins some years after the mother's reported brain injury in 1997 by Aaminah's biological father,
31  Alvin Jerome Watkins. Mr. Watkins was denied his requests for full legal and physical custody of his
32  daughter in the Orange County Superior Courts. Aaminah moved out of Virginia to California in 2016
33  after her Mom separated from Mr. Henderson, to remain near her mother in Anaheim, California.

35  Lamour Ponce Jr., upon arriving to California in late November of 2015, could have simply transferred
36  all 3 children to include Jordyn's IEP from Henry County Public schools to Running Springs
37  Elementary and EL Rancho Charter School as 2 very highly rated schools right down the street from
38  her Anaheim home address  with the Orange Unified School District, however, Lamour Ponce Jr and
39  her employed Eastside Christian Schools mother, Lamour Ponce Sr, chose to use the Fullerton private
40  school and close relationship with the Eastside Christian School Principal as a means to continue to
41  deny the parenting rights and  the existence of the marriage in Virginia and influence the custody
42  situation in her favor with the court.

35

1  Mr. Henderson's mother in law, L'amour Ponce but known as Ellis to family, used a California issued
2  social security  number to take on her daughter's legal birth name of Lamour Ponce for continued
3  custodial and financial gain of her 3 granddaughters, after years of using her daughters same name to
4  conceal being made her legal guardian of her 4th and eldest granddaughter, Aaminah. Such actions
5  concealed to Mr. Henderson by the mother in law as a private school employee then would allow both
6  her and her daughter to switch identities in California and Virginia with a California issued Social
7  Security number. The California social security number would allow the mother in law as Lamour
8  Ponce Sr, and her daughter, Lamour Ponce Jr., with employment, volunteer, and friendship ties to the
9  private school Principal, to create another identity used to deny the existence of both biological fathers
10  with Orange County Government Agencies and the County Superior Court to Aaminah Watkins, Maya
11  Henderson, Kayla Henderson and Jordyn Henderson.
12
13  In the end an Invalid IEP was transferred without the involvement of a father who was involved and
14  persistently pushed for his daughter, Jordyn's IEP to STAY PUT while asking for placement of supports
15  for his daughter's learning disability to not be changed to the private school principal and asistant
16  principal once arriving to California and eventually having to deal with all 3 defendants who have
17  repeatedly denied such rights for him as a parent with a child with an out of state IEP that continued to
18  be targeted for removal by the mother and all 3 defendants in California.
19
20  The court should have knowledge that Mr. Henderson's daughter, Maya Henderson was also denied
21  disability needs for school by all the defendants as well who either colluded with the mother to refuse
22  to inform the father of behaviors associated with diagnosed depression, weight gain, skin picking, and
23  severe anxiety due to dealing with her parents pending divorce without a professional child psychiatrist
24  or psychologist.
25
26  Its important that the court realize before making a decision based off of California's Statute of
27  Limitations in filing, Mr. Henderson tried the Family Law court and was lied to by all 3 defendants
28  who stated his daughter's out of state IEP would be implemented once transferred to the Corona Norco
29  School District as it should have from the moment Jordyn arrived to California but her IEP supports
30  stated by her advocate were never implemented by Orange Unified School District with intent  along
31  with the mother and grandmother on eventually removing Jordyn from her IEP with only math being
32  the lone subject supported from various subjects supported in Georgia and Virginia.
33
34  **Filings Made with Corona Norco School District and the OAH in relation to Jordyn & Maya**
35  **Henderson's diagnosed disabilities will be provided to the court.**
36
37  Mr. Henderson along with his initial complaint to the Corona Norco School District in January of 2020,
38  made several filings into their Human Resources Department in relation to Administration of Hearings
39  request and Due Porccess Hearing Request due to being denied Stay Put laws for his childs IEP that
40  was completely taken away by the mother and Eastside Christian in 2016/17 and then drastically
41  reduced only when Mr. Henderson made the private school aware that an IEP existed and should not be
42  removed. It was that new IEP created by Orange School District that remains invalid for Jordyn and the
43  reason why the defendants went out of their way to completely remove all evidence of prio wrongs
44  committed by the state of California in dismantling my daughters Special Education Program

37

1  implemented by both the mother and father just weeks several actions took place by the mother and
2  grandmother to deny the existence of Mr. Henderson as the father in marriage to Lamour Ponce out of
3  the state of Calfiornia due to fraudulently receiving SSI, and Survivor benefits for years with financial
4  support in the millions for Orange County through American Indian inheritance of oil and gas leases
5  denied to Mr. Henderson's Native American family and children as heirs,  as the Elephant in the Room
6  for all reasons behind both triennial school year attempts in 2016/17 with Eastside Christian Schools
7  with the Orange School District and the 2019/20 triennial school year with the Corona Norco School
8  District's Letha Raney Intermediate Schools, all to dismantle and remove Jordyns out of state IEP in
9  Orange and Riverside Counties of California.
10
11  **Attachments:** Attachments will include 2 written reports in 2017 made by Jordyn's IEP Advocate .
12  Other attachments will be provided to the court in relation to diagnosed medical disabilities of
13  Depression, Anxiety Disorder and Skin Picking Disorder for Maya denied to the father by the mother
14  for over 2 years to treat her mental health needs first attending Eastside Christian Schools before
15  transfering to Corona Norco School District and the father finding out of such medical records and
16  reporting them to Letha Raney Intermediate who never attempted to suggest a 504 Plan meeting with
17  both parents, again denying to respond to the father and only to the mother, Lamour Ponce, who
18  remained employed as a substitute teacher but similar close ties with Principal Sanchez/ McIntire as the
19  senior Lamour Ponce was close with Principal Van Geloof with Eastside Christian to deny the fathers
20  rights and students disability needs.
21
22  Mr. Henderson also pointed out to the School District of Corona Norco and the OAH that Jordyn's IEP
23  Team with Letha Raney Intermediate did not follow procedural policies requiring team members be
24  present at the meetings such as the 1) School Psychologist, 2) the Special Educaton Teacher, Mrs Y, and
25  the Math Academy Teacher, Mrs Klat, in which the IEP Team removed Jordyn from her IEP support
26  with a Special Education Math Instructor such as Mrs Y to replace with non special education support
27  by Mrs Klat and neither were present at the IEP Meeting to support Principal McIntyre's reasoning for
28  denying Mr. Henderson's Stay Put request he feels shoulf have never been approved by a Principal who
29  stated in the meeting to the meeting coordinator if the IEP Team could move forward without Mr.
30  Henderson's support and vote! Mr. Henderson requested the same actions be done to remove Principal
31  Sanchez/ McIntyre as was done to Principal Kim Van Geloof in her relations with Lamour Ponce Sr at
32  Eastside Christian in denying Stay Put laws and Mr. Henderson's parental rights to support his
33  daughters disabilities.
34  \
35  **Subpoena Request:**
36
37  Subpoena's of all school records, employee position titles, and reasons for removal or terminations of
38  staff after Mr. Henderson's filed complaint specifically to Eastside Christian Schools last May of 2019
39  will be requested, filled and served for all 3 defendants with the current Eastside Christian Schools
40  Principal, Orange School District Psychologist, who assessed Jordyn, the current Orange School
41  District Superintendent, the Vicentia Elementary Special Education Case Worker who worked with
42  Jordyn, and Letha Raney Intermediate Special Education Instructor known as Mrs. Y who also worked
43  with Jordyn will be asked to testify.

3 7.

1
2
3                                    **RELIEF**
4    In relief, Mr Henderson is requesting damages from Eastside Christian Schools, the Orange School
5    District and the Corona Norco School District due to the completion and transfer of an Invalid
6    California IEP after denying to follow "Stay Put Laws of a child on a current IEP implemented for
7    Jordyn that should remain in place , comparable or equal to the approved Special Education
8    programming needs Jordyn maintained in her previous school, state and School District ionce the
9    parent disputes any placement change of their child made by the school. Jordyn should not have been
10   removed from her placement and should have "STAYED PUT" at Letha Raney Intermediate this
11   triennial school year of 2019/20 and should have "STAYED PUT" due her fathers disagreement to
12   displace her from her IEP due to Jordyn's diagnosed learning disability noted outside of California
13   before transferring to Eastside Christian Schools from Luella Elementary in Georgia in 2016/17 mid
14   school year *[20 U.S.C., section 1414, subdivision (a)(1)]* .
15
16   Furthermore, Kenneth Henderson, as Jordyn's father, although he participated in Jordyns previous IEP
17   meetings in Georgia and Virginia, once arriving to California, Orange County clearly showed a
18   preference for the mother and Mr. Henderson's Mother in Law as an Eastside Christian Schools teacher
19   and volunteer by not including Mr. Henderson in the completion of an invalid enrollment process of his
20   3 daughters without including the father in any financial tuition agreement, not including the father in a
21   decision to not have his daughters complete an enrollment assessment test which would have provided
22   the private school with facts supporting Jordyn was a Special Needs Child requiring them to further
23   review the students previous transcripts in which Eastside did not until Mr. Henderson brought the
24   school records from Georgia and Virginia to Principal Van Geloof's attention.
25
26   Eastside Christian Schools teacher, Ms Wozab and the Orange School District psychologist with
27   Running Springs Elementary, Eric Supedo, did not include Mr. Henderson in any new triennial
28   assessment for Jordyn before the IEP was completed and transferred to the Corona Norco School
29   District in which Jordyn's Special Education Advocate at the time called an Invalid IEP Transfer due to
30   the School Districts inability to include Mr. Henderson. Mr. Henderson states the state of California
31   conspired with both mothers in using the same name of Lamour Ponce to deny not only the existence of
32   the marriage but to deny the existence of Mr. Henderson's family inheritance to claim his children
33   through his mother in law while using his wife's name of Lamour with an additional social security
34   number from Orange County for financial gain of millions in oil and gas leases given to Laura
35   McCullough, Mr. Henderson's grandmother.
36
37   Because of the above actions taken against Mr. Henderson and his family as Native American Indians
38   by California Government Agencies while using his wife and mother in law to claim the same name
39   and his children for custodial and financial gain with the court, and for financial gain of primarily
40   Eaton Corp and Exxon Mobil as to major oil and gas companies who financially support other various
41   Orange County Government Agencies, Schools, Hospitals and Medical Centers, he believes a Relief
42   Payment of $5 million from Eastside Christian Schools, $5 million from Orange School District and $5
43   million from the Corona Norco School District.

38

# A Total in Damages from Relief is requested by the Plaintiff's as Heirs:

1) Easter Seals ($5,000,000)
2) Ultimate Software (UltiPro) Santa Ana, CA ($10,000,000)
3) Orange County Social Services ($5,000,000)
4) CHOC Hospital ($5,000,000)
5) St. Joseph's Heritage Medical (Group)  ($10,000,000)
6) Anaheim Social Security Administration ($40,000,000)
7) CalOptima Health Insurance ($5,000,000)
8) CHOC Health Alliance ($5,000,000)
9) Orange County Superior Courts ($55,000,000)
10) Exxon Mobil ($170,000,000)
11) Eaton Corp (175,000,000)
12) Anadarko Petroleum ($200,000,000)
13) Union Bank ($100,000,000)
14) Adams, Silva & McNALLY LLP. ($15,000,000)
15) Attorney, Milton C. Grimes ($100,000)
16) Attorney, Thomas Chapin ($100,000)
17) Attorney, Tommy Andrews Jr. ($100,000)
18) Darrell's Drilling ($100,.000)
19) Christine Holmes ($100,000)
20) Judge Orel Busby and Estate Heirs ($5,000,000)
21) Afgagh Kathryn Khorashadi ($100,000)
22) Tulare County Probate Court ($5,000,000)
23) OAH ($5,000,000)
24) Eastside Christian Schools
25) Orange Unified School District
26) Corona-Norco School District

## Total: $975,000,000

**$675,000,000** in damages and relief to Kenneth Henderson, Amillia Henderson, Monica Henderson, Maya Henderson, Jordyn Henderson, and Kayla Henderson as direct Native American decedents as Washitaw and Seminole Indians from the Anadarko reservation, with Laura McCullough as an heir, raised by Lula Dunford as a Seminole. However, due to Nath Cochran as a full blooded Seminole and Washitaw Indian being married to Ida-Nellie Chateau Cochran as a full blooded Seminole, and Nath Cochran having Lula Dunford as his biological daughter and Laura McCullough as his biological granddaughter, like Nath Cochran, all the Richardsons and McCullough's were surnamed Washington's, as are the descendents of David and Laura McCullough, as all of us are part of the George Washington Band of Indians from the Anadarko reservation.

**$300,000,000** to all the remaining McCullough 37 direct descendants as Washita and Seminole Native American Indian heirs as victims of the above Defendants in an Inheritance Heist of the David McCullough Tulare Court Probate listing Plaintiff, Monica Henderson as Administrator of the McCullough estate property.

/e/  Pro se Plaintiff: Kenneth K. Henderson
Address: 1266 Ryan Ln. #F
Corona, CA 92882
Phone: H/951-393-0318 & C/951-261-6517

39

VALERIE APRAHAMIAN

# Advocates for Angels

Ex: J

 

Special Education Advocacy Services
3466 Christopher Lane, Corona, CA 92882
TELEPHONE (909) 241-2655 FAX (951) 348-8490

June 5, 2017

Judge Frank Ospino
Superior Court of California
County of Orange
341 The City Drive South
Orange, CA 92868-3205

Case Number: 17D000513 Kenneth Henderson vs L'Amour Ponce

Re:  Jordyn Alana Henderson

Dear Judge Ospino,

My name is Valerie Aprahamian and I am the founder of Advocates For Angels, an advocacy agency that provides advocates who assist parents in the development of their child's IEP.  As a special education advocate, I have more than 20 years of experience in working with families in the Inland Empire and Orange County area.  I hold a Special Education Advocacy Certificate from the William and Mary Law School and have attended more than 1,500 IEP meetings to represent students on an IEP.

On behalf of Mr. Kenneth Henderson, I am writing this letter to you regarding the Individual Education Program (IEP) for his daughter, Jordyn Alana Henderson.  Mr. Henderson believes that L'Amour Ponce has failed to provide the special education program and services Jordyn requires to receive educational benefit as mandated by IDEA by removing Jordyn from public school and placing her in private school and without Mr. Henderson's authorization.

Jordyn has been identified as a student with a learning disability, memory, vision and processing deficits, speech and language deficit, and fine and gross motor deficits.  These deficits impede Jordyn's ability to access the general education curriculum.  Without specialized teaching by a special education teacher to provide the placement,

1 of 3

modifications, accommodations, supports and services she requires. Jordyn will not receive educational benefit and continue to fall further behind grade level.

During the 2016-2017 school year, Mrs. Ponce unilaterally removed her daughter, Jordyn, from public school and placed her in private school at Eastside Christian School in Fullerton, California, without the authorization of Jordyn's father, Kenneth Henderson. Eastside Christian School does not provide special education services, nor does the Eastside Christian School staff have the knowledge or credentials to provide the accommodations, modifications, supports and services required to implement her IEP per the October 31, 2016 IEP document.

Mr. Henderson holds equal educational rights to Jordyn, therefore, Mrs. Ponce violated Mr. Henderson's parental rights under IDEA and the California Education Code by removing Jordyn from public school and placing her in private school without Mr. Henderson's signature or agreement. As a result of Mrs. Ponce's decision, Jordyn was denied implementation of the IEP dated October 31, 2016 for the 2016-2017 school year. Mr. Henderson believes that Jordyn must be placed in Public School in order to receive the specialized instruction she requires to receive educational benefit by providing the educational placement, supports, and services that are documented in her October 31, 2016 IEP.

According to the IEP dated October 31, 2016, Jordyn's IEP was developed and agreed upon and to be implemented from October 31, 2016 thru October 31, 2017. Supports and services included: 50 minutes of collaborative support by a special education teacher and 50 minutes of supported instruction by a special education teacher. Goals included: academics and task completion. Accommodations included: small group instruction, extended time, verbal/visual cues to remain on task, positive reinforcers, use of math manipulatives.

The Triennial assessment review, which is mandated by the California Education Code, is due July 7, 2017. The district cannot reassess without parents authorization, yet, Orange Unified School District assessed Jordyn without Mr. Henderson's knowledge and based upon Mrs. Ponce's signature. In addition, an IEP was scheduled for June 6, 2017 to review the Psycho-educational assessment for the Triennial review. Mr. Henderson was not made aware of the IEP meeting scheduled for June 6, 2017 until June 4, 2017 after he became suspicious that assessments were taking place and called the Orange County District to inquire.

It is Mr. Henderson's position that Mrs. Ponce has violated his parental rights and failed to provide the education that Jordyn requires as a student with a specific learning disability. For the reasons as outlined above, Mr. Henderson is requesting that Jordyn be placed to live in the home with him to allow Jordyn to attend the most appropriate school within the Corona/Norco Unified School District where Jordyn can receive the mandated special education services she requires.

Furthermore, Mr. Henderson believes Jordyn's current IEP was not fully developed appropriately because Mrs. Ponce was not able to advocate properly in the development of the IEP. It is Mr. Henderson's intention to retain special education assistance in order to provide Jordyn with the most appropriate supports and services available to her and to meet her needs under IDEA.

Thank you for your consideration of the information and requests as outlined in this letter.

Respectfully,

Valerie Abrahamian
Advocates For Angels
AdvocatesForAngels.com

3 of 3

VALERIE APRAHAMIAN

# Advocates for Angels

 

Ex: K

Special Education Advocacy Services

3499 Crestside Lane Corona, CA 92880
TELEPHONE (909) 941-0000 FAX (951) 547-7480

July 4, 2017

Judge Frank Ospino
Superior Court of California
County of Orange
341 The City Drive South
Orange, CA 92868-3205

Case Number: 17D000513 Kenneth Henderson vs. L'Amour Ponce

Re:  Jordyn Alana Henderson

Dear Judge Ospino,

On June 5, 2017, I wrote a letter regarding Jordyn Henderson's current IEP.  Mr.
Henderson has requested my assistance in providing you with the additional information
you have requested for the upcoming hearing on July 5, 2017.

On behalf of Mr. Kenneth Henderson and as previously stated in my letter dated June 5,
2017, Mr. Henderson believes that L'Amour Ponce has caused Jordyn significant
educational regression by unilaterally removing Jordyn from public school and placing
her in private school without Mr. Henderson's consent and without informing Orange
Unified that Jordyn was a student on an IEP upon relocating to the Orange County area.
This decision impeded Orange Unified School District from collaborating with Eastside
Christian School and Mr. Henderson, to ensure that the current IEP from Georgia be
implemented properly and authorized by both parents during the 2016-2017 school year.
Therefore, Mrs. Ponce not only failed to meet her daughter's educational needs, which
caused significant regression, but also violated Mr. Henderson's educational rights
regarding his daughter, Jordyn Henderson.

In a letter from Estefan Encarnacion, Esq. dated June 30, 2017, he asks, "On June 22,
2017, the court ordered this office to attempt to obtain a letter from the Corona-Norco
School District that can indicate whether or not the IEP assessment conducted by Orange
Unified School District would be able to be implemented for Jordyn Henderson."



1 of 7

As an independent special education advocate, I have worked with CNUSD for 20 years and I am confident that CNUSD is capable of implementing the assessment findings as outlined in the Psycho-Educational Evaluation from Orange Unified. However, it is my professional opinion that the Psycho-Educational Assessment conducted by Orange Unified is incomplete and inaccurate and therefore, insufficient to develop an appropriate IEP for Jordyn. Conversely, the offer of FAPE (Free and Appropriate Public Education) as documented in the Orange Unified IEP dated June 16, 2017, does not offer the supports and services necessary to meet Jordyn's current educational needs. Therefore, I believe that an Independent Educational Psycho-Educational Evaluation is warranted.

Below, please find a diagnostic comparison of the IEP from Luella Elementary School in the Henry County Schools, McDonough, GA, start date 10/24/16, end date 10/30/17 and the IEP developed by the Orange Unified School District, Annual/Triennial meeting start date 6/16/17, end date 6/16/18. The IEP meeting by Orange Unified on July 16, 2017, was conducted without Mr. Henderson's attendance and authorization and is not signed or authorized to be implemented by Mr. Henderson.

**Luella Elementary School – Academic Support**
50 minutes 5 times a week of collaborative support by as Special Education teacher.
50 minutes 5 times a week of supportive instruction by Special Education staff member

*It is important to note that the Henry County Schools determined that Jordyn required academic support in multiple areas,* which include:
Math
Language Arts
Science
Social Studies

**Orange Unified – Academic Support**
30 minutes 5 times a week in a group setting of Specialized Academic Instruction outside the General Education classroom in a special education classroom

*It is important to note that Orange Unified recommended that Jordyn required academic support in the sole area of Math only.*

Additionally, Orange Unified has *decreased the academic support by 70 minutes 5 times a week.* It is documented and reported in every IEP that Jordyn does not complete any academic task in the time allotted. Therefore, I believe that Jordyn requires additional Academic Support in order to meet her needs.

Furthermore, in the areas of vision processing, attention, and memory, Jordyn's scores indicate that she exhibits deficits that would require her to receive instructional support in all areas of academics and not just in the area of Math in order for her to be successful in accessing and completing grade level assignments.



**Luella Elementary School – Accommodations**
1. Small group instruction
2. Extended time
3. Verbal/visual cues to remain on task
4. Positive reinforcers
5. Use of math manipulatives

**Orange Unified – Accommodations**
1. Preferential seating, near instruction
2. Additional time to complete assignments and tests, as needed
3. Shortened assignments, for example fewer math problems to solve
4. Limit timed tests

Orange Unified does not offer the accommodations of small group instruction, verbal/visual cues to remain on task, positive reinforcers, and Math manipulatives.

The Psycho-Educational assessment conducted by Orange Unified sites the following suggested classroom strategies, however, the IEP team from Orange Unified did not include or recommend these accommodations in the IEP.

1. **Organization:**
   Color code materials for each subject
   Use of assignment notebook
2. **In-Class Learning**
   Provide meaning to her learning and how it may relate to a real-life situation
   When available, check in to make sure Jordyn understands what is expected
   Create a signal to get Jordyn's attention. This could be in the form of a sticky note on the desk or moving closer to Jordyn to gain her attention.
   Keep instructions simple and clear

In addition to the accommodations offered by Orange Unified and as supported by the current test results in the Psycho-educational Assessment, I believe that Jordyn requires the following additional accommodations be added to the IEP:

1. Repeated directions
2. Check for understanding.
3. Break down instruction into small chunks
4. Prompting to remain on task and complete a task
5. Peer buddy
6. Teacher prompting to complete homework planner/assignment book and assistance to ensure proper materials are brought home for homework completion
7. Teacher prompting to turn in homework
8. Homework shortened by teacher to reduce completion time at home

3 of 7

**Luella Elementary School – Goals**
1. Given a 10-problem assessment, Jordyn will use correct addition, subtraction, multiplication and/or division skills to answer 8 of 10 problems correctly.

2. With no more than 2 verbal reminders, Jordyn will complete assigned tasks in 3 of 5 assignments.

**Orange Unified – Goals**
1. By June 2018, Jordyn will multiply 5 two-digit numbers (using strategies based on place value and the properties of operations) with at least 80% accuracy in 3 consecutive trials as measured by student work samples/teacher records.

2. By June 2018, Jordyn will find 5 whole-number quotients and remainders with up to four-digit dividends and one-digit divisors (using strategies based on place value, the properties of operations, and/or the relationship between multiplication and division) with at least 80% accuracy in 3 consecutive trials as measured by student work samples/teacher records.

Orange Unified did not develop a task completion goal in comparison to Luella Elementary School.

The Psycho-Educational Evaluation conducted by Randall Knack, Ph.D., NCSP, and referred by the Prince William Co. Public Schools states, "Jordyn will need coaching to help her monitor when she is fatigued and how she can *take breaks or change the work to give her a break.* (Poor attention is one sign she may have worked to long on a visually demanding task.)" This supports the need for a break during demanding visual and/or writing tasks.

According to the historical and current test results, it is my professional opinion that Jordyn requires the following additional goals be added to the IEP:

1. Task completion with decreasing of prompts
2. Organization for homework planner and independence to turn in homework
3. Following directions
4. Visual and writing breaks

Based on these findings, it is also my opinion that Jordyn be assessed in the additional areas of:

**1. Psycho-Educational Independent Educational Evaluation**
Evidence supporting my opinion why I believe a Psycho-Educational IEE (Independent Educational Evaluation) is necessary is as follows:

The Psycho-Educational assessment conducted by Orange Unified states, "The alternative method for determining a discrepancy may include":

4 of 8

1. **Consideration of work samples and documented classroom performance on criterion referenced testing.**
   The assessment does not state that Orange Unified obtained work samples or documented classroom performance on criterion referenced testing from Eastside Christian School; therefore, it appears that the assessment is incomplete which poses the question regarding the validity of an incomplete assessment.

2. **Documented classroom observations by school staff.**
   The assessment report states, "A classroom observation was attempted, however, due to time conflicts one could not be conducted." Again, this causes the assessment to present as an incomplete assessment. The classroom observation component of an assessment bears heavy weight upon the outcome of the recommendations, supports and services.

3. **Parent input.**
   Mr. Henderson was not provided the opportunity to fill out the BASC-2 Rating Scales and Parent Report, which was completed by Mrs. Ponce only, therefore, the assessment is incomplete. Without parent input, the evaluation results do not include the full picture of the child. Additionally, Mr. Henderson's rights were violated by not including his input within the test scores.

In addition, attention problems and anxiety have been repeatedly reported; therefore, the possibility of whether or not Jordyn meets the criteria for ADHD remains in question. The Psycho-Educational Evaluation, Prince William Public Schools, states, "Her slow work pace and inattention suggests *"Attention Deficit Hyperactivity Disorder, Primarily Inattention"* with referral to her neurologist for further treatment. Very poor handwriting and visual motor skills are noted and recommendation was made for an occupational therapy consultation."

2. **Vision Processing Assessment by a Developmental Optometrist**
Evidence supporting my opinion why I believe a Vision Processing Assessment is necessary is as follows:

The IEP developed by Orange Unified states, "Based on alternative methods for determining the criteria for Specific Learning Disability, Jordyn presents with a psychological processing and visual processing deficit which affects involvement and progress in the general curriculum." Additionally, the Psycho-educational assessment results for the VMI reflected areas of significant deficit.

The Psycho-Educational Evaluation conducted by Randall Knack, Ph.D., NCSP and referred by the Prince William Co. Public Schools, "Jordyn's severe difficulties with visual scanning and its impact on visual memory and learning are evident in the WRAML2 visual memory subtests. Her performance was extremely low (3 standard



5 of 8

deviations below the mean) and confirms that she misses many important clues when visually scanning. This affects visual memory."

Although Mrs. Ponce states that Jordyn's visual deficits have improved as a result of two surgeries for Strabismus, these surgeries took place prior to the evaluation conducted by Dr. Randall Knack who found significant deficits in visual scanning and visual memory after the surgeries were completed.

Additionally, the current VMI test scores reflect the fact that vision processing and visual motor continue to be an area of need, which greatly impact Jordyn's ability to access the general education curriculum.

### 3. Auditory processing to determine Central Auditory Processing Disorder (CAPD)

Evidence supporting my opinion why I believe a CAPD Assessment is necessary is as follows:

The Woodcock-Johnson IV for "Understanding Directions" reflected a Standard Score of 79, which is in the borderline range. This indicates that Jordyn may have a relative weakness in processing auditory information. This may be due to inattention but it would serve as best practices to rule out an auditory processing disorder.

The *Classroom Behavior Checklist* also reflects additional areas of weakness that relate to auditory deficits. These areas are:

Follows class rules as "Rarely"
Follows oral directions well as "Rarely"
Completes class assignments as "Rarely"
Uses class time well as "Rarely"
Does not stay on task as "Often"
Daydreams as "Often"

### 4. Occupational Therapy Assessment

Evidence supporting my opinion why I believe an Occupational Therapy Assessment is necessary is as follows:

1. The Psycho-Educational Evaluation conducted by Randall Knack, Ph.D., NCSP and referred by the Prince William Co. Public Schools states, "Her grip is still awkward and seemingly unaided by her "scrunchie" aid. She presents with a backward slanted 4-5 finger right handed pencil grip. Occupational Therapy services were provided to improve eye hand coordination and pencil grasp. Written language is difficult for these reasons."

2. The Evaluation conducted by Michele Fletcher, Prince William Public Schools, states, "Classroom teacher reports that Jordyn has difficulty producing written language and has received individualized instruction, small group instruction and



6 of 7

other strategies to address written language and classroom tool usage." This would indicate that Jordyn presents with fine motor difficulties, which would warrant an Occupational Therapy Assessment.

The following lists the documents signed and IEP meeting held in which Mr. Henderson was omitted and therefore, violating his parental rights under IDEA.

1. Assessment plan signed by Mrs. Ponce to give parent permission to assess Jordyn. Mr. Henderson was not made aware of this document, nor did he sign the document agreeing to assess Jordyn. Jordyn was assessed on April 21, 2017, May 5, 2017 and May 8, 2017 without Mr. Henderson's authorization.

2. An IEP was held on June 16, 2017, in which Mr. Henderson was not present. The assessment findings were presented and Mrs. Ponce signed the IEP in agreement. Mr. Henderson did not sign the IEP, nor was he present for the meeting. Because Mrs. Ponce signed the IEP, it is evident that she is not aware of the serious concerns as outlined in this letter by her signature in agreement to a Psycho-Educational Evaluation that is incomplete and inaccurate and an IEP that is insufficient to meet her daughter's educational needs.

If you have further questions regarding Jordyn's special education program, I can be reached at (909) 841-2600.

Respectfully,

Valerie Aprahamian
Advocates For Angels

Ex. L

**Prehearing Statement**                    Date: 02-26-2020

**Case # 2020020889**

**History of denied child disability supports for students at Letha Raney Intermediate Schools:**

Jordyn Henderson is a child with diagnosed learning disabilities from Virginia and Georgia who has now had her FAPE removed 3 times by Lamour Ponce (twice in her 2016/17 school year from Potowmack Elementary in Loudoun County, VA while placing Jordyn in an online K12 Program, and again from Luella Elementary in McDonough, GA after the mother and her parents abducted Jordyn and her sisters after the mother abruptly separated from their father, Kenneth Henderson and placed them into a Private School, Eastside Christian Schools in Fullerton, CA.

As Jordyn's then Special Education Advocate, Valerie Apprehanian stated in Jordyn's 2016/17 School year to the presiding Judge Ospino, by placing Jordyn into a private school the mother unilaterally removed her child from her FAPE without the father's involvement. Lamour Ponce then had a School Psychologist reassess Jordyn while implementing a new California IEP without Jordyn's previous supports just implemented from Virginia and Georgia but left unknown to the Orange Unified School and again without the father's involvement. In Mr. Henderson's filed court declaration in January of 2017 in the Orange County Superior Courts, he informs the court that the mother gave him an ultimatum during the 1st semester of the 2016/17 School year in which the mother had removed Jordyn from her FAPE in Virginia and stated "I will be returning back to California with my parents with the children with or without you by December of 2016. With such premeditated actions taken by the mother with support from her mother as an Eastside Christian Schools employee to remove Jordyn from her FAPE in Virginia into an online K12 program was intent in knowing Jordyn needed to be removed from her FAPE in Virginia to meet her ultimatum to return to California with the children by December. Now, less than a year after Lamour Ponce the Grandmother and mother as a teacher and volunteer were removed from their private school positions along with the removal of Eastside Christian Schools Kim Van Geloof as the Principal, here Jordyn is today, once again in another 2019/20 triennial assessment school year and removed from her FAPE but at Letha Raney Intermediate Schools with the Corona Norco School District and Lamour Ponce once again listed as an employee of the School and School District.

Multiple FAPE Procedural Violations may have once again caused Jordyn to be removed from her Special Education program without the father's involvement while in the child's triennial year again at Letha Raney Intermediate. In this statement, Mr. Henderson is claiming not only was he never given a Prior Written Notice of FAPE supports being removed or denied by the School District but just 9 days after the IEP Team chose to never give him measurements from IEP goals supporting the Special Education staff had indeed supported his daughter's learning disability with extended test taking time, just 9 days after the IEP Team stated they should have had a transition meeting for Jordyn as an incoming new student from her elementary school taking on 6 new teachers and classes, and just after 9 days from the January 14th, 2020 IEP Meeting in which Mr. Henderson declined as Jordyn's father to agree with the mother and IEP team's request to add a Math Academy class knowing it would remove Jordyn's FAPE, as stated by the assistant principal, Erik Schultz in his October 2019 meeting with Mr. Henderson and Mrs. Martinez in stating the mother attempted to call and add Math Academy class 5x.

Mr. Henderson, in knowing Jordyn made a point to inform her father that she was not getting the same extended test taking time as she was in her previous schools, he disagreed with all actions by an IEP Team on January 14th, 2020 who never once involved Mrs. Klatt in any meetings as the Math Academy

1 of 3

teacher who ended up being approved to have her Math Academy class added in removing Jordyn FAPE to suddenly begin instructing both the fathers twin daughters with Kayla Henderson with a non diagnosed learning disability along side her sister, Jordyn with a known diagnosed learning disability. Mrs. Klatt or the IEP Team never informed the father in any meeting that they would be placing both of his daughters in a class together meant to achieve the mothers goal of removing such FAPE's supporting public school funding due to her court recent court request to place Jordyn with her sister Kayla into El Rancho Charter School in Anaheim, California, aware that the Charter school has more restrictive FAPE funding requirements while blocks away from the mother and grandmother, L'amour Ponce's place of residence.

Missing from the February 13th, 2020 IEP Meeting was the School Psychologist and again from the previous January 14th, 2020 meeting was the Math Academy teacher, Ms. Klatt in which the IEP Team without Mr. Henderson's involvement or consent,, placed Jordyn into her class with her twin sister after the start of the 2nd semester at the January 23rd 2020 meeting. Just as recently as Friday, the 21st of February, Mr. Henderson's twin girls were the ones to notify him, not Letha Raney Intermediate School or the Corona Norco School District that Ms. Klatt, their Math Academy instructor would be missing over 3 weeks due to sudden illness. So if the Corona Norco School teacher as the Math Academy instructor who was suddenly teaching my child with a known learning disability with her twin sister without a known learning disability without extended math test taking time in her 1st semester of this 2019/20 school year, a Math Academy teacher who only met Mr. Henderson at Back to School night as Kayla's Math Academy teacher, is no longer teaching the class then who is teaching my children under such circumstances regarding my complaints on the IEP Team ans School District not following procedures, and why was there never a letter sent out stating the change due to Ms. Klatt's illness?

One conflict of interest in this matter with Jordyn and the IEP team is 3 of the IEP Team members in Principal Michelle Sanchez, also named Principal Michelle McIntyre, the Letha Raney School Psychologist, also a non IEP Team member in the Letha Raney School Nurse to include Jordyn's mother, Lamour Ponce as an IEP team member, all denied to support her sister, Maya Henderson ass well, just last year for her 2018/19 School year as the father gave the school medical records and requested they meet and support Maya regarding her diagnosed Anxiety Disorder, Skin Picking Disorder, and positive Depression Test. Only now, after 3 years of the father attempting to inform the Corona Norco School District of the mothers repeated denial of both Jordyn and her sister, Maya's diagnosed disabilities with a filed complaint is Maya just now receiving her 504 Plan to support her Anxiety, Skin Picking, and Eating Disorders at Centennial High School.

I endured emotional abuse as a father advocating for my daughter at the 02-13-2020 IEP Meeting in which my ability to keep my daughter's FAPE to include my cultural identity as an American Indian was scrutinized by the Special Education director's statements of "I'm embarrassed to be an African American, I'm ashamed and Ms. Ponce, I am sorry you are dealing with this" The Special Education Director's words came without knowing I as an American Indian do not identify myself or my children in such correlation with the African American race.

After the Special Education Director's horrible remarks as she referred to being ashamed or embarrassed of her own cultural identity due to the actions of Mr. Henderson at the February 13th, 2020 IEP Meeting can not be minimized as they were said infront of people from various other racial backgrounds, and said by a women who did not care about her words stated as she was preparing to retire in a few months, as she stated.

2 of 3

It is Mr. Henderson's belief that every school within the Corona Norco School District should follow the same procedural policies in using a Date Stamp as the District Office as a way the parents and schools can recognize they received sensitive documents from parents such as medical records and court orders. Without a Date Stamp, neither the schools or the parents have a receipt of showing when they provided school officials such records and who was responsible for filing and following up with being notified of a child's diagnosed learning disability or mental illness.

With IEP meetings scheduled with a missing parent, a missing Math Academy teacher, a missing School Psychologist, a missing Prior Written Notice before removing Jordyn's FAPE with only the mother present, a missing IEP transition Meeting from Vicentia Elementary, a missing option for Mr. Henderson other than adding a Math Academy Class in which placed Jordyn in a class with her twin sister without notifying the father, while IEP Team member made very inappropriate comments in referencing their own cultural identity with her embarrassment due to Mr. Henderson's decision to not agree with the team, may have led to several violations against procedural safeguards in support of Jordyn's diagnosed disabilities and FAPE. When you review Jordyn's low test scores in comparison to her high scores in class assignments turned in transition from Vicentia to Letha Raney Intermediate Schools, as Lisa Waller, Jordyn's last Special Education Coordinator said just last year in Jordyn's last meting at Vicentia, "Jordyn will continue to need her IEP , I know there has been some statements made suggesting removing Jordyn's IEP, but based off of what we have seen here at Vicentia, I would not remove her IEP Mr. Henderson." Lisa Waller used a class projector to detail measurements of Jordyn either completing or not completing her implemented goals we has an IEP Team made for her while no such actions by Raney's IEP staff were ever made in support of showing how they met Jordyn's disability needs during test taking in her classes before electing to side with the mother alone in removing the very IEP supports with Special Education instruction that Lisa Waller requested not to remove.

Respectfully,

Kenneth Henderson .

3 of 3



Ex; M

**To: The OAH and The Corona Norco School District (Assigned Legal Counsel)**     **Date: 06-08-2020**

**4 IEP Related Questions that Still Need to be Answered by the Corona Norco School District**

1) Letha Raney Intermediate never sent out IEP Meeting invites to Jordyn Henderson's parents to have a transitional meeting as parents arriving with a new student to the middle school from Corona Norco School District's Vicentia Elementary School with an already implemented IEP due to a diagnosed learning disability. In fact, the only meeting held on January 14th, 2020 was requested by Jordyn's father, Kenneth Henderson. Jordyn's father in his filed complaint with the Corona Norco School District's HR Department, verbally supporting at the 01/14/2020 meeting with the Raney Intermediate IEP Team, that they not make any changes to his daughters current IEP Placement as he wanted to first discuss with the team all measured goals on Jordyn's IEP did continue to offer extended test taking time in the required subjects from Georgia and Virginia but the IEP Coordinator, Jason O'Sullivan was unable to provide Mr. Henderson with copies of Jordyn's complete IEP measurement goals.

   Mr. Henderson is notifying the OAH today, June 8th, 2020, due to delays for several weeks into months in relation to the School District closing due to COVID-19 in March of 2020 and the California Governors State of Emergency,, that he is once again requesting since the 01/14/20 if the Corona Norco School District can provide him with all measured goals supporting Jordyn's IEP from Virginia and Georgia and if she continued to meet her Special Education goals while receiving extended test taking time for all subjects during her academic school years from her IEP being implemented from Virginia to the Corona Norco School District?

2) Mr. Henderson also recognized at the 01/14/2020 and the 02/13/2020 IEP meetings for his daughter, Jordyn Henderson that neither Mrs. Y. as the licensed Special Education Math Instructor who often worked to assist Jordyn with completing her Math work, or Mrs. Klatt as the requested Public School Math Academy Instructor used to completely remove Jordyn from her IEP for math, were not in attendance along with Letha Raney's School Psychologist at the 02/13/2020 IEP meeting? Due to COVID-19 health and safety restrictions resulting in school district closures across the Country, Mr. Henderson believes many questions for parents seeking answers to their filed complaints with the OAH against school districts may still need to be answered or provided in the Discovery Process. Mr. Henderson is informing both the Corona Norco School District and the OAH that he is still requesting the above information relating to his daughters IEP Measurement Goals implemented in Virginia and Georgia before arriving here to California in relation to extended test taking time along with answers relating to the unavailability of IEP Meeting Members on 01/14/20 and 02/13/20.

3) Mr. Henderson wants to confirm receiving a Prior Written Notice to reduce, change or end placement of his daughter's IEP was sent to him by mail around or near February 5th, 2020?

4) Request the last agreed upon IEP assessment completed and agreed upon by both parents since the Corona Norco School District was made aware of the parents 07/25/2017 Court Order?

Respectfully, Kenneth Henderson

1 of 1

**OFFICE OF ADMINISTRATIVE HEARINGS**
**STATE OF CALIFORNIA**
**SPECIAL EDUCATION DIVISION**



# REQUEST FOR DUE PROCESS HEARING AND MEDIATION REQUESTED ON BEHALF OF STUDENT

## Student's Information:

Student's first and last name:

| |
|---|
| Maya Ayana Henderson |

Student's birthdate:

| |
|---|
| 04-14-2020 |

Student's main language:

| |
|---|
| English |

Student's address, including the street address, city and zip code:

| |
|---|
| 1266 Ryan Ln #F<br>Corona CA 9282 |

Student's grade level. For example, if student is in second grade, then write "second grade."

| |
|---|
| 9th Grade |

Name of the school student goes to:

| |
|---|
| Centennial High School |

Student's school district of residence:

| |
|---|
| Corona Norco School District |



DGS OAH 59 (ED. CODE § 56500.3, SUBD. (d))
(34 C.F.R. § 300.506, SUBD. (b)) (REVISED 1/20)

(FOR OPTIONAL USE)
PAGE 4

## Parent Information:

**All of the information requested below is required if student is under 18 years of age.**

For each parent to be included in this Request for Due Process Hearing and Mediation, please write the information in the space below. If the student has a legal guardian or an educational rights holder then please put their name and information under the Parent Number 1 section, and add either "legal guardian" or "educational rights holder" after their name.

### FIRST PARENT INFORMATION:

First and last name for Parent Number 1:

Kenneth K. Henderson

Phone numbers for Parent Number 1:

Cell Phone: 951-515-9639

Work Phone:

Home Phone: 951-393-0318

Home address for Parent Number 1, including the street address, city and zip code:

1266 Ryan Ln. #F
Corona, CA 92882

If an interpreter is needed for Parent Number 1, please state the language in the space below. For example, if Parent Number 1 needs a Spanish interpreter, please write "Spanish" in the space below.

2 of 9

**SECOND PARENT INFORMATION, TO BE COMPLETED ONLY IF THERE IS A SECOND PARENT:**

First and last name for Parent Number 2:

Lamour Kim Ponce Jr.

Phone numbers for Parent Number 2:

Cell Phone: 949-426-2319

Work Phone:

Home Phone:

Home address for Parent Number 2, including the street address, city and zip code:

1405 East Wood Cove Drive
Anaheim, CA 92808

If an interpreter is needed for Parent Number 2, please state the language in the space below. For example, if Parent Number 2 needs a Spanish interpreter, please write "Spanish" in the space below.

# Parties to be Named by Parents or Student Filing this Request

Only public agencies, such as those listed below, may be named. Do not list individual people who may work for a public agency. The parties to be named for this case must include at least one of the following:

- School district student currently attends, will attend, or did attend;

- Charter school student currently attends, will attend, or did attend;

- County office of education, or

DGS OAH 59 (ED. CODE § 56500.3, SUBD. (d))
(34 C.F.R. § 300.506, SUBD. (b)) (REVISED 1/20)

3 of 9

(FOR OPTIONAL USE)

PAGE 6

- Other public agencies involved in any decision regarding the student.

Please provide the name and address of the public agency or agencies with whom you wish to schedule a due process hearing and mediation. If an interpreter is needed for Parent Number 2, please state the language

Office of Administative Hearings, Special Education Division
2349 Gateway Oaks Drive, Suite 200,
Sacramento, CA 95833

## Identify the Specific Problems or Complaints:

Federal and state law require you to describe in detail the nature of the problem or problems you want included in this complaint. Simply describing a problem in general terms, such as "Student was denied FAPE for school year 2005-2006," is not enough. You must include facts, dates, references to specific individual education program provisions – also known as "IEP" provisions -, etc. Failure to specifically describe the problem or problems to be included in this complaint may result in this case being closed. Closing a case is called a dismissal.

Describe the nature of the problem including all important facts. Provide details. You may add more pages if needed.

**PROBLEM OR COMPLAINT NUMBER 1:**

On February 21st, 2020 Centennial H.S held a Pre 504 Plan Meeting for daughter, Maya Henderson in which the Centennial Principal, the Assistant Principal, the 504 Coordinator, the School Nurse, the School Psychologist were all in support of daughter, Maya Henderson with diagnosed Anxiety Disorder, Skin Picking DIsorder, Positive Depression Test, with recent Anxiety related behaviors of Eating binges and bed wetting. All Centennial staff present supported Maya needing a 504 Plan, however, the school failed to send a proper School District 504 Plan Meeting Invites, complete a Meeting Sign In sheet, or provide cards on 03/05/20 in denying a 504 Plan due to having A's. Sec. 300.101 (c) (1) of the IDEA clearly states: "...FAPE is available to any individual child with a disability who needs special education and related services, even though the child has not failed or been retained in a course or grade, and is advancing from grade to grade."

**PROBLEM OR COMPLAINT NUMBER 2:**

According to section 300.503 (a) of the IDEA, they must provide written notice whenever the public agency "Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child." In other words, they are suppose to give you a Prior Written Notice (PWN) that provides a data-driven explanation of why they are refusing to evaluate for services. At no point from the March 5th 504 Plan meeting at Centennial High School for Maya Henderson in which denied her accommodations did the meeting ever legally exist on paper, or provide a Prior Written Notice for denying our daughter accomodations who the person leading the 02/05/20 meeting stated to both parents to not be concerned about the Truancy letter sent home for our child dagnosed with Anxiety and Skin Picking Disorders who had been repeatedly late to school while staying up well past midnight to complete school work with an added 3-6pm class on her schedule and bed wetting in the morning in need of a shower. The 1st period P.E teacher voiced her concerns of Maya being late to school and the School Psychologist said his doors were open to her but with no 504 Plan.

**PROBLEM OR COMPLAINT NUMBER 3:**

Maya Henderson was also denied the same supports for a 504 Plan by her prior School last year, Letha Raney Intermediate, who was well aware of her diagnosed mental health conditions due to the father submitting medical records and asking the school to meet with Maya. Mr. Henderson did in fact meet with the Letha Raney Intermediate Assistant Principal requesting the school be aware of the current court order in place between both parents and support Maya for her disability. Mr. Schultz informed me that he would have Maya meet with the School Psychologist, however, there was no follow up to the meeting in which was only confirmed due to the mothers dismay that the School pulled Maya out of her class to meet for counseling why the mother informed everyone that Maya already had a therapist and didnt need to be taken out of class. Letha Raney Intermediate denied Maya supports without ever requesting a 504 meeting once being informed of our daughters anxiety disorder and is currently denying IEP supports in violation of "Stay Put" laws due to Mr. Henderson informing Letha Raney Intermediate to not remove Maya's sister, Jordyn Henderson's (OAH Case# 2020020889) FLAP by adding a Math Academy class instructed by a Public Education teacher less than a year after denying to support Maya's known conditions at Letha Raney & Centennial.



5 of 9

## Proposed Resolution of Problems Stated Above

"Proposed Resolution of Problems" means how you want each of the problems described above to be solved. Federal law requires that you provide a solution to each of the problems described in this complaint to the extent you know the solution. You must describe the solution with as much detail as you can.

Describe the solution for each of the problems outlined above. You may add more pages if needed.

**SOLUTION TO PROBLEM OR COMPLAINT NUMBER 1:**

Maya is a very bright young lady who does get nearly all A's as commonly stated by the Centennial HS staff who denied her 504 Plan, however, it undeniable that she struggles with depression and anxiety in which impact her daily life in the mornings such as bed wetting to include staying up well past midnight to complete her homework as a 14 year old in the International Baccalaureate student.  Solution is Maya does need accommodations that will support her morning routine in getting up for school, preparing for school, getting to school on time, for completing her daily homework routine without staying up past midnight, daily food intake, and fluid intake before going to bed.

Solution to Problem or Complaint Number 2:

Centennial H.S needs to provide a Prior Written Notice stating they plan to deny a 504 plan for accomodations with supported reasoning from both meetings held on February 21st, and March 5th, 2020.

**SOLUTION TO PROBLEM OR COMPLAINT NUMBER 3:**

A complete District Wide Investigation on the actions of the Corona Norco School Districts denying to support diagnosed disabilities for sisters, Maya and Jordyn Henderson after entering the state of California and the father being aware to inform the schools of diagnosed conditions  to support his daughters needs multiple times with the court order given at the beginning of the 2018/19 and 2019/20 school years. , including prior Seizure activity for Jordyn in 2017 from Eastside Christian left unknown to Mr. Henderson by the mother, Lamour Kim Ponce Jr. Once a school is informed of either Maya or Jordyn's disabilities they should forward the medical records to the qualified medical staff such as the School Nurse or School Psychologist and set up a meeting to make sure the child is receiving the proper supports for their conditions. The Corona Norco School District needed a datetstamp, to involve the father and school medical staff

# Signature of Party Requesting Due Process Hearing and Mediation

Print the name of the party requesting a due process hearing and mediation in the space below.

| |
|---|
| Kenneth K. Henderson                    (For Due Process Hearing only) |

Print the email address for the party requesting a due process hearing and mediation in the space below.

| |
|---|
| no email |

The party requesting the due process hearing and mediation, or their representative, must sign and date in the space below.

| |
|---|
| |

Date: | 03-11-2020 |

7. of 9

DGS OAH 59 (ED. CODE § 56500.3, SUBD. (d))                    (FOR OPTIONAL USE)
(34 C.F.R. § 300.506, SUBD. (b)) (REVISED 1/20)                    PAGE 10

# STATEMENT OF SERVICE

Federal and state laws require you to send or deliver a copy of this Request to each of the named parties. Additionally, you must send or deliver a copy to the Office of Administrative Hearings. Retain a copy for yourself. Please indicate that you have sent copies of this Request by completing the appropriate box or boxes below.

## I have provided a copy of this Request for Due Process Hearing and Mediation to all the named parties and to the Office of Administrative Hearings by:

First Class Mail to the person or agency named below at the address listed below. Please include the date the document was mailed to that person or agency. You may add more if needed by attaching additional pages.

```
1) The Office of Administrative Hearings
2349 Gateway Oaks Dr. SW 200
Sacramento, CA 95833
2) Lamour Kim Ponce Jr.
8504 East Wood Cove Drive Apt. 128
Anaheim CA 92808
```

Facsimile transmission, also referred to as fax, or email to the person or agency named below at the fax number or email listed below. Please include the date the document was faxed or emailed to that person or agency. You may add more if needed by attaching additional pages.

DGS OAH 59 (Ed. Code § 56500.3, subd. (d))
(34 C.F.R. § 300.506, subd. (b)) (Revised 1/20)       (For Optional Use)
PAGE 11

Messenger or overnight delivery such as UPS, FedEx, or other courier service to the person or agency named below using the service identified below. I have also attached a copy of the receipt. You may add more if needed by attaching additional pages.

Personal delivery to the person or agency listed below at the address shown below. I have included the name of the person who made the delivery and the date and time of the delivery. You may add more if needed by attaching additional pages.

3) Corona Norco School District and their Representing Attorney
2820 Clark Ave.
Norco CA 92860

## Signature of person completing this statement

Print the name of the person completing this Statement of Service in the space below.

Kenneth K. Henderson

The person completing this Statement of Service must sign in the space below and write the date of the signature below the signature.

By typing your name in the space below you are consenting to electronically signing this document.

Kenneth K. Henderson

Date: 03-11-2020

9 of 9

DGS OAH 59 (ED. CODE § 56500.3, SUBD. (d))
(34 C.F.R. § 300.506, SUBD. (b)) (REVISED 1/20)

(FOR OPTIONAL USE)
PAGE 12

EXECUTIVE DEPARTMENT
STATE OF CALIFORNIA



**EXECUTIVE ORDER N-33-20**

**WHEREAS** on March 4, 2020, I proclaimed a State of Emergency to exist in California as a result of the threat of COVID-19; and

**WHEREAS** in a short period of time, COVID-19 has rapidly spread throughout California, necessitating updated and more stringent guidance from federal, state, and local public health officials; and

**WHEREAS** for the preservation of public health and safety throughout the entire State of California, I find it necessary for all Californians to heed the State public health directives from the Department of Public Health.

**NOW, THEREFORE, I, GAVIN NEWSOM**, Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes of the State of California, and in particular, Government Code sections 8567, 8627, and 8665 do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1) To preserve the public health and safety, and to ensure the healthcare delivery system is capable of serving all, and prioritizing those at the highest risk and vulnerability, all residents are directed to immediately heed the current State public health directives, which I ordered the Department of Public Health to develop for the current statewide status of COVID-19. Those directives are consistent with the March 19, 2020, Memorandum on Identification of Essential Critical Infrastructure Workers During COVID-19 Response, found at: https://covid19.ca.gov/. Those directives follow:

ORDER OF THE STATE PUBLIC HEALTH OFFICER
March 19, 2020

To protect public health, I as State Public Health Officer and Director of the California Department of Public Health order all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors, as outlined at https://www.cisa.gov/identifying-critical-infrastructure-during-covid-19. In addition, and in consultation with the Director of the Governor's Office of Emergency Services, I may designate additional sectors as critical in order to protect the health and well-being of all Californians.

Pursuant to the authority under the Health and Safety Code 120125, 120140, 131080, 120130(c), 120135, 120145, 120175 and 120150, this order is to go into effect immediately and shall stay in effect until further notice.

The federal government has identified 16 critical infrastructure sectors whose assets, systems, and networks, whether physical or virtual, are considered so vital to the United States that their incapacitation or



destruction would have a debilitating effect on security, economic security, public health or safety, or any combination thereof. I order that Californians working in these 16 critical infrastructure sectors may continue their work because of the importance of these sectors to Californians' health and well-being.

This Order is being issued to protect the public health of Californians. The California Department of Public Health looks to establish consistency across the state in order to ensure that we mitigate the impact of COVID-19. Our goal is simple, we want to bend the curve, and disrupt the spread of the virus.

The supply chain must continue, and Californians must have access to such necessities as food, prescriptions, and health care. When people need to leave their homes or places of residence, whether to obtain or perform the functions above, or to otherwise facilitate authorized necessary activities, they should at all times practice social distancing.

2) The healthcare delivery system shall prioritize services to serving those who are the sickest and shall prioritize resources, including personal protective equipment, for the providers providing direct care to them.

3) The Office of Emergency Services is directed to take necessary steps to ensure compliance with this Order.

4) This Order shall be enforceable pursuant to California law, including, but not limited to, Government Code section 8665.

IT IS FURTHER ORDERED that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

IN WITNESS WHEREOF I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 19th day of March 2020.

GAVIN NEWSOM
Governor of California

ATTEST:

ALEX PADILLA
Secretary of State

2 of 2

POS-040(P)

| SHORT TITLE: | CASE NUMBER: |
|---|---|
| Kenneth K. Henderson et al., v. Exxon-Mobil et al., | . |

## ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)
*(This attachment is for use with form POS-040.)*

NAMES, ADDRESSES, AND OTHER APPLICABLE INFORMATION ABOUT PERSONS SERVED:

| Name of Person Served | Where Served |
|---|---|
| *(If the person served is an attorney, the party or parties represented should also be stated.)* | *(Provide business or residential address where service was made by personal service, mail, overnight delivery, or messenger service. For service by fax, provide fax number.)* |
| Exxon-Mobil | 5959 Las Colinas Blvd, Irving, TX 75039 |
| Eaton Corp | 9650 Jeronimo Rd, Irvine, CA 92618 |
| Orange County Superior Courts | 341 The City Dr. S. Orange, CA 92868 |
| Attorney Karen A. Anderson | 400 Oceangate #800, Long Beach, CA 90802 |
| Ultimate Software | 5 Hutton Centre Dr. #130, Santa Ana, CA 92707 |
| Orange County Internal Revenue Service | 801 W. Civic Center Dr. Santa Ana, CA 92701 |
| Anaheim Social Security Administration | 900 S. Harbor Blvd, Anaheim, CA 92805 |
| Orange County Social Services | 3320 E. La Palma Ave. Anaheim, CA 92806 |
| CalOptima | 505 City Pkwy W. Orange, CA 92868 |
| Union Bank (MUFG) | 500 S. Main St., Orange, CA 92868 |
| Wells Fargo Bank | 101 E. Chapman Ave. Orange CA 92866 |
| Darrell's Drilling | 402 W. North St. Konawa, OK 74849 |
| Christine Holmes (Therapist) | 1451 Ramau Avenue, Suite 215, Corona CA 92879 |

Form Approved for Optional Use
Judicial Council of California
POS-040(P) [Rev. February 1, 2017]

**ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)**
**(Proof of Service)**

Page __1__ of __3__

www.courts.ca.gov

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

 

| SHORT TITLE: | | POS-040(P) |
|---|---|---|
| Kenneth K. Henderson et al., v Exxon-Mobil et al., | CASE NUMBER: | |

## ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)
### (This attachment is for use with form POS-040.)
## NAMES, ADDRESSES, AND OTHER APPLICABLE INFORMATION ABOUT PERSONS SERVED:

| Name of Person Served | Where Served |
|---|---|
| *(If the person served is an attorney, the party or parties represented should also be stated.)* | *(Provide business or residential address where service was made by personal service, mail, overnight delivery, or messenger service. For service by fax, provide fax number.)* |
| Saint Joseph's Heritage (Group) Center | 478 S Anaheim Hills Rd, Anaheim, CA 92807 |
| Attorney Thomas Chapin | 232 E Grand Blvd #204, Corona, CA 92879 |
| Attorney Tommy Andrews Jr. | 122 N Alfred St #3011, Alexandria, VA 22314 |
| OAH-Office of Administrative Heartings | 2349 Gateway Oaks Dr #200, Sacramento, CA 95833 |
| Easter Seals | 1570 17th St, Santa Ana 92705 |
| David Joseph Ponce | 28401 Los Alisos Blvd #6209 Mission Viejo CA 92692 |
| Lamour Ellis Ponce Sr. | 8504 E. Wood Cove Dr. Apt. 128, Anaheim 92808 |
| Joseph Ponce Jr. | 8504 E. Wood Cove Dr. Apt. 128, Anaheim 92808 |
| Lamour Kim Ponce Jr. | 8504 E. Wood Cove Dr. Apt. 128, Anaheim 92808 |
| Stephen Dolphin Sr. | 8504 E. Wood Cove Dr. Apt 128 Anaheim CA 92808 |
| Michele Dolphin | 8504 E. Wood Cove Dr Apt 128 Anaheim CA 92808 |
| Attorney Milton C. Grimes | 3774 W. 54th St, Los Angeles CA 90043 |
| Tulare County Probate Court | 221 S. Mooney Blvd Visalia CA 93291 |

Form Approved for Optional Use
Judicial Council of California
POS-040(P) (Rev. February 1, 2017)

**ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)**
(Proof of Service)

Page 2 of 3

www.courts.ca.gov

For your protection and privacy, please press the Clear
This Form button after you have printed the form.

 
Save this form

POS-040(P)

| SHORT TITLE: Kenneth K. Henderson et al., v Exxon-Mobil et al., | CASE NUMBER: |
|---|---|

# ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)

*(This attachment is for use with form POS-040.)*

### NAMES, ADDRESSES, AND OTHER APPLICABLE INFORMATION ABOUT PERSONS SERVED:

| Name of Person Served (If the person served is an attorney, the party or parties represented should also be stated.) | Where Served (Provide business or residential address where service was made by personal service, mail, overnight delivery, or messenger service. For service by fax, provide fax number.) |
|---|---|
| Christine Holmes | 1451 Rimpau Avenue, Suite 215 |
| Orange County Medi-Cal Services | 3320 E La Palma Ave, Anaheim, CA 92806 |
| Adams Silva & McNALLY LLP | 2888 Loker Ave. East, Suite 303 Carlsbad, CA 92010 |
| (OAH) Office of Administrative Hearings | 2349 Gateway Oaks Drive, Suite 200 Sacramento, CA 95833 |
| Union Bank (MUFG) | 400 California Street San Francisco California |
| Wells Fargo Bank | 1111 W 6th St, Corona, CA 92882 |
| Alvin Watkins | 31116 Mountain View st Visalia CA 93292 |
| Attorney: Karen A. Anderson | 400 Oceangate, Long Beach, CA |
| Afagh (Kathryn) Khorashad | 22 Odyssey, Irvine CA 92618 |
| Aaminah Watkins | 8504 E, Wood Cove Dr Apt 128 Anaheim CA 92808 |
| Anadarko Petroleum | 1201 Lake Robbins Dr. Woodlands, Tx 77380 |
| | |
| | |

Form Approved for Optional Use
Judicial Council of California
POS-040(P) [Rev. February 1, 2017]

**ATTACHMENT TO PROOF OF SERVICE—CIVIL (PERSONS SERVED)**
**(Proof of Service)**

Page __3__ of __3__
www.courts.ca.gov

For your protection and privacy, please press the Clear This Form button after you have printed the form.

